UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/10/2021
```

-----------------------------------------------------------------------X
                                        :

KEAWSRI, et al.,                          :

                       Plaintiffs,          :

                                            :             17-cv-2406 (LJL)

          -v-                          :

                                          :        OPINION AND ORDER

RAMEN-YA INC., et al.,                 :

                                          :

                       Defendants.       :

                                          :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

       This matter is before the Court on cross-motions for summary judgment and on

Plaintiffs' motion for an order conditionally certifying a collective action.  Plaintiffs Ornrat

Keawsri, Sachina Nagae, Takayuki Sekiya, Siwapon Topon, Pimparat Ketchatrot, Thiratham

Raksuk, Parichat Kongtuk, Tanon Leechot, Thanatharn Kulaptip, Wanwisa Nakwirot, Natcha

Natatpisit, and Parada Mongkolkajit ("Plaintiffs") move for summary judgment, pursuant to

Federal Rule of Civil Procedure 56, and for an order certifying this case as a collective action,

pursuant to 29 U.S.C. § 206.  Dkt. No. 388.

       Defendants Ramen-Ya Inc. ("RYI"), Miho Maki ("Maki"), Mr. Masahiko Negita ("Mr.

Negita") and Mrs. Yasuka Negita ("Mrs. Negita") (collectively, the "RYI Defendants") move for

partial summary judgment dismissing the federal claims under the Fair Labor Standards Act

against them on the grounds that Plaintiffs have presented no facts to support that RYI engaged

in interstate commerce and dismissing the claims against Mr. and Mrs. Negita on an individual

basis on the theory that they did not perform functions that would qualify them to be

"employers" under FLSA.  They ask the Court to decline to exercise supplemental jurisdiction

over the state-law claims.  Dkt. No. 387.

For the following reasons, Defendants' motion for summary judgment is denied; Plaintiffs' motion for an order certifying this case as a collective action is granted; and Plaintiffs' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

Plaintiffs' allegations have been described in previous orders and opinions by Judges Caproni and Wang.  *See* Dkt. Nos. 130, 367.  Plaintiffs are former employees of RYI and Y&S International Corp. d/b/a Ramen-Ya ("Y&S"), which have operated and continue to operate as a single or joint employer under the trade name Ramen-Ya.  Defendants Kobayashi and Kora are purportedly the owners and managers of Y&S.  Defendant Maki is purportedly responsible for the management and operation of Ramen-Ya.  Mr. and Mrs. Negita are allegedly owners and managers of RYI.

Plaintiffs allege various violations of federal and state labor laws, including failure to pay minimum wages, failure to provide pay-rate notices, failure to establish tip sharing and pooling arrangements, failure to maintain accurate and complete records, failure to provide complete and accurate wage statements, and failure to pay overtime and spread-of-hours compensation. Plaintiffs allege that they were paid solely from tips which were not provided to them exclusively but only after Defendants deducted more than 20% to pay for expenses of the restaurants.  Plaintiffs further allege that their employers sought to conceal the compensation arrangement by providing four of the named Plaintiffs falsified payroll checks for a portion of the tip earnings described above, with the remainder of the tip earnings being paid in cash. Plaintiffs also allege that they sometimes worked in excess of forty hours per week without receiving overtime pay, and that on some days they worked more than ten hours without receiving spread-of-hours compensation as required by New York Labor Law.

RYI is a corporation organized under the laws of New York with its principal place of business at 133 West 3rd Street in Manhattan.  Dkt. No. 388 ¶ 1.  Y&S is a corporation organized under the laws of the State of New York with its principal place of business at 181 West 4th Street in Manhattan.  Dkt. No. 388 ¶ 2.

## PROCEDURAL HISTORY

Plaintiffs Keawsri, Nagae, Sekiya, and Topon instituted this action by complaint filed on April 3, 2017.  Dkt. No. 1.  On September 1, 2017, Plaintiffs filed their first amended complaint.  Dkt. No. 34.  On January 2, 2018, the Court entered an order denying Defendants' motion to dismiss the First Amended Complaint and conditionally certifying the case as a collective action pursuant to 29 U.S.C. § 216.  Dkt. No. 130.  On September 27, 2018, Plaintiffs filed their second amended complaint.  On August 12, 2020, after being given leave to do so, Plaintiffs filed their Third Amended Complaint adding Mrs. Negita as a defendant.  Dkt. No. 371.

## LEGAL STANDARD

### I.  Federal Rule of Civil Procedure 56

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).

In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "there is no

genuine dispute as to any material fact," Fed. R. Civ. P. 56(a).  If the movant meets its burden,

"the nonmoving party must come forward with admissible evidence sufficient to raise a genuine

issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536

F.3d 140, 145 (2d Cir. 2008).  It may not rely on "mere speculation or conjecture as to the true

nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), or "on

the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits

supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir.

1996) (internal citation omitted).  Rather, to survive a summary judgment motion, the opposing

party must establish a genuine issue of fact by "citing to particular parts of materials in the

record," Fed. R. Civ. P. 56(c)(1)(A), and demonstrating more than "some metaphysical doubt as

to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  If "the party opposing

summary judgment propounds a reasonable conflicting interpretation of a material disputed

fact," summary judgment shall be denied.  *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9-10 (2d

Cir. 1983).  Where each party moves for summary judgment, "each party's motion must be

examined on its own merits, and in each case all reasonable inferences must be drawn against the

party whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121

(2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

## II.     Local Rule 56.1

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how

the facts relied upon by the moving party and disputed by the opposing party are to be presented.

Any party moving for summary judgment must annex to its notice of motion "a separate, short

and concise statement, in numbered paragraphs, of the material facts as to which the moving

party contends there is no genuine issue to be tried."  L. R. 56.1(a).  Local Rule 56.1(b), in turn,

4

requires the party opposing the motion to "include a correspondingly numbered paragraph

responding to each numbered paragraph in the statement of the moving party, and if necessary,

additional paragraphs containing a separate, short and concise statement of additional material

facts as to which it is contended that there exists a genuine issue to be tried."  L. R. 56.1(b).  All

statements in a Local Rule 56.1 submission "must be followed by citation to evidence which

would be admissible." L. R. 56.1(d). "Each numbered paragraph in the statement of material

facts set forth in the statement required to be served by the moving party will be deemed to be

admitted for purposes of the motion unless specifically controverted by a correspondingly

numbered paragraph in the statement required to be served by the opposing party." L. R.

56.1(c).

A Local Rule 56.1 statement, however, "is not itself a vehicle for making factual

assertions that are otherwise unsupported in the record." *Giannullo v. City of New York*, 322

F.3d 139, 140 (2d Cir. 2003) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir.

2001)); *see also Weider Health and Fitness v. AusTex Oil Ltd.*, 2018 WL 8579820, at *2

(S.D.N.Y. Dec. 19, 2018) (same); *Rodriguez v. Schneider*, 1999 WL 459813, at *1 n.3 (S.D.N.Y.

June 29, 1999) ("Rule 56.1 statements are not argument. They should contain factual assertions,

with citation to the record. They should not contain conclusions.") (emphasis omitted), *aff'd*, 56

F. App'x 27 (2d Cir. 2003).  "Where . . . the record does not support the assertions in a Local

Rule 56.1 statement, those assertions should be disregarded and the record reviewed

independently." *Holtz*, 258 F.3d at 74.  A party who declines to respond to a Rule 56.1 statement

in the proper form eschews its right to have the Court search the record to determine whether the

allegedly undisputed fact is in fact disputed.  *Id.* at 73 ("[A] court 'is not required to consider

what the parties fail to point out' in their Local Rule 56.1 statements.") (quoting *Monahan v.*

*New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000)); *see also Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("If the opposing party then fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule.") (quoting *Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 507 (S.D.N.Y. 2014)).  A court has broad discretion to overlook a failure to comply with Local Rule 56.1 and may choose instead to conduct its own "assiduous review of the record."  *Holtz*, 258 F.3d at 73. For example, that authority can and has been exercised on behalf of *pro se* litigants.  *See, e.g.*, *Guan v. City of New York*, 2020 WL 6688855, at *2 (S.D.N.Y. Sept. 18, 2020) ("While *pro se* litigants are not excused from meeting the requirements of Local Rule 56.1, the court has broad discretion to overlook a party's failure to comply with local court rules, and may exercise that discretion, on behalf of a *pro se* party, to go beyond the evidence cited in the Rule 56.1 statements and "conduct an assiduous review of the record.") (internal quotation marks and citations omitted).  "[T]he court can also disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement."  *Weider Health*, 2018 WL 8579820, at *2.

Both the RYI Defendants and the Y&S Defendants have violated Rule 56.1.  The RYI Defendants have filed what purports to be a response to Plaintiffs' Rule 56.1 statement, but all that it does is single out a few paragraphs in Plaintiffs' statement with which it disagrees and notes the disagreement without citing contrary evidence.  Dkt. No. 408.  The Y&S Defendants have not done even that.  They have submitted an attorney affidavit that states that there are genuine issues of fact without citing any evidence in the record that creates a genuine issue of fact.  Dkt. No. 404.  Neither set of defendants have offered a reason for the Court to overlook its default.  Each is represented by counsel who is presumed to be aware of the Rules.  Plaintiffs have complied with their obligations and prepared statements both in favor and in opposition to

summary judgment that are in conformance with Local Rule 56.1.  There is no reason for the

Court to exercise solicitude for one side of this dispute by disregarding its choice not to follow

the Rules when the other side has done so, particularly where—as here—to conduct the its own

review would require the Court to review the lengthy record compiled in discovery.

Accordingly, the Court will review Plaintiffs' Rule 56.1 statement to determine as to each

paragraph whether it states a matter of fact or expresses a conclusion or opinion.  Where the 56.1

statement purports to state a matter of fact, the Court will review the evidence cited to determine

whether it supports the proposition for which it is cited.  Where it does so, the Court will treat the

matter of fact as not in genuine dispute and will not independently search the record to create a

factual question for Defendants that they have not identified for the Court through filing a proper

Rule 56.1 statement.  "[T]he Court has only relied upon uncontroverted paragraphs of

[Plaintiffs'] Rule 56.1 Statement where the record evidence duly supports [Plaintiffs']

contentions." *Baity*, 51 F. Supp. 3d at 421.

### III.    Federal Rule of Civil Procedure 36(a)(3)

Federal Rule of Civil Procedure Rule 36(a)(3) provides: "A matter is admitted unless,

within 30 days after being served, the party to whom the request is directed serves on the

requesting party a written answer or objection addressed to the matter and signed by the party or

its attorney."  Fed. R. Civ. P. 36(a)(3). "A matter admitted under this rule is conclusively

established unless the court, on motion, permits the admission to be withdrawn or amended."

Fed. R. Civ. P. 36(b).  Moreover, "[f]or the purposes of summary judgment, matters admitted

under rule 36(a) of the Federal Rules of Civil Procedure may be used for summary judgment

under rule 56."  *Virga v. Big Apple Constr. & Restoration Inc.*, 590 F. Supp. 2d 467, 471

(S.D.N.Y. 2008).  The Court has "some discretion in Rule 36(b) to make exceptions in

appropriate circumstances," to relieve the responding party of the consequences of its

non-response, as for example, where there is no prejudice to the requesting party. *Lopez v. MNAF Pizzeria, Inc.*, 2021 WL 1164336, at *2 n.1 (S.D.N.Y. Mar. 25, 2021) (quoting *Healthfirst, Inc. v. Medco Health Sols., Inc.*, 2006 WL 3711567, at *4 (S.D.N.Y. Dec. 15, 2006)); *Local Union No. 38 v. Tripodi*, 913 F. Supp. 290, 294 (S.D.N.Y. 1996).

## DISCUSSION

### I.    The Requests for Admission

Plaintiffs served Requests for Admission ("RFAs") on the Y&S Defendants on March 13, 2020.  Dkt. No. 399 ("Haber Decl.") ¶¶ 8, 10, Exs. 1, 3.  Counsel for the Y&S Defendants—Y&S, Kora, and Kobayashi—answered certain of the RFAs relating to authentication of certain documents on July 13, 2019.  Dkt. No. 399-4.  The Y&S Defendants provided no other response to the RFAs.  Those matters thus are deemed admitted by the Y&S Defendants.  They have made no motion under Rule 36(b) for amendment or withdrawal, nor have they offered any "meaningful explanation either for [their] tardiness or for [their] failure to seek more time from the court to meet [their] obligations under Rule 36." *S.E.C. v. Thrasher*, 1996 WL 460148, at *1 (S.D.N.Y. Aug. 13, 1996).  Counsel for Y&S Defendants simply states that he prepared a response to the RFAs which was "not sent in error until January 29, 2021 because it was in a draft folder." Dkt. No. 404 ¶ 16.  This response is patently false and in any event insufficient.  The Y&S Defendants did serve a response, just not to the requests which are now dispositive of its liability.  It did not serve those responses until after Plaintiffs had moved for summary judgment. To admit the response now after discovery is completed would cause Plaintiffs prejudice.  Accordingly, the Court will deem the RFAs to which the Y&S Defendants did not respond to be admitted conclusively by the Y&S Defendants. *See Gibson v. SCE Grp., Inc.*, 391 F. Supp. 3d 228, 250 (S.D.N.Y. 2019) (deeming facts conclusively established where

responding party neither timely responded to requests for admission nor made a motion for the admission to be withdrawn or amended).

## II.   Defendants' Motion for Summary Judgment

RYI moves for summary judgment on the grounds that it is not covered by FLSA.  In addition, Mr. and Mrs. Negita each argue that they cannot be considered employers under FLSA. Plaintiffs cross-move for summary judgment on both issues.  Defendants' motions for summary judgment are denied.  Plaintiffs' motion is granted.

### A.   Enterprise Coverage

FLSA requires that employers pay a premium or overtime wage of "not less than one and one-half times the regular rate" for hours worked in excess of forty hours in a single workweek if an employee either: 1) "is engaged in commerce or in the production of goods for commerce," or 2) "is employed in an enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 207(a)(1).  Thus, "[e]ngagement in interstate commerce, either by an employee or by the employer as a whole, is a prerequisite for liability for the FLSA's overtime requirement."  *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 353 (E.D.N.Y. 2015).  "The two categories are commonly referred to as 'individual' and 'enterprise' coverage, respectively." *Jacobs v. New York Foundling Hosp.*, 577 F.3d 93, 96 (2d Cir. 2009).  An enterprise is "engaged in commerce" when it "(i) has employees engaged in commerce or in the production of goods for commerce, or . . . has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000."  29 U.S.C. § 203(s)(1)(A).  "The word 'commerce' in this provision refers to 'interstate commerce.'" *Vasquez v. NS Luxury Limousine Service, Ltd.*, 2021 WL 1226567, at *9 (S.D.N.Y. Mar. 31, 2021) (quoting *Archie v. Grand Cent. Partnership, Inc.*, 997 F. Supp. 504, 528 (S.D.N.Y. 1998));

*see also* 29 U.S.C. § 203(b)).  FLSA defines an "enterprise," *inter alia*, as "the related activities performed . . . by any person or persons for a common business purpose . . . [excluding] the related activities performed for such an enterprise by an independent contractor."  29 U.S.C. § 203(r)(1); *see also Jacobs*, 577 F.3d at 97.

Plaintiffs rely on the "enterprise" theory of FLSA coverage.  The requirement that the enterprise be "engaged in commerce" is "rarely difficult to establish."  *Jacobs*, 577 F.3d at 99 n.7.  It can be met "by showing that two or more employees have 'handl[ed] . . . materials that have been moved in . . . commerce,'" even without any demonstration that the enterprise sells its goods or services in interstate commerce.  *Id.* (quoting 29 U.S.C. § 203(s)(1)(A)(i)) (citing *Wirtz v. Melos Constr. Corp.*, 408 F.2d 626, 628 (2d Cir. 1969) for the proposition that "'handling' includes dealing in goods consumed locally in the employer's business" and *Archie v. Grand Cent. P'ship*, 997 F. Supp. 504, 530 (S.D.N.Y.1998) to demonstrate "the ease with which the second step is satisfied under § 203(s), "lead[ing] to the result that virtually every enterprise in the nation . . . is covered by the FLSA").  "Enterprise coverage has been interpreted broadly by the courts."  *Ethelberth*, 91 F. Supp. 3d at 355 (quoting *Boekemeier v. Fourth Universalist Society*, 86 F. Supp. 2d 280, 285 (S.D.N.Y. 2000)).

Defendants do not dispute the $500,000 in annual sales or business element.  They argue instead that Plaintiffs have not established the "engaged in commerce" element because "RYI and YS are two small restaurants that make and offer ramen noodles to their customers in Greenwich Village" and "plaintiffs have been [un]able to establish that RYI and YS provided food to customers beyond Greenwich Village or [that] any of the items they provided moved or was produced in interstate commerce."  Dkt. No. 387 at 6, 14; *see also* Dkt. No. 404 at ¶ 10 ("Serving food to people in the neighborhood is not considered interstate commerce, as

everything is within the same store, and the good is not used in another state.").  However,

FLSA's protection does not extend just to those who sell their wares in commerce but also to

those who, in the preparation of those wares, "handle . . . materials that have been moved in . . .

commerce." 29 U.S.C. § 203(s)(1)); *see also, e.g.*, *Lopez*, 2021 WL 1164336, at *5 ("It is

inconceivable that a restaurant with over $500,000 in annual sales did not use materials

originating from out of state."); *Gao v. Kerry Nails Salon Corporation*, 2021 WL 673460, at *3

(S.D.N.Y. Feb. 22, 2021) ("The Court concludes that the nail salon's employees handle and work

with products—such as nail polish and nail polish remover—that have traveled in interstate

commerce."); *Shu Lan Chen v. Gypsophila Nail & Spa Inc.*, 2015 WL 3473510, at *4 (S.D.N.Y.

June 2, 2015) ("The complaint alleges that Plaintiff was employed as a 'nail technician and

beautician' who 'was responsible for performing manicures and pedicures, hair removal

procedures, and massages for customers.'  She also performed 'cleaning duties,' including

'sweeping, garbage removal, and other cleaning tasks.'  The [c]ourt concludes that 'it is logical

to infer' from Plaintiff's allegations concerning the business that Defendants 'ha[ve] employees

who handle goods or materials that have moved in interstate commerce.'") (internal citations

omitted); *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 33 (E.D.N.Y. 2015);

*Huerta v. Victoria Bakery*, 2012 WL 1107655, at *2 (E.D.N.Y. Mar. 30, 2012).  Were it

otherwise, there would be numerous businesses—both large and small—who would be exempted

from the coverage of FLSA's overtime provisions, contrary to Congress's intent.

In resisting summary judgment, Plaintiffs do not rely on the mere allegations of the

complaint itself or on an inference that a restaurant which generates thousands of dollars in sales

must purchase some of the food it sells and handles in interstate commerce.  There is deposition

testimony, which is not controverted, that the two restaurants which are located in New York

purchase their restaurant supplies primarily at two suppliers located in New Jersey.  Dkt. Nos.

409 ¶ 12; 409-4 at 181-183; 232-233.  No more is required.[1]

### B.    Employer

Mr. and Mrs. Negita also each argue that the undisputed facts demonstrate that they are

not employers who can be held individually liable under FLSA.

FLSA defines "employer" as "any person acting directly or indirectly in the interest of an

employer in relation to an employee."  29 U.S.C. § 203(d).  "The Second Circuit treats the term

'employer' pursuant to the FLSA as a 'flexible concept to be determined on a case-by-case basis

by review of the totality of the circumstances.'"  *Lopez*, 2021 WL 1164336, at *4 (quoting

*Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008)).  "Courts

utilize the 'economic reality' test to determine whether a particular individual is an employer."

*Id.*  This four-factor test considers "whether the alleged employer (1) had the power to hire and

fire the employees, (2) supervised and controlled employee work schedules or conditions of

employment, (3) determined the rate and method of payment, and (4) maintained employment

records."  *Id.* (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999), *holding

modified by Zheng v. Liberty Apparel Co.*, 355 F.3d 61 (2d Cir. 2003)).

---

[1] The RYI Defendants rely on *Ethelberth*, but it is not to the contrary.  In *Ethelberth*, there were genuinely disputed questions of fact whether the security firm at issue handled good or materials that had been moved in or produced for commerce.  91 F. Supp. 3d at 355-56.  No such fact issues exist here.  In *Xelo v. Mavros*, 2005 WL 2385724, at *3-4 (E.D.N.Y. Sept. 28, 2005) and *Russell v. Continental Restaurant, Inc.*, 430 F. Supp.2d 521, 526-27 (D. Md. 2006), upon which Defendants also rely, Plaintiff failed to offer evidence that defendants had annual gross volume of sales or business done of $500,000 or more.  *Martinez v. Palace*, 414 F. App'x 243, 244 (11th Cir. Feb. 11, 2011), involved individual coverage and not enterprise coverage.  The district court decision in *Lamonica v. Safe Hurricane Shutters, Inc.*, 578 F.Supp.2d 1363, 1366 (S.D. Fla. 2008), upon which defendants also rely, was vacated on appeal by the 11th Circuit.  *See* 616 F.3d 1217 (11th Cir. 2010).

Defendants argue that Mr. and Mrs. Negita cannot be employers because Miho Maki was the manager of the two restaurants and was the most direct manager of the Plaintiffs.  A person who exercises operational control over a business, including with respect to the conditions of employment, however, cannot insulate himself from liability by inserting a manager into his relationship with an employee.  "[N]either the FLSA nor NYLL limit personal liability to a single individual employer." *De Quan Lu v. Red Koi, Inc.*, 2020 WL 7711410, at *7 (S.D.N.Y. Dec. 29, 2020).  "For purposes of the FLSA and NYLL, '[a]n individual may simultaneously have multiple 'employers' . . . in which case, 'all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the [FLSA and NYLL].'" *Fallon v. 18 Greenwich Avenue, LLC*, 2021 WL 1105066, at *3 (S.D.N.Y. Mar. 23, 2021) (quoting *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 421 (S.D.N.Y. 2017)).

Defendants further argue that Mr. and Mrs. Negita cannot be employers because they did not have a "daily role in the operations of the RYI and YS restaurants."  Dkt. No. 387 at 15. They argue that the depositions of the Plaintiffs themselves demonstrate that it was Maki who made the decisions to hire each of them, who set the schedules for their work, and who ran day to day operations, Dkt. No. 387 at 17, and that, in particular, the Plaintiffs rarely saw Mrs. Negita at the restaurant, *id.*; *see also* Dkt No. 385, Exs. 4-11.

A person need not "be responsible for managing plaintiff employees—or, indeed, . . . have directly come into contact with the plaintiffs, their workplaces, or their schedules," to be an employer under FLSA.  *Irizarry v. Catsimatidis*, 722 F.3d 99, 110 (2d Cir. 2013); *see also Henao v. Parts Authority, LLC*, 2021 WL 2784528, at *6 (S.D.N.Y. July 2, 2021) ("The law does not require that an individual directly interact with employees to be considered their employer under FLSA."); *De Quan Lu v. Red Koi, Inc.*, 2020 WL 7711410, at *6 (S.D.N.Y. Dec.

29, 2020) (same).  Nor need he or she "have been personally complicit in FLSA violations; the broad remedial purposes behind the statute counsel against such a requirement.  The statute provides an empty guarantee absent a financial incentive for individuals with control, even in the form of delegated authority, to comply with the law."  *Catsimatidis*, 722 F.3d at 110.

The evidence supports the conclusion that both Mr. and Mrs. Negita were employers within the meaning of FLSA.  The Court discusses below whether it compels that conclusion. As to Mrs. Negita, there is evidence that she was an actual or beneficial owner of RYI from April 3, 2014 to June 2019, when—in the wake of this lawsuit—she transferred her shares to Maki with no consideration.  Haber Decl. ¶ 30; Dkt. Nos. 399-11 ("Negita Dep.") at 16-18; 399-12, at 41-42; 399-20.[2]  She also was an officer of RYT as president of the entity continuously during the period April 3, 2014 to June 2019. Dkt. Nos. 399-12 at 34-35, 242-243; 399-20; 398 ¶¶ 7-9. Those facts alone do not make her an employer.  "Evidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status."  *Catsimatidis*, 722 F.3d at 109.

The evidence, however, also would permit a jury to find that Mrs. Negita possessed control over RYI and Y&S "in a manner that relate[d] to plaintif[fs'] employment" or, put otherwise, had "individual involvement in [the restaurants] in a manner that affect[ed] employment-related factors such as workplace conditions and operations, personnel, or compensation."  *Catsimatidis*, 722 F.3d at 109.  She also received substantial compensation from RYI and Y&S consistent with her occupying a management role.  During the four fiscal years

---

[2] Mrs. Negita testified that she did not know who owned the shares of RYI and that she did not know whether she had in her possession any documents that evidenced the sale her shares.  Dkt. No. 399-12 at 161-162.

from October 1, 2014 through September 30, 2018, the New York State Quarterly Combined Withholding, Wage Reporting, and Unemployment Insurance Tax Returns filed by RYI showed that RYI reported to the New York State Department of Taxation and Finance salary paid by RYI to Mrs. Negita of $196,400.00: $21,400 in FY 2014, $37,000 in FYI 2015, $52,000 in FY 2016, and $86,000 in FY 2017.  Dkt. Nos. 409 ¶ 21; 399-18.  The federal income tax filings by RYI show the same amounts as salary paid by RYI to Yasuko in each of the four fiscal years, except that the 2016 return states that Yasuko received $33,600.00 in salary, rather than $52,000.00 as reported to the State of New York.  Dkt. No. 409-1.  In addition, these returns show that RYI paid to Yasuko officership compensation totaling $178,000: $21,400 in FY 2014; $37,000 in FY 2015; $33,600 in FY 2015; and $86,000 in FY 2017—Yasuko's compensation from RYI during this period was $374,500.  Dkt. No. 409 ¶ 22.

Although Mrs. Negita claims that the monies paid to her were repayment of a loan, RYI's federal income tax returns do not reflect outstanding loans from shareholders in anything like the amount that Mrs. Negita was paid, Dkt. No. 409 ¶ 20, nor do its internal records, Dkt. No. 409 ¶¶ 24-28.  In fact, the balance sheet for September 30, 2017 reflects a loan from a shareholder in a negative amount of -$16,228.33 reflecting that during September 30, 2017 RYI repaid to Mrs. Negita the outstanding loan amount and loaned her an additional $16,228.33 in addition to the compensation paid to her.  Dkt. No. 409 ¶¶ 28-29.  The RYI Defendants did not produce during discovery, nor proffer in support of the motion for partial summary judgment or in support of the averments in the Jung Declaration, any documents demonstrating that Yasuko made any loan to RYI, the amount of any such supposed loans, the dates any such loans was made, the repayment terms or schedule for any such loans, or receipts or other documentation that RYI made a loan repayment to Yasuko at any time in any amount.  Dkt. No. 409 ¶ 30.

There also is testimony, from two percipient witnesses, that Mrs. Negita exercised managerial functions.  In particular, according to the testimony of Miho Maki—who was manager of both restaurants—Mrs. Negita would visit the restaurants on at least a weekly basis to collect the cash receipts and to inquire as to the situation at the restaurants.  Dkt. No. 399-10 at 23.  She thus "stayed apprised" of how the restaurants were doing and "exercised influence" on the restaurants "on multiple occasions."  *Catsimatidis*, 722 F.3d at 112-13.

The evidence also demonstrates that Mrs. Negita not only had this power but has exercised it with respect to the hiring and firing of employees and with respect to work schedules.  Maki would not only report on "the status of the restaurant, the situation of the restaurant to her," and receive instruction from her," Dkt. No. 399-15 at 24, but also would "report to [Mrs. Negita] with regard to the fact that employees came late at the work, or the trouble they had with customers."  *Id.* at 25.  Maki was required to consult with Mrs. Negita about hiring and took instruction from her with respect to how to respond to questions from employees about the minimum wage.  *Id*. at 26-27.  Mr. Negita testified that Mrs. Negita "has been working at the restaurant for about 20 years," that "she would visit them both, Ramen-Ya and also West 4th Street restaurant, at least twice or three times a week," and that she would ask Maki what was happening at the restaurants and "give her advice" and that while she was working it was Mrs. Negita who would give Miko advice regarding HR issues.  Negita Dep. at 19.

Even by her account, Mrs. Negita would visit restaurant one or twice a week and talk to Maki about "things like decorating, changing seasonal items on the wall or fixing the scene."  Dkt. No. 409-4 at 175-176.  She also picked up food twenty times over a four-year period and used her own money to fund certain expenses.  *Id.* at 178.  Mrs. Negita also shopped for RYI and

Y&S once or twice a week from shopping lists that did not distinguish between the two

restaurants, *id.* at 229-30, 223, and did sewing and repair work for Y&S, *id.* at 223.

The evidence also supports the conclusion that Mr. Negita is an employer.  On October 1,

2013, Y&S entered into a management agreement with Negita (the "Management Agreement")

pursuant to which Negita assumed responsibility for management of the 4th Street Restaurant,

which agreement was revised and renewed in 2015 and 2017.  Haber Decl. ¶ 37; Negita Dep.;

Dkt. No. 388 ¶ 12.  The management agreement stated that Mr. Negita would the "leading

person" in bringing the restaurant concept to life.  Dkt. No. 399-16 at 17.  He would be

responsible for making repairs and keeping "sales and tax related records."  *Id.* at 19. Mr. Negita

admitted that he has been continually managing both RYI and the Y&S restaurant, and that Maki

was his subordinate working under him, and that he told her that she should make the schedule

for servers to work in both restaurants.  Negita Dep. at 99-100, 143-44, 150.  In particular, Mr.

Negita explained that when employees started to make demands to set their own schedules and to

choose which restaurant they wanted to work at, it was he who delegated to Maki the

responsibility to create a scheme and discussed it with her many times and she followed his

instruction.  *Id.* at 151-53.  After Mrs. Negita expressed a desire that she wanted to quit, he

assumed the responsibility of giving instructions to Maki regarding human resources issues.  *Id.*

at 196-97.  Although shares were held in Mrs. Negita's name, it was Mr. Negita who made the

decision to put out a ramen noodle shop and was involved in the formation of the company, and

it was he who spoke to the accountant and the lawyer and negotiated the lease with the landlord.

*Id.* at 18-20.  He was the only person involved in the formation of RYI.  *Id*. at 19.  Moreover, as

he lived with Mrs. Negita, Mr. Negita could be considered the beneficial owner of RYI from

April 3, 2014 to June 2019.

### III.    Plaintiffs' Motion for Summary Judgment

Plaintiffs cross-move for summary judgment.  Plaintiffs first request the court certify the collective group because the original plaintiffs and opt-in plaintiffs are similarly situated.  They next claim that there is no dispute of material fact that (1) RYI and Y&S operate as a single integrated enterprise for purposes of FLSA and NYLL; (2) Maki, Mr. Negita, Mrs. Negita, Kobayashi, and Kora are employers under FLSA and NYLL; and (3) that Defendants failed to pay Plaintiffs wages from the restaurants revenues, to distribute to Plaintiffs all tips left for them by customers, to pay overtime compensation and spread of hours payments, and to issue complete and accurate pay statement.  They also claim that they should receive liquidated damages and reasonable attorney fees and costs.

### A.  Conditional Certification

FLSA gives employees a "right" to join an action filed by another employee as long as they are "similarly situated" to the named employees.  *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 516 (2d Cir. 2020).  The Second Circuit has "endorsed a two-step process for certifying FLSA collective actions based on the 'similarly situated' requirement."  *Id.* at 515

> At step one, the district court permits a notice to be sent to potential opt-in plaintiffs if the named plaintiffs make a modest factual showing that they and others together were victims of a common policy or plan that violated the law.  At step two, with the benefit of additional factual development, the district court determines whether the opt-in plaintiffs are in fact similarly situated to the named plaintiffs.

*Id.* (quoting *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016)).

"Congress's goal in granting employees the right to proceed as a collective was to provide them 'the advantage of lower individual costs to vindicate rights by the pooling of resources.'"  *Scott*, 954 F.3d at 515-16 (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).

When this lawsuit was commenced, there were five named Plaintiffs who were servers employed at the 3rd Street Restaurant or the 4th Street Restaurant at various times from 2014 to 2016—Keawari, Nagai, Sekiya, Topon and Ketchatrot.  Dkt. No. 389 ¶ 26.  The Court granted their motion for conditional certification and authorized the issuance of notice.  Seven additional servers opted in—Raksuk, Kontuk, Leechot, Kulaptip, Nakwirot, Natatpisit, and Mongkolakahit—each of whom was employed by Defendants at various times between 2016 and March 2018.  Dkt. No. 389 ¶ 40.  The question at step two is whether the "named plaintiffs and opt-in plaintiffs are alike with regard to some material aspect of their litigation," meaning that they "share one or more issues of law or fact that are material to the disposition of their FLSA claims."  *Scott*, 954 F.3d at 516.

Plaintiffs argue that they have satisfied that standard.  Each of the Plaintiffs was employed as a server at the 3rd Street and the 4th Street restaurant during the period of their respective employments and performed the same work.  Dkt. No. 414, ("Haber Reply Decl.") ¶¶ 20-21.  They were all managed most immediately by Maki, *see e.g.,* Dkt. Nos. 399-46 ¶ 9, 399-47 ¶¶ 7–8, and were subject to common employee guidelines and procedures including wage policies, Haber Reply Decl. ¶¶ 22, 24-25.  They were also subject to the same policies with respect to tips.  For each Plaintiff, Defendants maintained a separate spreadsheet recording the number of hours worked at the 3rd Street Restaurant and the 4th Street Restaurant on each shift on each day and the amount of tips credited to the server on that shift, and for all of these servers the amount of the tips credited for that day that were paid by check and in cash.  Dkt No. 399 ¶ 50.

Defendants respond that there are dissimilarities among the Plaintiffs: (a) some worked at unrelated locations while employed by the RYI Defendants; and (b) some relocated out of the

country after their period of employment ended.  Dkt No. 408 ¶¶ 3, 7.  They also argue that Plaintiffs failed to produce documents regarding the hours they worked, failed to provide their social security numbers, and switched shifts and reimbursed one another without Defendants' knowledge.  *Id.* ¶¶ 6, 9-12.  They argue that RYI did not require any of its employees to wear uniforms.  *Id.* ¶ 6.

The evidence establishes that the Plaintiffs are all similarly situated.  They are united by a common question of law: whether Defendants' policies, procedures, and practices violated FLSA.  Defendants' response harks back to the "ad hoc" approach rejected in *Scott*, identifying "disparate factual and employment settings of individual plaintiffs."  954 F.3d at 517.  The Second Circuit held in *Scott* that such an analysis was not faithful to the congressional intent behind FLSA.  Moreover, many of Defendants' arguments fall of their own weight.  It is not incumbent upon Plaintiffs to keep records of the hours they worked.  Under FLSA and the NYLL, it is the employer's obligation to maintain and preserve complete and accurate time records.  29 U.S.C. § 211(c); 29 C.F.R. § 516.2; NYLL §§ 195, 661; 12 N.Y.C. R.R. § 146-2-1(a).  The Defendants themselves would have been in possession of Plaintiffs' social security numbers.  And, to the extent that Defendants would intend to defend on the grounds that they did not know the hours that the employees worked, that is precisely the type of common factual question for which the FLSA collective action is designed.

### B.    Single Integrated Enterprise

Plaintiffs argue that RYI and Y&S should be considered a single integrated enterprise for purposes of FLSA and the NYLL.

"[D]istrict courts have applied the 'single integrated enterprise' test 'to assess whether a group of distinct but closely affiliated entities should be treated as a single employer for FLSA purposes.'"  *Stewart v. Hudson Hall LLC*, 2020 WL 8732875, at *5 (S.D.N.Y. Oct. 19, 2020)

(quoting *Juarez v. 449 Rest., Inc.*, 29 F. Supp.3d 363, 367 (S.D.N.Y. 2014)).  "[M]ultiple corporate entitles can be liable as the 'employer' under 'a joint employer theory based on the theory that they operate as a single enterprise with a significant interrelation of operations.'" *Huer Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580, 586 (S.D.N.Y. 2020) (quoting *Apolinar v. R.J. Rest., LLC*, 2016 WL 2903278, at *4 (S.D.N.Y. May 18, 2016)).  "In determining whether multiple defendants constitute a single employer, courts consider the following factors: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control."  *Perez v. Westchester Foreign Autos, Inc.*, 2013 WL 749497, at *7 (S.D.N.Y. Feb. 28, 2013).  "Where the single-integrated-enterprise theory applies, courts may impose liability for a violation 'not only on the nominal employer but also on another entity comprising part of the [single] integrated employer.'"  *Huer Huang*, 459 F. Supp. 3d at 286 (quoting *Arculeo v. On-Site Sales & Mktg, LLC*, 425 F.3d 193, 198 (2d Cir. 2005)); *see also Perez v. Westchester Foreign Autos, Inc.*, 2013 WL 749497, at *7 (S.D.N.Y. Feb. 28, 2013) ("There is well-established authority under this theory that, in appropriate circumstances, an employee, who is technically employed on the books of one entity, which is deemed to be part of a larger 'single-employer' entity, may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer.") (quoting *Arculeo*, 425 F.3d at 198).

    Defendants argue that RYI and Y&S are separately incorporated and have "separate officers and owners," Dkt. No. 385-12, and that the two "companies operate different restaurants at different locations," Dkt. No. 404 ¶ 5.  Mrs. Negita was the owner and President of RYI.  Kora and Kobayashi were owners of Y&S and officers of Y&S.  However, "in determining whether a

particular defendant is an employer, the court is not bound by the niceties of formal corporate relationships." *Huer Huang*, 459 F. Supp. 3d at 586. The undisputed evidence here establishes that RYI and Y&S are a single integrated enterprise. Kora testified that "all the operation, including accounting, is rendered to Mr. Negita alone." Dkt. No. 399-13 at 24. Kobayashi could not even recall that he was an officer. Dkt No. 399-14 at 61.

The two restaurants were jointly operated under the trade name "Ramen Ya" and represented to the public that they were operated jointly. Haber Decl. ¶ 92 (citing Ex. 3 (RFAs to Y&S), ¶¶ 14-16 (deemed admitted)). The restaurants were advertised on the same website (www.ramenya.com) with the same trade name. Dkt. No. 399-33. Both were open to service for customers at the same times: on Sundays through Thursdays from noon to midnight and on Fridays and Saturdays from noon to 3:00 am. Haber Decl. ¶ 93 (citing Ex. 3 (RFAs to Y&S), ¶ 9 (deemed admitted); Ex. 5, at 80:20-81:21; Ex. 27). Servers who worked at the 3rd Street Restaurant and the 4th Street Restaurant were subject to common employee guidelines and procedures. Haber Decl. ¶¶ 95, 98, 99; (citing Ex. 3); Dkt. No. 388 ¶¶ 64-66. The two corporations shared the same manager, Maki. Dkt No. 388 ¶¶ 17-20. During their respective periods of employment with RYI and with Y&S, weekly work schedules were prepared by and issued by Maki to Plaintiffs, which set forth, on a single schedule, the various shifts to which they were assigned to work at the 3rd Street Restaurant and/or the 4th Street Restaurant, and servers were transferred from one restaurant to the other. Haber Decl. ¶ 96 (citing Ex. 25; Ex. 26). Defendants maintained for each Plaintiff a separate spreadsheet enumerating for that Plaintiff the number of hours worked each day at the 3rd Street Restaurant and/or the 4th Street Restaurant and the tips credited to that Plaintiff for the shift worked. Haber Decl. ¶ 97 (citing Ex. 17); Dkt. No. 388 ¶¶ 67-68.

The companies shared pay practices and jointly announced pay decisions.  Commencing on an unknown date in 2015 and continuing through March 31, 2018, RYI and Y&S established a weekly payroll period of Monday through the following Sunday.  Haber Decl. ¶ 107 (citing Ex. 28; Ex. 29); Dkt No. 388 ¶ 75.  On or about August 17, 2017, Plaintiffs Raksuk, Kongtuk, Leechot, Kulaptip, Nakwirot, Natatpisit, and Mongkolkajit were informed that their hourly wage to be paid by RYI and by Y&S would be increased to $12.00 per hour, that servers would no longer be allowed to receive tips from customers, and that customers would be assessed a fifteen percent administrative charge.  Haber Decl. ¶ 106 (citing Ex. 24); Dkt No. 388 ¶ 73.

Between April 3, 2014 and March 31, 2018, customers at the 3rd Street Restaurant left tips for servers/waitstaff employed by Y&S, which were placed in a tip bowl and were collected by RYI.  Haber Decl. ¶ 126 (citing Ex. 38, ¶ 21; Ex. 39, ¶ 11; Ex. 40, ¶ 12; Ex. 41, ¶ 12; Ex. 42, pp. 20:21-22:6, 24:24-25:18); Dkt No. 388 ¶ 56.

### C.    Employer

Plaintiffs seek summary judgment that Maki, Mrs. Negita, Mr. Negita, Kora, and Kobayashi were each employers under FLSA and NYLL.

#### 1.    Maki

Plaintiffs assert that Maki was a manager of both the 3rd and 4th Street restaurants and that his responsibilities in those capacities included hiring and terminating servers/waitstaff, establishing the wages, compensation terms, and other terms and conditions of employment of servers/waitstaff, and maintenance of employee records.  They also allege that his responsibilities included determining and distributing the work schedules of servers/waitstaff employed by RYI and Y&S and maintaining records of hours of work and tips collected by servers employed by RYI and Y&S.  Dkt. No. 398 ¶¶ 51-55.  In support, they cite the Y&S admissions to the RFAs, but those RFAs were directed to the Y&S Defendants and not to Maki;

they are not binding on Maki. *See* Charles A. Wright & Arthur R. Miller 8B Federal Practice & Procedure Civil § 2264 (3d ed. 2021) ("The admission does not bind the party who requested it . . . Nor do the admissions of a party bind a coparty."); *U.S. v. Wheeler*, 161 F. Supp. 193, 198 (W.D. Ark. 1958) (granting plaintiff's motion for summary judgment against one defendant from whom Rule 36 admissions had been directed and obtained, but not against the other defendant to whom requests for admissions had not been directed). They also cite Maki's admissions that he was employed by and received compensation from RYI, that he served as a manager of the 3rd Street restaurant from April 3, 2014, to March 31, 2018, and that his responsibilities as a manager of the West 3rd Street restaurant included the hiring and termination of servers/waitstaff employed by RYI and determining the wages and compensation terms of servers/waitstaff employed by RYI. Dkt. No. 399-5 ¶¶ 34-37. Moreover, although the RYI Defendants denied it in their responses to the RFAs, the cited evidence also supports the proposition that between April 3, 2014 and March 31, 2018, Maki's responsibilities as a manager of both restaurants included determining and distributing the work schedules of servers/waitstaff employed by RYI and Y&S. *See* Haber Decl. ¶¶ 84, 85 (citing Ex. 5 at 65:10-77:21; Exs. 25, 26). The cited evidence also supports the proposition that between April 3, 2014 and March 31, 2018, Maki's responsibilities as a manager of the 4th Street Restaurant included hiring and terminating servers/waitstaff, establishing the wages, compensation terms, and other terms and conditions of employment of servers/waitstaff, and maintenance of employee records, Dkt. Nos. 399-29, 399-45, and that during the same time his responsibilities as a manager of both restaurants included maintaining records of hours of work and tips collected by servers employed by RYI and Y&S, Dkt. Nos. 399-55 ¶ 14, 399-59. He was an employer.

### 2.      Mr. and Mrs. Negita

The record supports Plaintiffs' assertions in their Rule 56.1 Statement that Mrs. Negita was an actual or beneficial owner of RYI from April 3, 2014 to at least June 2019 and held the position of President of RYI during that time period.  Dkt. No. 399 ¶¶ 8-9.  It also supports that Mr. and Mrs. Negita were married at all times material to this action, having been married for more than 30 years, that Mrs. Negita was employed by and received compensation from RYI from April 3, 2014 to March 31, 2018, and that she was employed by and received compensation from Y&S during that same time period.  Dkt No. 399 ¶¶41-43.[3]  The record further supports that for at least a portion of the time period between April 3, 2014 until March 31, 2018, as a manager of the 3rd Street and 4th Street restaurants, her responsibilities included determining the wages and compensation terms of servers and waitstaff employed by Y&S in consultation with Maki.  Dkt. No. 399 ¶¶ 46-47.  However, it does not require the conclusion that she was at all times an employer.  She denied that there was ever a time when she was actually involved in the management or work of Ramen-Ya and testified that it was her husband and Maki who were involved in actual managerial activities.  Dkt. No. 399-12 at 9.  Mr. Negita testified that it was only after his wife was no longer interested in running the business that he became involved in its operations.  Dkt. No. 409-3 at 194; Negita Dep. at 195-97.  Thus, the Court will permit the question of whether and when Mrs. Negita was an employer to proceed to trial.

With respect to Mr. Negita, he has admitted that he was an actual or beneficial owner of RYI from April 3, 2014 to June 2019, Dkt. Nos. 399 ¶ 7, 399-5 ¶ 6, and that he was a manager of employees at both restaurants.  Dkt. Nos. 399 ¶ 48, 399-5 ¶¶ 56, 60; Negita Dep. at 99:21-100:7.

---

[3] The Court disregards the assertion that she was a manager of employees at both restaurants, both because it is conclusory and because it is only supported by the RFAs to Y&S.  Dkt. No. 399 ¶¶ 44-45.

He has also admitted that between April 3, 2014 and March 31, 2018, his responsibilities as a manager of the West 3rd Street Restaurant included determining the wages and compensation terms of servers/waitstaff employed by RYI, in consultation with Maki; the issuance of wages and other forms of compensation, including distribution of gratuities, to servers/waitstaff employed by RYI, in consultation with Maki; the maintenance of employee records pertaining to servers/waitstaff employed by RYI.  Dkt. No. 399-5 ¶¶ 57-59.  He further testified that during the same time period, during which he served as a manager of the West 4th Street Restaurant, his responsibilities as a manager of the West 4th Street Restaurant included determining the wages and compensation terms of servers/waitstaff employed by Y&S, in consultation with Maki, and the maintenance of employee records pertaining to servers/waitstaff employed by Y&S, in consultation with Maki. Dkt. No. 399-5 ¶¶ 60-62.  The record supports that he was an employer during that entire time period.

### 3.    Kora

Plaintiffs' argument that Kora is an employer under FLSA and NYLL rests in part on his deposition testimony that he was an owner of the Y&S and, in part on his deemed admission to the RFAs.  Certain of the RFAs call for legal conclusions and will be disregarded.  Dkt. No. 399-6 ¶¶ 61-63.  Other of the RFAs, however, address matters of fact and are deemed admitted.  In particular, by his failure to respond to the RFAs, Kora is deemed to have admitted that between April 3, 2014 and March 31, 2018, he served as a manager of the West 4th Street Restaurant; that between April 3, 2014 and March 31, 2018, his responsibilities as a manager of the West 4th Street Restaurant included determining the wages and compensation terms of servers/waitstaff employed by Y&S, in consultation with Ms. Negita, Mr. Negita and/or Maki; that between April 3, 2014 and March 31, 2018, his responsibilities as a manager of the West 4th Street Restaurant included the issuance of wages and other forms of compensation, including distribution of

gratuities, to servers/waitstaff employed by Y&S, in consultation with Ms. Negita, Negita and/or

Maki; and that between April 3, 2014 and March 31, 2018 his responsibilities as a manager of

the West 4th Street Restaurant included the maintenance of employee records pertaining to

servers/waitstaff employed by Y&S, in consultation with Ms. Negita, Negita and/or Maki.  Dkt.

No. 399-6 ¶¶ 57-60.  Those admissions are sufficient to make Kora an employer under FLSA

and NYLL.

### 4.  Kobayashi

The same cannot be said for Kobayashi.  In their Local Rule 56.1 statement, Plaintiffs

assert that "Kobayashi was an employer of employees of Y&S" and rely on the non-response to

paragraphs 64-66 of the RFAs.  Dkt. No. 398 ¶ 63.  That assertion, however, is not a statement of

fact but a conclusion of law and thus is disregarded.  Moreover, requests to admit paragraphs

64-66, which ask Kobayashi to admit that he is an employer under FLSA, NYLL, and the Wage

Order, similarly call for legal conclusions and are disregarded.  Dkt. No. 399-6 ¶¶ 64-66.  The

motion for summary judgment as to Kobayashi is denied.

### D.  Plaintiff's Entitlement to Summary Judgment on Each Cause of Action

"In a FLSA case, it is the employee's burden to prove that he performed work for which

he was not properly compensated."  *McGlone v. Cont. Callers, Inc.*, 49 F. Supp. 3d 364, 370

(S.D.N.Y. 2014).  To meet this burden, employees can reference employer records.  *See Lopez*,

2021 WL 1164336, at *6.  FLSA mandates that every employer "shall make, keep, and preserve

such records of the persons employed by him and of the wages, hours, and other conditions and

practices of employment maintained by him."  29 U.S.C. § 211(c).  If an employer retained

inadequate or incomplete records, "an employee suing for lost wages under the FLSA may carry

his burden by submitting 'sufficient evidence from which violations of the [FLSA] and the

amount of an award may be reasonably inferred.'"  *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp.

2d 327, 331 (S.D.N.Y. 2005) (quoting *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58,

66 (2d Cir.1997)); *see also McGlone*, 49 F. Supp. 3d at 371 ("[I]f an employer keeps inaccurate

or inadequate records, the plaintiff need only offer a reasonable estimate of his damages.")

(citing *Harold Levinson Associates, Inc. v. Chao*, 37 F. App'x 19, 21 (2d Cir. 2002)). Thus, in an

action for unpaid wages, "the first step is for the Court to determine whether [D]efendants have

failed to keep accurate or adequate records." *McGlone*, 49 F. Supp. 3d at 371 (internal citations

and quotations omitted).

## 1. Defendants' Failure to Keep Complete and Accurate Records

The information that employers are required to keep for each employee is described in 29

C.F.R. § 516.2(a)(1)-(12).  For example, employers must record "[r]egular hourly rate of pay for

any workweek in which overtime compensation is due" as well as "[h]ours worked each

workday and total hours worked each workweek."  *Id.*  While "Section 215(a)(5) of the FLSA

makes it unlawful for any employer covered under the statute to violate any of these

record-keeping provisions," *Santillan v. Henao*, 822 F. Supp. 2d 284, 291 (E.D.N.Y. 2011), there

is no private right of action to enforce these provisions, *Cunningham v. Elec. Data Sys. Corp.*,

579 F. Supp. 2d 538, 543 (S.D.N.Y. 2008).  Thus, for FLSA purposes, the inadequacy or

incompleteness of certain records is most relevant for determining which party bears the burden

of proving the employee was fairly, or not fairly, compensated for their work.

Under the New York State Wage Theft Prevention Act (WTPA), however, failure to keep

complete and adequate records is actionable.  The WTPA "obligates an employer to furnish each

employee with a statement with every payment of wages, listing information about the rate and

basis of pay, any allowances and deductions, and the employer's identity and contact details."

*Canelas v. A'Mangiare Inc.*, 2015 WL 2330476, at *5 (S.D.N.Y. May 14, 2015); N.Y. Lab. Law

§ 195(3).  Section 195(3) "has been interpreted to require a wage statement to expressly identify

the per-hour amount of a tip credit and the total amount of the tip-credit allowance." *Khereed v.
W. 12th St. Rest. Grp. LLC*, 2016 WL 590233, at *4 (S.D.N.Y. Feb. 11, 2016); *see also Inclan v.
New York Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 502 (S.D.N.Y. 2015) (granting summary
judgment and awarding statutory damages to employees because wage statements listed "amount
of tips earned," but not the "tip credit allowance"); *Ametepe v. Peak Time Parking, Corp.*, 2021
WL 1172669, at *6 (S.D.N.Y. Mar. 29, 2021) ("Courts have widely found that a missing element
disqualified a document as a wage statement").  Pursuant to N.Y. Lab. Law § 198(1-b),
employees are entitled to recover "damages of fifty dollars for each work day that the violations
occurred or continue to occur, but not to exceed a total of five thousand dollars."

   In this case, the undisputed evidence establishes that Defendants supplied an incomplete
record of the work and violated the record-keeping provisions of both FLSA and the WTPA.
The Hours/Tips Spreadsheet, supplied by Defendants, contains information related to dates
worked, employee hours, and the amount paid by check and cash; it fails to describe the hourly
wage rate, deductions, or the percentage or amounts of tips (if any) applied to wages.  Dkt. No.
399-22.  The documents addressing Plaintiff Kongtuk's employment seem to include different
hourly wage rates for different days, and similarly fail to include deductions.  Dkt. No 399-23 at
863.  The Pay Statements for the other employees, Dkt. Nos. 399-24, 399-27, 399-34, 399-35,
399-36, 399-37, 399-38, 399-39, 399-40, 399-41, 399-42, 399-43 (collectively, the "Pay
Statements"), also do not address the "total amount of the tip credit allowance taken nor the
employee's gross wages before tip credit allowance." *Inclan*, 95 F. Supp. 3d at 502 (S.D.N.Y.
2015).  Moreover, as discussed in further detail below, the Pay Statements show that the
employees earned far fewer tips than originally listed in the Hours/Tips Spreadsheet.  As such,

Plaintiffs are entitled to summary judgment on this issue and to damages under NYLL § 198(1-b).

### 2. Defendants' Failure to Pay Plaintiff Wages

Plaintiffs assert that they are entitled to summary judgment on the issue of whether RYI and Y&S unlawfully applied employee tip earnings to gross wages because there are "no genuine material facts controverting Defendants' failure to pay."  Dkt. No. 391 at 23.

FLSA requires that every covered, nonexempt employee receive minimum wage.  29 U.S.C.A. § 206(a).  However, under 29 U.S.C.A. § 203, employers may take a "tip credit" which "allows an employer to pay 'tipped employees' an hourly rate *less than* the federal minimum wage by crediting a portion of the actual amount of tips received by the employee against the required hourly minimum wage."  *Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114, 131 (S.D.N.Y. 2014) (emphasis added).  In effect, the tip is credited to the employee's wages to cover the shortfall between the actual wage and the minimum wage.  As long as employers, "(1) inform the employee of the 'tip credit' provision of the FLSA, and (2) permit the employee to retain all of the tips the employee receives," they can apply a portion of tips collected to employee wages.  *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 287 (S.D.N.Y. 2011).

Each of these requirements is strictly construed.  The requirement that an employee be informed of the tip crediting practice "must be satisfied even if the employee received tips at least equivalent to the minimum wage."  *Chung v. New Silver Palace Rest., Inc.*, 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002); *see also Hristova v. 3321 Astoria Inc.*, 2018 WL 4006880, at *4 (E.D.N.Y. June 27, 2018) ("Employers must inform employees that they intend to use tips to satisfy their minimum wage obligations.").  Specifically, employers must provide employees with information on:

(i) the amount of cash wage the employer is paying a tipped employee; (ii) the additional amount claimed by the employer as a tip credit; (iii) a statement that the tip credit claimed by the employer cannot exceed the amount of tips actually received by the tipped employee; (iv) a statement that all tips received by the tipped employee are to be retained by the employee except for a valid tip pooling arrangement; and (v) a statement that the tip credit will not apply to any tipped employee unless the employee has been informed of these tip credit provisions.

*Chichinadze v. BG Bar Inc.*, 2021 WL 429948, at *9 (S.D.N.Y. Feb. 8, 2021) (quoting Wage and Hour Division, U.S. Dep't of Labor, *Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA)* (Apr. 2018)) (internal quotation marks omitted). "If the employer cannot show that it has informed employees that tips are being credited against their wages, then no tip credit can be taken and the employer is liable for the full minimum-wage." *Inclan*, 95 F. Supp. 3d at 497.

Under 29 U.S.C. § 203(m)(2)(B), an employer is barred from "keep[ing] tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." FLSA further provides that "[a]n employer may not avail itself of the tip credit if it requires [tipped] employees to share their tips with employees who do not customarily and regularly receive tips,' for example, managers or kitchen workers." *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 39 (E.D.N.Y. 2015) (quoting *Fonseca v. Dircksen & Talleyrand Inc.*, 2014 WL 1487279, at *2 (S.D.N.Y. Apr. 11, 2014)); *Wicaksono v. XYZ 48 Corp.*, 2011 WL 2022644, at *4 (S.D.N.Y. May 2, 2011), *report and recommendation adopted*, 2011 WL 2038973 (S.D.N.Y. May 24, 2011) (noting employers are barred from using tip credits where employees were required to share their tips with kitchen staff); *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 89 (E.D.N.Y. 2012) ("[T]he employer must refrain from withholding any portion of the employees' tips or requiring some employees to share the tips they receive with non-service

employees, such as managers or kitchen staff, who do not customarily and regularly receive tips.").

N.Y. Labor Law § 196-d similarly states that employers may not "demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee."  While employers have discretion to determine how a certain tip pool is divided amongst employees, *Barenboim v. Starbucks Corp.*, 21 N.Y.3d 460, 474 (2013), employers may not keep gratuities earned by employees for themselves, *Islam v. Morgans Hotel Grp. Mgmt. LLC*, 2019 WL 6497532, at *2 (S.D.N.Y. Dec. 2, 2019).

Plaintiffs assert as undisputed that RYI and Y&S unlawfully paid employee wages "by taking those amounts from tips credited to them, resulting in an actual payment of 'wages' of $0.00 per hour."  Dkt. No. 398 at 12. To support this claim, and the allegations in their accompanying brief, Plaintiffs first note that the Defendants "maintained for each Plaintiff a separate spreadsheet enumerating for [each employee] the number of hours worked each day." Dkt. Nos. 398 ¶ 68; 399-22 ("Hours/Tips Spreadsheets").  Plaintiffs also assert as undisputed that RYI and Y&S distributed compensation through a combination of check and cash.  Dkt. No. 398 ¶¶ 69, 70.  On every payday, Defendant Maki provided each Plaintiff with a Pay Statement which included their hourly wage rate, number of hours worked, the gross wages, and the amount of tips distributed.  *Id.* at ¶ 76; Pay Statements.  Finally, Plaintiffs explicitly claim: "Between April 3, 2014 to March 31, 2018, Defendants issued to Plaintiffs pay statements that *did not set forth the amount of tip credit* that RYI and/or Y&S applied against the regular wage to be paid to such Plaintiffs."  Dkt. No. 398, ¶ 85 (emphasis added).

Plaintiffs' assertions are supported by comparing the tips listed on the Hours/Tips

Spreadsheets with the gross and total wages of the Pay Statements, from the pay records of

Topon and Raksuk's pay records.  Dkt. No. 391 at 10–11.  The records of the other employees

are incomplete.

For Topon, Plaintiffs highlight the week of Monday, February 29, 2016 to Sunday,

March 6, 2016, to establish that Defendants were "apply[ing] a portion of the tips," specifically

the tips Topon was to be paid by check, "as her gross wages."  Dkt. No. 391 at 11.  The

Hours/Tips Spreadsheet indicates that Topon worked 20.75 hours at the 3rd Street Restaurant

and earned a total of $281.32 in tips, $155.63 of which was to be paid by check.  Hours/Tips

Spreadsheets at 772.  Relevant portions reproduced below:

| Dai | Hours | Tip | Check | Cash |
|------|-------|--------|------------|--------|
| 2/29 | 5.25 | 61.78 | 39.38 | 22.41 |
| 3/3 | | | 0.00 | 0.00 |
| 3/4 | 5.50 | 107.25 | 41.25 | 66.00 |
| 3/5 | 4.50 | 36.44 | 33.75 | 2.69 |
| 3/6 | 5.50 | 75.85 | 41.25 | 34.60 |
| Total | 20.75 | 281.32 | **155.63** | 125.70 |

Topon's corresponding Pay Statement for February 29, 2016 for the 3rd Street Restaurant states

that RYI paid Topon $155.63 in gross wages and that Topon only earned a total of $85.70 in tips.

Pay Statements, Dkt. No. 399-35, at 166. Relevant portions reproduced below:

| Earnings | Current | YTD |
|----------------|---------|---------|
| Gross Wages | 155.63 | 1030.02 |
| Total Wages | **155.63** | 1030.02 |
| Total Tips | 85.70 | 803.75 |
| Total Earnings | 241.33 | 1083.77 |
| Total Deductions | 119.97 | 1011.51 |
| NETPAY | 121.36 | 822.26 |

Plaintiffs also point to an example from Raksuk's Pay Statements, which reveals a similar pattern. For the week of Monday, July 24, 2017 to Sunday, July 30, 2017, the Hours/Tips Spreadsheet states that Raksuk earned a total of $815.93 of tips, of which $318.75 was to be paid by check. Hours/Tips Spreadsheets at 789. The corresponding RYI Pay Statement, Pay Statements, Dkt. No. 399-36, at 238, states that Raksuk was paid $168.75 in total wages for the week of July 24, 2017 and the Y&S Pay Statement indicates he earned a total of $150.00 in wages for that week, Pay Statements, Dkt. No. 399-41, at 555, for a total for the week of July 24 of $318.75, which equals the amount of tips he received that were to be paid by check. His pay did not include the tips he received that were not to be paid by check. Plaintiffs claim that the two examples from Topon's and Raksuk's pay statements "indisputably establish" that Defendants illegally used employee tips to pay gross wages. Dkt. No. 391 at 11.

Those examples are consistent with the records in the summary judgment record from the few other cases where full and complete payment histories exist. For example, for the week of September 14, 2015, the Hours/Tips Spreadsheet indicates that Topon earned $99.00 in tips at the 3rd Street Restaurant, $55.00 of which was to be paid by check. Hours/Tips Spreadsheets at 770. In the corresponding RYI Pay Statement for the 3rd Street Restaurant, Topon was paid exactly $55.00 in gross wages (the same amount of his tips which were to be paid by check) and the statement claimed she earned only $47.27 in total tips. Pay Statements, Dkt. No. 399-34, at 143. For the week of July 13, 2015, the Hours/Tips Spreadsheet reflects that Topon earned $43.08 in tips at the West 3rd Restaurant, $30.00 of which was to be paid by check, Hours/Tips Spreadsheets at 770, and $183.85 in tips at the West 4th Restaurant, $53.75 of which was to be paid by check, *id.*, for a total of tips earned to be paid by check of $83.75. That is the same number that the RYI Pay Statement notes Topon was paid $83.75 in total wages, Pay Statements,

Dkt. No. 399-34, at 139, which is also the sum of the tips Topon was to be paid by check by both restaurants ($30.00 + $53.75).

The Pay Statements and Hours/Tip Spreadsheet for Raksuk reflect the identical pattern. Raksuk's total wages as listed on the RYI and Y&S Pay Statements consistently equaled the amount of tips he was to be paid by check according to the Hours/Tips Spreadsheet. For the week of August 7, 2017, the RYI Pay Statement reflects Raksuk earned $156.83 in total wages, Pay Statements, Dkt. No 399-36, at 240, and the Y&S Pay Statement reflects Raksuk earned $127.50 in total wages, Pay Statements, Dkt. No. 399-41, at 557, for a total of $284.33. That figure is the precise amount of tips Raksuk was to be paid by check for the week of August 7, 2017. Hours/Tips Spreadsheets at 789. For the week of August 29, 2016, RYI states Raksuk was paid $150.00 in total wages, Pay Statements, Dkt. No. 399-35, at 197, and Y&S states Raksuk was paid $127.50 in total wages, Pay Statements, Dkt. No. 399-40, at 517, for a total of $277.50, the exact amount of tips Raksuk was supposed to be paid by check. Hours/Tips Spreadsheets at 787. Finally, for the week of October 31, 2016, the RYI Pay Statement reflects Raksuk was paid $180.00 in wages, Pay Statements, Dkt. No. 399-35, at 206, and the Y&S Pay Statement reflects Raksuk was paid $156.83 in total wages, Pay Statements, Dkt. No. 399-40, at 524. The sum of total wages for Raksuk for this week equals $336.83, which is the amount of tips that the Hours/Tips Spreadsheet states Raksuk was to be paid by check.[4] Hours/Tips Spreadsheets at 787. After thoroughly reviewing the record, the Court was unable to identify a week where the sum of Raksuk's wages from both restaurants did *not* equal the amount of tips he was to be paid by check according to the Hours/Tips Spreadsheet.

---

[4] The exact sum is equal to $336.825, rounded up for the sake of analysis.

As Plaintiffs note, the pay statements from Plaintiffs other than Topon and Raksuk are incomplete. However, upon independent review, the record reveals several examples from the other Plaintiffs which further support Plaintiffs' contention that Defendants used a portion of employee tips to pay gross wages and show that the practices with respect to Raksuk and Topon were not idiosyncratic. For example, for the week of December 5, 2016, the Hours/Tips Spreadsheet indicates that Kulaptip Thanatharn earned $395.95 in tips, $188.70 of which was to be paid by check. Hours/Tips Spreadsheets at 796. The corresponding RYI Pay Statement then indicates that Thanatharn earned $188.70 in total wages, the exact amount of tips he was to be paid by check. Pay Statements, Dkt. No. 399-37, at 327. Similarly, for the week of February 5, 2018, the Hours/Tips Spreadsheet indicates Tanon Leechot earned $345.08 in tips, $198.00 of which was to be paid by check. Hours/Tips Spreadsheets at 794. The corresponding RYI Pay Statement for that week indicates that Leechot earned $198.00 in wages. Pay Statements, Dkt. No. 399-37, at 322.

Defendants do not dispute Plaintiffs' factual assertions. In fact, Defendants have failed to proffer a single piece of evidence which would suggest the information Plaintiffs cite in their 56.1 statement is materially disputed. In its "Counter-Statement of Undisputed Facts in opposition to Motion for Summary Judgment," RYI disputes a number of Plaintiffs' contentions, but did not dispute any of Plaintiffs claims related to wage issues. Dkt. No. 408-1. Defendants do not dispute Plaintiffs' contentions regarding the Hours/Tips Spreadsheet, Dkt. No. 398 ¶ 68, the Pay Statements, Dkt. No. 398 ¶ 76, or the failure to include information related to tip credits Dkt. No. 398, ¶ 85. Y&S's responses to Plaintiffs' contentions are even more sparse. Counsel for Y&S merely claims that "there are genuine issues of material fact," because "[t]here is no proof of the hours worked and that the pay was below the standards as set forth by the FLSA and

New York State wage hours at the time of employment."  Dkt. No. 404 ¶ 3.  Thus, Defendants

have not pointed to any evidence which suggests the restaurant's payment of employee wages

through tip money is "materially disputed."  Neither have Defendants raised "a reasonable

conflicting interpretation" of the phenomenon.  *Schering Corp.*, 712 F.2d at 9-10.

Finally, Defendants do not dispute that the practices engaged in with respect to Raksuk

and Topon are also reflective of those with respect to the other Plaintiffs.  Plaintiffs acknowledge

that Defendants "did not produce complete and accurate records" related to employee hours and

payments.  Dkt. No 391 at 25.  Apart from Topon and Raksuk, the records for the remaining

employees are extremely limited.  Plaintiffs claim that because "Defendants utilized for each

Plaintiff the same form of documentation to record the hours worked each day and the tips

credited each day . . . it cannot be credibly disputed that Defendants treated each of the Plaintiffs

identically to Topon and Raksuk in the use of their credited tips to pay their gross wages."  Dkt.

No. 391 at 12-13.  The Court agrees with Plaintiffs on this point.

"In FLSA cases, the damages need not be precise."  *Solis v. SCA Rest. Corp.*, 938 F. Supp.

2d 380, 402 (E.D.N.Y. 2013); *see also Khan v. AC Auto., Inc.*, 2021 WL 2036706 (S.D.N.Y.

May 21, 2021) ("In the absence of a rebuttal by defendant, a court may then award damages to

the employee, even though the result be only *approximate*.") (internal quotation marks and

citations omitted) (emphasis added).  Employees may establish a prima facie case for employer

liability "through the testimony of a *representative sample* of employees . . . [which]

establish[es] a pattern and practice of defendants' FLSA violations."  *Solis*, 938 F. Supp. 2d at

402 (emphasis added).  The Court may award damages where plaintiffs have presented credible

evidence, in the form of employee testimony or other records, and defendants "have not

produced any credible evidence of the precise hours the employees worked, or any evidence to

negate the reasonableness of the inference to be drawn from the [plaintiff's] evidence." *Id.* at 403.

Here, the evidence Plaintiff cites is sufficient to support a pattern of FLSA violations and Defendant has failed to produce any evidence to rebut the reasonableness of Plaintiffs' claims. In fact, to establish liability, Plaintiff relies almost entirely on documents *provided by Defendants*: the Hours/Tips Spreadsheets and the Pay Statements. Thus, the Court finds there are no genuine issues of material fact with regard to Plaintiff's claim that Defendants illicitly used employee-earned tips to pay gross wages. Accordingly, summary judgment is granted to Plaintiffs on the issue of Defendants use of employee tips to pay gross wages, with the exact amount of damages to be determined.

### 3. Defendants' Failure to Distribute Employee Tips

Plaintiffs also allege that Defendants unlawfully retained a portion of Plaintiff tip money. Dkt. No. 391 at 13. Plaintiffs claim, "Maki told servers that the 20 percent reduction [in tips] was to provide money to the kitchen staff." *Id.* at 14; Dkt. Nos. 399-53 ¶ 21; 399-54 ¶ 12; 399-55 ¶ 13; 399-56 ¶ 13. In addition to the employee affidavits, Plaintiffs rely on text messages between Maki and Topon, where Maki explains the methodology used to calculate tips. Dkt. No. 399-58. Maki adds the tips that each of the servers collected for that shift, multiplies that sum by 0.8, then divides it by two to account for each server; the calculation supports the conclusion that Maki routinely deducted 20 percent of server tips. *Id.* at 4-5. Plaintiffs also refer to a series of handwritten notations where Maki tracked the amount of tips each server collected during shifts. Dkt. No. 399-59. They highlight several examples where Maki wrote down that the servers earned more than they were eventually paid, according to the Hours/Tips Spreadsheet. Hours/Tips Spreadsheets; Dkt. No. 399-59. Plaintiffs reference the evening of October 30, 2016, where Maki wrote that Raksuk worked with one other server from 6:00 PM to 12:00 AM and

earned $299.91 in tips.  Dkt. No. 399-59 at 3.  The accompanying entry on the Hours/Tips

Spreadsheet indicates Raksuk worked only 5.5 hours and was credited with only $124.76 in tips.

Hours/Tips Spreadsheets at 00787.  If tips were split evenly between the servers, and no amount

was deducted, Raksuk should have earned $149.96.

The evidence is not disputed by Defendants.  On the summary judgment record, it is

undisputed that Defendants did not allow the employees to keep all of the tips that they earned,

and no reasonable jury could conclude otherwise.  Defendants were not eligible to take tip credits

because they did not provide proper notice of the policy *and* they required Plaintiffs to share at

least 20% of their tips with the kitchen staff, who "do not customarily and regularly receive tips."

*Fermin*, 93 F. Supp. 3d at 39. Furthermore, Defendants failed to present any evidence which

would suggest their retention of employee tips was proper.  Neither have Defendants offered an

explanation regarding the specific example of the discrepancy between Maki's recording of

Raksuk's tips and the amount reflected on the Hours/Tips Spreadsheet.  Thus, summary

judgment is warranted for Plaintiffs on this issue, with the exact amount of damages to be

determined.

### 4.      Defendants' Failure to Distribute Overtime Compensation

Plaintiffs further move for summary judgment on their overtime compensation claims

under FLSA and NYLL.  Relying on the data from the Hours/Tips Spreadsheet, Plaintiffs claim

that Defendants failed to pay Plaintiffs appropriate overtime wages.[5]  Dkt. No. 391 at 14-15.

Plaintiffs claim that they worked for more than 40 hours at the restaurants on numerous

---

[5] The only fact that that Plaintiffs cite in their 56.1 Statement to support their overtime
compensation claims is: "RYI and Y&S maintained records setting forth the hours worked each
shift by each Plaintiff at the 3rd Street Restaurant and/or the 4th Street Restaurant." Dkt. No. 389
¶ 79. Defendants do not dispute this statement in their response.  Dkt. No. 408-1.

occasions, outlined in greater specificity below, and that they were never compensated for the additional work. *Id.* at 15.

FLSA "require[s] an employer to pay an overtime wage of one and one-half times the regular rate for each hour worked in excess of forty per work week." 29 U.S.C. § 207(a)(1); *Inclan*, 95 F. Supp. 3d at 498. "[I]f an employer has knowledge that an employee is working hours in excess of forty per week, it is responsible for compensating that employee 'even where the employer has not requested the overtime be performed or does not desire the employee to work.'" *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 462 (S.D.N.Y. 2008) (quoting *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008). "Under the FLSA, an employee's overtime rate is calculated with reference to the minimum wage to which he was legally entitled." *Khan v. AC Auto., Inc.*, 2021 WL 2036706, at *3 (S.D.N.Y. May 21, 2021).

In a typical overtime pay case, where an employee has received their regular wage rate for overtime hours and has just missed the overtime component, the appropriate method for calculating damages is to multiple the number of overtime hours worked by the overtime premium (0.5 times the regular rate). *See, e.g. Kliger v. Liberty Saverite Supermarket Inc.*, 2018 WL 4782342, at *6 (E.D.N.Y. Sept. 17, 2018), *report and recommendation adopted as modified*, 2018 WL 4783964 (E.D.N.Y. Oct. 3, 2018). In that way, the employee is paid through damages for the overtime premium the employer failed to pay. In this case, however, where the employee has not compensated at all for the overtime hours that they worked—even by their regular hourly wages—the damages the employee is entitled to is greater. The employee is entitled to the number of overtime hours, multiplied by one and one-half times the minimum wage rate or their regular hourly rate (whichever is greater)—*i.e.* the hourly wage rate + 0.5% of the regular hourly wage rate. Here, Plaintiffs have established that they did not receive any hourly wage for their

hours (and their hourly wages were effectively $0.00 an hour), because Defendants illicitly channeled a portion of their tips towards their gross wages.  Thus, Plaintiffs are entitled to the number of overtime hours worked multiplied by Plaintiff's overtime wage, which here is 1.5 times minimum wage.

The Court calculated the amount of overtime compensation each Plaintiff is entitled to using this formula; the tables below set forth the date of the work week, the total number of hours the employee worked during that week, the number of overtime hours, and the minimum wage rate which was in effect at the time. In several places, Plaintiff miscalculated the exact amount of hours the given employee worked.  The Court identified and corrected those below; the corrections are in brackets.  The evidence, however, is undisputed.  Defendants offered no contrary evidence to that proffered by Plaintiffs.

**a.      Keawrsi Damages**

Plaintiffs identified 11 workweeks in 2015 and one workweek in 2016 where Keawrsi worked for more than forty hours.  Dkt. No. 391 at 15; Haber Decl. ¶ 137; Hours/Tips Spreadsheets at 777-81.

| Date | Total Number of Hours | Number of Overtime Hours | Minimum / OT Wage Rate (NYS CLS Lab. 652) |
|---|---|---|---|
| June 28, 2015 | 48.25 hours | 8.25 | $8.75 / $13.13 |
| July 5, 2015 | 46.00 hours | 6 | $8.75 / $13.13 |
| July 26, 2015 | 47.75 hours | 7.75 | $8.75 / $13.13 |
| Aug. 30, 2015 | 40.50 hours | 0.5 | $8.75 / $13.13 |
| Sept. 6, 2015 | 45.75 hours | 5.75 | $8.75 / $13.13 |
| Sept. 27, 2015 | 46.50 hours | 6.5 | $8.75 / $13.13 |
| Oct. 4, 2015 | 45.25 hours | 5.25 | $8.75 / $13.13 |
| Oct. 11, 2015 | 53.75 hours | 13.75 | $8.75 / $13.13 |
| Nov. 1, 2015 | 41.75 hours | 1.75 | $8.75 / $13.13 |
| Nov. 15, 2015 | 42.75 hours | 2.75 | $8.75 / $13.13 |
| Dec. 6, 2015 | 42 hours | 2.0 | $8.75 / $13.13 |
| Dec. 19, 2015 | 41.25 hours | 1.25 | $8.75 / $13.13 |

41

| Jan. 2, 2016 | 55.00 hours | 15 | $9.00 / $13.50 |
|---|---|---|---|
| **Totals**: | 61.5 hours * $13.13 = $807.19<br>15 hours * $13.50 = $202.50<br>Total OT Compensation: **$1,009.69** | | |

### b.   Nagae Damages

Plaintiffs claim Nagae worked more than forty hours during the week of March 15, 2015. Dkt. No. 391 at 15; Haber Decl. ¶ 137; Hours/Tips Spreadsheets at 766-69.  Plaintiffs state that Nagae worked 51.75 hours, which would entitle her to 11.75 hours in overtime pay.  Haber Decl. ¶ 137.  However, the Hours/Tips Spreadsheet indicates that between March 15, 2015 and March 22, 2015, Nagae worked 49.25 hours at both restaurants, not 51.75 hours.  Thus, Nagae will be entitled to the following overtime pay:

| Date | Total Number of Hours | Number of Overtime Hours | Minimum / OT Wage Rate (NYS CLS Lab. 652) |
|---|---|---|---|
| Mar. 15, 2015 | 51.75 hours [49.25] | 9.25 | $8.75 / $13.13 |
| **Totals**: | 9.25 hours = $13.13 = $121.40<br>Total OT Compensation: $121.40 | | |

### c.   Topon Damages

Plaintiffs identified two workweeks in 2016 where Topon worked for more than forty hours. Dkt. No. 391; Haber Decl. ¶ 137; Hours/Tips Spreadsheets at 770-73.

| Date | Total Number of Hours | Number of Overtime Hours | Minimum / OT Wage Rate (NYS CLS Lab. 652) |
|---|---|---|---|
| Feb. 28, 2016 | 42 hours | 2 | $9.00 / $13.50 |
| Mar. 6, 2016 | 42.75 hours | 2.75 | $9.00 / $13.50 |
| **Totals**: | 4.75 hours * $13.50 = $64.13<br>Total OT Compensation: $64.13 | | |

#### d.      Raksuk Damages

According to Plaintiffs, Raksuk worked more than forty hours during 15 workweeks in 2016, 30 workweeks in 2017, and four workweeks in 2018.  Dkt. No. 391 at 15; Haber Decl. ¶ 137; Hours/Tips Spreadsheets at 787-91.  In analyzing the data cited by Plaintiffs, the Court identified numerous weeks where Plaintiff miscalculated the exact amount of hours Raksuk worked.  The Court corrected the calculations as follows:

| Date | Total Number of Hours | Number of Overtime Hours | Minimum / OT Wage Rate (NYS CLS Lab. 652) |
|---|---|---|---|
| Sept. 18, 2016 | 42.65 hours | 2.65 | $9.00 / $13.50 |
| Oct. 2, 2016 | 44.25 hours | 4.25 | $9.00 / $13.50 |
| Oct. 9, 2016 | 50.16 hour | 10.16 | $9.00 / $13.50 |
| Oct. 16, 2016 | 40.08 hours | 0.08 | $9.00 / $13.50 |
| Oct. 23, 2016 | 46.00 hours | 6 | $9.00 / $13.50 |
| Oct. 30, 2016 | 47.58 hours | 7.58 | $9.00 / $13.50 |
| Nov. 6, 2016 | 42.91 hours; [44.91] | 4.91 | $9.00 / $13.50 |
| Nov. 13, 2016 | 46.83 hours | 6.83 | $9.00 / $13.50 |
| Nov. 20, 2016 | 47.50 hours; [46.5] | 6.5 | $9.00 / $13.50 |
| Nov. 27, 2016 | 42.17 hours | 2.17 | $9.00 / $13.50 |
| Dec. 4, 2016 | 40.50 hours; [46.5] | 6.5 | $9.00 / $13.50 |
| Dec. 11, 2016 | 47.91 hours | 7.91 | $9.00 / $13.50 |
| Dec. 18, 2016 | 46.50 hours | 6.5 | $9.00 / $13.50 |
| Dec. 25, 2016 | 46.41 hours; [46.4] | 6.4 | $9.00 / $13.50 |
| Jan. 1, 2017 | 43.24 hours | 3.24 | $11.00 / $16.50 |
| Jan. 8, 2017 | 47.29 hours [47.16] | 7.16 | $11.00 / $16.50 |
| Jan. 22, 2017 | 46.82 hours | 6.82 | $11.00 / $16.50 |
| Feb. 5, 2017 | 40.66 hours; [47.66] | 7.66 | $11.00 / $16.50 |
| Feb. 12, 2017 | 40.67 hours; [45.91] | 5.91 | $11.00 / $16.50 |
| Feb. 19, 2017 | 49.70 hours | 9.7 | $11.00 / $16.50 |
| Feb. 26, 2017 | 45.33 hours; [44.08] | 4.08 | $11.00 / $16.50 |
| Mar. 5, 2017 | 47.91 hours | 7.91 | $11.00 / $16.50 |
| Mar. 12, 2017 | 43.58 hours | 3.58 | $11.00 / $16.50 |
| May 7, 2017 | 41.88 hours; [42.41] | 2.41 | $11.00 / $16.50 |
| June 4, 2017 | 47.57 hours; [48.07] | 8.07 | $11.00 / $16.50 |
| June 25, 2017 | 47.16 hours; [48.16] | 8.16 | $11.00 / $16.50 |
| July 2, 2017 | 40.24 hours | 0.24 | $11.00 / $16.50 |
| July 9, 2017 | 48.83 hours | 8.83 | $11.00 / $16.50 |
| July 16, 2017 | 41.06 hours; [42.06] | 2.06 | $11.00 / $16.50 |

| July 30, 2017 | 43.50 hours; [42.5] | 2.5 | $11.00 / $16.50 |
| Aug. 6, 2017 | 41.28 hours | 1.28 | $11.00 / $16.50 |
| Aug. 27, 2017 | 44.03 hours | 4.03 | $12.00 / $18.00 |
| Sept. 3, 2017 | 42.50 hours; [43.5] | 3.5 | $12.00 / $18.00 |
| Sept. 17, 2017 | 43.33 hours | 3.33 | $12.00 / $18.00 |
| Oct. 1, 2017 | 43.40 hours | 3.40 | $12.00 / $18.00 |
| Oct. 15, 2017 | 43.83 hours | 3.83 | $12.00 / $18.00 |
| Oct. 22, 2017 | 40.36 hours | 0.36 | $12.00 / $18.00 |
| Oct. 29, 2017 | 43.00 hours | 3.0 | $12.00 / $18.00 |
| Nov. 5, 2017 | 42.48 hours | 2.48 | $12.00 / $18.00 |
| Nov. 12, 2017 | 42.91 hours; [43.41] | 3.41 | $12.00 / $18.00 |
| Nov. 19, 2017 | 41.66 hours | 1.66 | $12.00 / $18.00 |
| Nov. 26, 2017 | 40.50 hours | 0.5 | $12.00 / $18.00 |
| Dec. 17, 2017 | 40.66 hours | 0.66 | $12.00 / $18.00 |
| Dec. 24, 2017 | 41.00 hours | 1 | $12.00 / $18.00 |
| Dec. 31, 2017 | 45.50 hours | 5.5 | $13.00 / $19.50 |
| Jan. 7, 2018 | 43.5 hours | 3.5 | $13.00 / $19.50 |
| Jan. 14, 2018 | 41.00 hours | 1 | $13.00 / $19.50 |
| Jan. 28, 2018 | 42.33 hours | 2.33 | $13.00 / $19.50 |
| Feb. 11, 2018 | 40.57 hours | 0.57 | $13.00 / $19.50 |
| **Totals**: | 78.44 hours * $13.50 = $1,058.94<br>89.61 hours * $16.50 = $1,478.57<br>31.16 hours * $18.00 = $560.88<br>12.9 hours * $251.55 = $251.55<br>Total OT Compensation: **$3,349.94** | | |

e.      **Kulaptip Damages**

Kulaptip worked more than forty hours during two workweeks in 2017.  Haber Decl.

¶ 137; Hours/Tips Spreadsheets at 796-798.

| Date | Total Number of Hours | Number of Overtime Hours | Minimum / OT Wage Rate (NYS CLS Lab. 652) |
|---|---|---|---|
| Mar. 12, 2017 | 43.50 hours | 3.5 | $11.00 / $16.50 |
| Apr. 16, 2017 | 45.50 hours; [45] | 5 | $11.00 / $16.50 |
| **Totals**: | 8.5 hours * $13.50 = $140.25<br>Total OT Compensation: $140.25 | | |

5.      **Defendants Failure to Pay "Spread of Hours" Payments Under NYLL**

Plaintiffs acknowledge that "Defendants did not have any timekeeping system for servers

to record when they arrived and when they left, or when they took breaks."  Dkt. No. 391 at 15,

n. 19.  They assert, though, that because the servers often worked "both a lunch and dinner shift on the same day, and on those days had a spread of hours of greater than 10 hours," Plaintiffs are entitled to spread of hours payments.  *Id.* at 15.  In Plaintiffs' 56.1 statement, they contend that RYI and Y&S set forth the hours worked each shift by each Plaintiff and did not pay additional compensation on days where Plaintiffs worked longer than 10 hours.  Dkt. No. 389 ¶ 80, 81.  RYI disputes this claim in their response to Plaintiff's 56.1 Statement.  Dkt. No. 408-1 ¶ 81.  However, Defendants do not refer to any evidence—pay stubs, spreadsheets, notes, etc.—which suggests that Plaintiffs were fairly compensated for working for more than 10 hours in a day.  Furthermore, Defendants provided the Hours/Tips Spreadsheet, from which Plaintiffs calculated the spread of hours compensation.

Pursuant to 12 N.Y. CRR 146-1.6, "[o]n each day on which the spread of hours exceeds 10, an employee shall receive one additional hour of pay at the basic minimum hourly rate."  In other words, "employers must pay employees an extra hour's pay at the minimum wage when their workday lasts longer than ten hours." *Franco v. Jubilee First Ave. Corp.*, 2016 WL 4487788, at *14 (S.D.N.Y. Aug. 25, 2016) (internal quotations omitted).  The spread of hours payments for each employee may be calculated by multiplying the number of days that the employee worked in excess of ten hours by the statutory minimum wage for the relevant period. *See, e.g. Anzurez v. La Unica Caridad Inc.*, 2021 WL 2909521, at *5 (S.D.N.Y. July 12, 2021).  Utilizing the data originally provided by the Defendants, and referenced by the Plaintiffs, the Court calculated spread of hours compensation as followed:

### i.      Keawsri: Hours/Tips Spreadsheets at 777-81

| Year | Number of Days Which Exceeded 10 Hours | Minimum Wage Rate |
|------|----------------------------------------|-------------------|
| 2015 | 31 [30] | $8.75 |
| 2016 | 11 | $9.00 |

| Total: | 30 days * $8.75 = $262.50<br>11 days * $9.00 = $99.00<br>Total Spread of Hours Compensation: **$361.50** |
| --- | --- |

### ii.    Nagae: Hours/Tips Spreadsheets at 766-69

| Year | Number of Days Which Exceeded 10 Hours | Minimum Wage Rate |
| --- | --- | --- |
| **2014** | 5 | $8.00 |
| **2015** | 36 | $8.75 |
| **2016** | 14 [12] | $9.00 |
| **Total:** | 5 days * $8.00 = $40<br>36 days * $8.75 = $315<br>12 days * $9.00 = $108.00<br>Total Spread of Hours Compensation: **$463.00** | |

### iii.    Topon: Hours/Tips Spreadsheets at 770-73

| Year | Number of Days Which Exceeded 10 Hours | Minimum Wage Rate |
| --- | --- | --- |
| **2015** | 25 [24] | $8.75 |
| **2016** | 21 | $9.00 |
| **Total:** | 24 days * $8.75 = $210.00<br>21 days * $9.00 = $189.00<br>Total Spread of Hours Compensation: **$399.00** | |

### iv.    Ketchatrotz: Hours/Tips Spreadsheets at 782-86.

| Year | Number of Days Which Exceeded 10 Hours | Minimum Wage Rate |
| --- | --- | --- |
| **2015** | 20 | $8.75 |
| **2016** | 5 | $9.00 |
| **Total**: | 20 days * $8.75 = $175.00<br>5 days * $9.00 = $45.00<br>Total Spread of Hours Compensation: $220.00 | |

### v.    Raksuk: Hours/Tips Spreadsheets at 787-91

| Year | Number of Days Which Exceeded 10 Hours | Minimum Wage Rate |
| --- | --- | --- |
| **2016** | 34 | $9.00 |
| **2017** | 88 [66] | $11.00 |
| **2018** | 21 [6] | $13.00 |
| **Total**: | 34 days * $9.00 = $306.00<br>66 days * $11.00 = $726.00<br>6 days * $13.00 = $78.00 | |

| | Total Spread of Hours Compensation: **$1,110.00** |
|---|---|

### vi.     Kongtuk: Hours/Tips Spreadsheets at 792-93

| Year | Number of Days Which Exceeded 10 Hours | Minimum Wage Rate |
|---|---|---|
| 2017 | 4 | $11.00 |
| 2018 | 5 | $13.00 |
| Total: | 4 days * $11.00 = $44.00<br>5 days * $13.00 = $65.00<br>Total Spread of Hours Compensation: **$109.00** | |

### vii.     Leechot: Hours/Tips Spreadsheets at 794-95

| Year | Number of Days Which Exceeded 10 Hours | Minimum Wage Rate |
|---|---|---|
| 2017 | 13 | $11.00 |
| 2018 | 10 | $13.00 |
| Total: | 13 days * $11.00 = $143.00<br>10 days * $13.00 = $130.00<br>Total Spread of Hours Compensation: **$273.00** | |

### viii.     Kulaptip: Hours/Tips Spreadsheets at 796-98.

| Year | Number of Days Which Exceeded 10 Hours | Minimum Wage Rate |
|---|---|---|
| 2016 | 3 | $9.00 |
| 2017 | 50 [49] | $11.00 |
| 2018 | 8 | $13.00 |
| Total: | 3 days * $9.00 = $27.00<br>49 days * $11.00 = $539.00<br>8 days * $13.00 = $104.00<br>Total Spread of Hours Compensation: **$670.00** | |

### ix.     Nakwirot: Hours/Tips Spreadsheets at 799-800

| Year | Number of Days Which Exceeded 10 Hours | Minimum Wage Rate |
|---|---|---|
| 2017 | 17 | $11.00 |
| 2018 | 9 | $13.00 |
| Total: | 17 days * $11.00 = $187.00<br>9 days * $13.00 = $117.00<br>Total Spread of Hours Compensation: **$304.00** | |

x.     **Natatpisit: Hours/Tips Spreadsheets at 801-03**

| Year | Number of Days Which Exceeded 10 Hours | Minimum Wage Rate |
|---|---|---|
| **2017** | 10 | $11.00 |
| **2018** | 3 | $13.00 |
| **Total**: | 10 days * $11.00 = $110.00<br>3 days * $13.00 = $39.00<br>Total Spread of Hours Compensation: **$149.00** | |

xi.     **Mongkolkajit: Hours/Tips Spreadsheets at 804-05**

| Year | Number of Days Which Exceeded 10 Hours | Minimum Wage Rate |
|---|---|---|
| **2017** | 6 | $11.00 |
| **2018** | 2 | $13.00 |
| **Total**: | 6 days * $11.00 = $66.00<br>2 days * $13.00 = $26.00<br>Total Spread of Hours Compensation: **$192.00** | |

6.     **Liquidated Damages**

Plaintiffs also seek liquidated damages under FLSA and the NYLL on all minimum

wages, tips, overtime compensation, and spread of hours payments.  Dkt. No. 391 at 30.  "If an

employer violates the minimum-compensation provisions of the FLSA and NYLL, it is liable for

both past-due wages and an equal amount in liquidated damages." *Brito v. Lucky Seven Rest. &*

*Bar, LLC*, 2021 WL 1131506, at *13 (S.D.N.Y. Mar. 24, 2021) (citing 29 U.S.C. § 216(b)); *see*

*also Zhen Ming Chen v. New Fresco Tortillas Taco LLC*, 2015 WL 5710320, at *5 (S.D.N.Y.

Sept. 25, 2015), *report and recommendation adopted*, 2017 WL 818469 (S.D.N.Y. Mar. 1, 2017)

("Under the FLSA, a plaintiff is entitled to liquidated damages of 100%.").  Liquidated damages

"are not a penalty exacted by the law, but rather compensation to the employee occasioned by

the delay in receiving wages due caused by the employer's violation of the FLSA."  *Hok Chin v.*

*United Restaurant Group, Inc.*, 2021 WL 3077480, at *8 (S.D.N.Y. July 20, 2021) (quoting

*Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)) (internal quotation marks omitted).

Courts may decline to award liquidated damages "where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Garcia v. JonJon Deli Grocery Corp.*, 2015 WL 4940107, at *5 (S.D.N.Y. Aug. 11, 2015) (quoting *Barfield v. N.Y.C. Health and Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008)) (internal quotation marks omitted). However, the burden on the employer in showing good faith is heavy, and "[d]ouble damages are the norm, single damages the exception." *Reich*, 121 F.3d at 71 (quoting *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987)); *McFarlane v. Harry's Nurses Registry*, 2020 WL 1643781, at *12 (E.D.N.Y. Apr. 2, 2020) ("The Second Circuit has characterized the employer's burden as a difficult one.") (quoting *Barfield*, 537 F.3d at 150) (internal quotation marks omitted). A "defendant's failure to point to any evidence sufficient to make such a showing [of good faith] may warrant awarding [liquidated] damages at the summary judgment stage." *Nunez v. Broadway Beauty Wholesale Inc.*, 2020 WL 6063536, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *De Jesus v. Empire Szechuan Noodle House Inc.*, 2019 WL 1789901, at *5 (S.D.N.Y. Apr. 24, 2019)).

Here, Defendants do not present any evidence to suggest "they took active steps to ascertain the dictates of and comply with federal or state labor law." *Nunez*, 2020 WL 6063536, at *5. Neither have Defendants produced "plain and substantial evidence of at least an honest intention to ascertain what the [FLSA] requires and to comply with it." *Reich*, 121 F.3d at 71 (quoting *Wilamowsky*, 833 F.2d at 19). Thus, Plaintiffs are entitled to summary judgment on their liquidated damages claim under either FLSA or NYLL. Plaintiffs may not collect

"duplicative liquidated damages for the same course of conduct" under FLSA or NYLL.  *Rana v. Islam*, 887 F.3d 118, 123 (2d Cir. 2018).  However, Plaintiffs may "recover under the statute that provides the greater relief."  *Underwood v. TAFSC Hous. Dev. Fund Corp.*, 2019 WL 5485211, at *4 (S.D.N.Y. Oct. 25, 2019) (quoting *Ortega v. JR Primos 2 Rest. Corp.*, 2017 WL 2634172, at *6 (S.D.N.Y. June 16, 2017)).  The exact amount of liquidated damages will be calculated following determinations on the wage issue.

### 7.     Attorney Fees and Costs

In their accompanying brief, Plaintiffs ask the Court to separately determine the attorney's fees and costs to be awarded.  Dkt. No. 391 at 34.  Plaintiffs note that an award of attorney fees and costs is "even more compelling in this case," given Defendants "repeated baseless motion practice and other dilatory conduct."  *Id.* at 34, n.26.

"Under the FLSA and the NYLL, a prevailing plaintiff is entitled to reasonable attorneys' fees and costs."  *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 600 (2d Cir. 2020).  Indeed, the award of attorney fees is often necessary to further "the FLSA's objective of secur[ing] legal representation for plaintiffs whose wage and hour grievance were too small, in terms of expected recovery, to create a financial incentive for qualified counsel to take such cases under conventional fee arrangements."  *Gonzalez v. Scalinatella, Inc.*, 112 F. Supp. 3d 5, 11 (S.D.N.Y. 2015) (quoting *Estrella v. P.R. Painting Corp.*, 596 F. Supp. 2d 723, 727 (E.D.N.Y.), *aff'd*, 356 F. App'x 495 (2d Cir. 2009)). "The party seeking reimbursement of attorney's fees bears the burden of proving the reasonableness and the necessity of the hours spent and rates charged." *Newman v. W. Bar & Lounge, Inc.*, 2021 WL 2401176, at *12 (E.D.N.Y. June 11, 2021) (citing *Fermin*, 93 F. Supp. 3d at 51).

Plaintiffs have proven Defendants' liability for wage violations, overtime compensation, and spread of hours payments, and are thus entitled to attorneys' fees.  However, Plaintiffs have

not submitted documentation or evidence to support their request.  The Court is therefore permitted to determine a prevailing party's entitlement to attorney fees prior to determining the exact amount.  *See, e.g. Choudry v. Durrani*, 2016 WL 6651319, at *14 (E.D.N.Y. Nov. 10, 2016) ("Having determined that Plaintiff established Defendants' liability for violations of the FLSA and NYLL by a preponderance of the evidence, the Court concludes that Plaintiff is entitled to a reasonable award of attorneys' fees and costs. However, because Plaintiff has not submitted documentation or other substantiation to support his request, he is granted leave to submit an application for such fees and costs.").

## CONCLUSION

Defendants' motion for summary judgment is DENIED; Plaintiffs' motion for an order certifying this case as a collective action is GRANTED; and Plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. Nos. 387 and 388.


SO ORDERED.

Dated: August 10, 2021
       New York, New York
                                    _____
                                         LEWIS J. LIMAN
                                    United States District Judge