M752Kea1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
ORNRAT KEAWSRI, *et al.,*

              Plaintiffs,          New York, N.Y.

          v.                17 Civ. 2406 (LJL)

RAMEN-YA, *et al.,*

              Defendants.
------------------------------x    Trial

                             July 5, 2022
                             10:40 a.m.

Before:

              HON. LEWIS J. LIMAN,

                      District Judge

                  APPEARANCES

IZOWER FELDMAN, LLP
    Attorneys for Plaintiffs
BY:  RACHEL IZOWER-FADDÉ

FLORENCE ROSTAMI LAW, LLC
    Attorneys for Plaintiffs
BY:  FLORENCE ROSTAMI
    NEAL D. HABER

BLOSSNER & PAWAR, PC
    Attorneys for Defendants Ramen-ya, Inc.,
    Maki, Masahiko Negita, Yasuko Negita
BY:  VIK PAWAR

KAPLAN & CHUN, PC
    Attorneys for Defendants Kobayashi, Kora,
    Y&S International Corp.
BY:  HOWARD C. CHUN

Also present:  Akiko Hikota, Japanese Interpreter

M752Kea1

(Case called)

THE DEPUTY CLERK:  Starting with counsel for plaintiffs, please state your appearance for the record.

MS. IZOWER-FADDÉ:  Rachel Izower-Faddé, with my colleagues here, Florence Rostami and Neal Haber, for plaintiff.

MS. ROSTAMI:  Good morning, your Honor.

MR. HABER:  Good morning.

THE COURT:  Good morning.

MR. PAWAR:  Good morning, your Honor.  Vik Pawar.  I represent Ramen-Ya, Inc.  To my left is Mr. Masahiko Negita, to his left is Mrs. Yasuko Negita, and to her left is Miss Miho Maki.  Good morning again, Judge.

THE COURT:  Good morning.

MR. CHUN:  And for the defendants Y&S International, Toshihito Kobayashi, and Kenji Kora, my name is Howard Chun, C-H-U-N, from Kaplan & Chun, P.C.  Good morning.

THE COURT:  Good morning, Mr. Chun.

So we are here for the bench trial of this matter.  Before the plaintiff calls its first witness, is there anything to raise with the Court from plaintiffs' perspective?

MS. IZOWER-FADDÉ:  Just a couple of things, your Honor.

We received your decision on the deposition designations, which we appreciate, that we want to move into

M752Kea1

evidence the deposition designations for Mrs. Yasuko Negita, Mr. Masahiko Negita and Miss Miho Maki.

THE COURT:  The objections that have been made thus far are preserved.  Are there any additional objections or anything to bring to the attention of the Court, Mr. Pawar?

MR. PAWAR:  Not at the moment, Judge.

THE COURT:  All right.  So those designations are -- Mr. Chun, any further objections from your perspective?

MR. CHUN:  No.

THE COURT:  So those designations are received.

MS. IZOWER-FADDÉ:  We also previously -- once we learned that Mr. Kenji Kora was going to be called as a witness, we made a few designations from the deposition of Mr. Kora.  We think that the same reasoning that your Honor applied in finding that we could use the other three defendants' depositions should apply with equal force to Mr. Kora's deposition, and we ask that you approve us to use those affirmatively here today as well.

THE COURT:  And Mr. Pawar, your position?

MR. PAWAR:  Judge, the same position as I had before for the three defendants, that Federal Rule of Evidence Rule 106 about the completeness is to show the bigger picture.  It just shows a portion of testimony that's favorable to the plaintiffs, doesn't allow for exploration of what came about in his answers and questions.  So other than that, I have no

M752Kea1

objections.

THE COURT:  So the -- Mr. Chun, anything from you?

MR. CHUN:  No.

THE COURT:  So the designations are received subject to the defendants' right to supplement the designations with any further portions of the depositions that they believe should be added subject to the rule of -- based upon the rule of completeness.  So if, Mr. Pawar, there is anything that is missing from the depositions that you think I should see in order to get a complete picture, you can make those designations at the beginning of your case.  Understood?

MR. PAWAR:  Yes, your Honor.

THE COURT:  Anything further from plaintiff?

MS. IZOWER-FADDÉ:  Well, I -- your Honor, would we be able to maybe get those designations a little bit in advance, since he did have an opportunity to provide counter-designations months ago already and he has known these designations for a long time.

THE COURT:  When is the witness testifying, Mr. Kora?

MS. IZOWER-FADDÉ:  Thursday morning.

(Counsel confer)

MS. IZOWER-FADDÉ:  Thursday morning.

THE COURT:  So Mr. Pawar, Wednesday night, tomorrow night, you will make any counterdesignations so that both parties have an opportunity during Mr. Kora's testimony to

M752Kea1

explore the deposition.

MR. PAWAR:  Understood, your Honor.

THE COURT:  Okay.  Anything further from plaintiff?

MS. IZOWER-FADDÉ:  I guess I also just, since we are going forward, his case is not separate, because the way that it has been arranged, we are calling each witness, we are going to do --

THE COURT:  That's why the designation is going to be made Wednesday night, tomorrow night.

MS. IZOWER-FADDÉ:  No, I understand.  I was just saying that we won't know the designations before, like, Ms. Maki came on the stand or Mr. Negita came on the stand, so we will deal with our argument at the end, then.

THE COURT:  Okay.

MS. IZOWER-FADDÉ:  Okay.  Thank you, your Honor.

The next thing is we had discussed exhibits last time. I wanted to at this time just move into evidence what we have previously identified as Exhibits 1 through 17, with only the caveat regarding whether the various tax documents were actually filed with the government, which is something that will true up hopefully this morning with Mr. Jung.

THE COURT:  Mr. Pawar, I understand there is no objection to the admissibility of PX 1 through 17, is that correct?

MR. PAWAR:  There is none as long as the witness

M752Kea1

testifies that those are the ones that were filed with the IRS.

THE COURT:  Well --

MR. PAWAR:  The reason I am backtracking just a little bit, Judge, is because the exhibits that your Honor has, which is 1 through 17, they were not signed by anybody from the defendants, so they are what they are.  And I had stated last week that, yes, those are the tax returns that my clients will testify to as being the tax returns.  They just cannot testify as to the signature or to the actual submission to the IRS, and that can be easily accomplished by Mr. Jung who is here in the courtroom.

THE COURT:  So I am going to reserve on 1 through 17. I understand plaintiffs' argument that any objection has already been waived as a result of the pretrial conference, but why don't you see what Mr. Jung says on the stand.

MS. IZOWER-FADDÉ:  Okay.  But, your Honor, only certain of those exhibits are tax-return related to Mr. Jung. So what I will do is I will true up under Mr. Jung the exhibits that are related to that, and then I will deal with the request to admit into evidence the remaining exhibits after Mr. Jung's testimony.

THE COURT:  Okay.  Very well.

Anything further?

MS. IZOWER-FADDÉ:  Not from plaintiffs, your Honor.

THE COURT:  Then we will call Mr. Jung to the stand.

M752Kea1

I understand we have got an interpreter. Is that correct?

MS. IZOWER-FADDÉ: No, your Honor. We have an interpreter for Ms. Maki and for the other defendant witnesses that are here. But Mr. Jung, we had asked him whether he would need an interpreter and he never responded, and this morning I asked him and he said he is fine with English.

THE COURT: Okay. All right.

Mr. Pawar, before we call Mr. Jung to the stand, anything from the defendants' perspective?

MR. PAWAR: Yes Judge. Two things, and they all relate to the translation of the witnesses.

Mr. Jung obviously -- I spoke with him very briefly this morning, and he said he does understand and can answer in English, but I just want to note that English is not his first language. And the reason I am saying that, Judge, is because we have had translators throughout this litigation and there have been issues with certain words which my client, after they -- they did not actually agree with the interpretation by the interpreter of certain words, so that covers Mr. Jung.

With respect to --

THE COURT: As to that, I expect that on your examination if there is anything that comes out in the direct examination that you believe to be unclear or inaccurate, you will probe that.

MR. PAWAR: Yes, absolutely, Judge.

M752Kea1

With respect to the Japanese interpreter, we had a similar issue in the past, and I would just ask either your Honor or I can do a very short *voir dire* of the interpreter about if she had any conversation with anyone and if there are any specific words or meaning that were discussed with her which words or meaning could be different than what my clients understand that to be.

THE COURT:  No.  I'm not going to do that unless you give me some authority.  What I will do is we will swear the interpreter, and if you believe -- I take it you have got clients who will be with you at counsel table who understand Japanese, is that correct?

MR. PAWAR:  One of them does English and Japanese. The others are mostly Japanese.

THE COURT:  Okay.  So if you believe that the interpreter is mistranslating something, you can at that point bring that to my attention and then we will address it at that point.  Does that make sense?

MR. PAWAR:  Judge, the only reason I brought that up is because in a very brief conversation with -- I forget -- I don't know her name, she said that she had some conversation with plaintiffs' counsel regarding certain words, which I think it's key, and I'm not suggesting that she is going to use those words one way or the other, but that was just a concern I wanted to raise --

M752Kea1

THE COURT:  Let me ask you something, Mr. Pawar.  Have you shared with the plaintiffs the words as to which you believe that there may be an issue as to their interpretation?

MR. PAWAR:  No.  I looked at the glossary of terms that she already has that was given to the court reporter --

THE COURT:  So the way we are going to handle it is, since it is not an issue for this current witness, during the next break, you are going to share with the plaintiffs the words as to which you think that there is an issue and then, if necessary, you will consult with -- both consult with the interpreter.  If there is an issue to be raised to the Court's attention, you can raise it that way.  I am not going to do a separate examination with the interpreter on the stand for a *voir dire* examination unless there is a good reason for it.

MR. PAWAR:  Understood, your Honor.  Nothing further from the defendants.

THE COURT:  Mr. Chun, anything from you?

MR. CHUN:  Just that, based on my scheduling, I might have to -- I will have the witness here on July 7, my witness that's been called, but on the other days, if there is something that comes up, I know I have something tomorrow, then I would ask that -- I'm going to notify the Court that I might not be present.

THE COURT:  You are not representing Mrs. Negita, are you?

M752Kea1

MR. CHUN:  No.

THE COURT:  Then your attendance will be excused. Just bring it to my attention.

MR. CHUN:  Thank you.

THE COURT:  Plaintiff call the first witness.

MS. IZOWER-FADDÉ:  Thank you, your Honor.  Plaintiffs called Mr. Kil Jung, CPA.

THE COURT:  Mr. Jung, can you please step up to the witness stand, which is right next to me on my left.  Come up here.  I will point to it.

Once you are in the witness box, you may take off your mask but remain standing.  Come up here.  Remain standing.  My deputy will administer the oath.

KIL S. JUNG,

    called as a witness by the plaintiffs

    having been duly sworn, testified as follows:

THE COURT:  Mr. Jung, you may be seated.  Please try to speak into the microphone.  Try to go slowly if you can.  It is easier for the court reporter, who is transcribing the proceedings today, if you speak slowly and clearly.

Counsel, you may inquire.

MS. IZOWER-FADDÉ:  Your Honor, may I?

THE COURT:  You may inquire from the podium, and from the podium you may take your mask off.

MS. IZOWER-FADDÉ:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. IZOWER-FADDÉ:

Q.  Good morning, Mr. Jung.  Thank you for coming here today. My name is Rachel Izower and I am here with my colleagues, Neal Haber and Florence Rostami, and we represent the plaintiffs in the matter who are the former workers of the restaurants known as Ramen-Ya, Inc., and Y&S International.

       If during the course of my examination I ask a question that you do not understand, please let me know and I will rephrase it.

A.  Okay.

Q.  You understand that you are here to testify pursuant to a subpoena?

A.  Yeah.

Q.  And that you are under oath today?

A.  Yeah.

Q.  What is your -- you have stated your full name on the record.  Do some people refer to you as Mr. Tay or Tie?

A.  In English it's Jung, J-U-N-G, but in Japanese people, they call it Tay.  The Japanese pronunciation is Tay, Tay.  So they say Tay-san.

Q.  Are you sometimes referred to as Mr. Young, Y-O-U-N-G?

A.  My name is J-U-N-G.

Q.  Do you use Jung in your e-mail address?

A.  My e-mail?  My e-mail address is Jung, J-U-N-G,

KilJungCPA@gmail.com.

Q.  Okay.  The subpoena required you to -- your subpoena that you are appearing pursuant to here today required that you bring certain documents.  Did you bring documents here today with you?

A.  Yeah.

Q.  And you handed them to me this morning?

A.  Yeah, right.

THE COURT:  Mr. Jung let me remind you, try to speak into the microphone that's right next to you.

THE WITNESS:  Okay.

THE COURT:  And you have to speak audibly.  If the answer is "yes," sometimes it is easier to just say "yes" rather than "yeah," but it's your testimony.  Do you understand?

THE WITNESS:  Okay.

THE COURT:  Go ahead, counsel.

MS. IZOWER-FADDÉ:  Your Honor, may I have one of my colleagues bring the documents that Mr. Jung handed to me this morning up to him so that he can identify them as the actual documents that he brought in?

THE COURT:  You may.  Are they marked with exhibit numbers?

MS. IZOWER-FADDÉ:  No, they are not, your Honor, and I was going to ask to then have them marked -- we can have them

marked for identification --

THE COURT:  Why don't you mark them from counsel table.  Put an exhibit number on them.  Show them to defense counsel.  And then after you place them in front of the witness, tell the witness on the record that you have placed in front of him documents that are marked exhibits, whatever the number is to whatever the number is.  That way we will have a clean record.

MS. IZOWER-FADDÉ:  That sounds fine, your Honor.  If it is all right, I will ask my colleagues to do that, and I will proceed to the next thing.

THE COURT:  That's okay.

(Counsel confer)

BY MS. IZOWER-FADDÉ:

Q.  Mr. Jung, are you familiar with any of the defendants in this case?  I can go through them.

Let me start with are you familiar with an entity by the name of Ramen-Ya, Inc.?

A.  Yes.

Q.  And do you recognize that as an entity that ran a restaurant at -- a ramen restaurant on 3rd Street?

A.  Yes.

Q.  And are you familiar with an entity named Y&S, Inc.?

A.  Yes.

Q.  And do you recognize that as an entity that ran a ramen

M752Kea1                    Jung - Direct

restaurant on 4th Street?

A.   Yes.

Q.   Are you familiar with a defendant who is sitting at the defense table over here, Mr. Masahiko Negita?

A.   Yes.

Q.   And next to him, Mrs. Yasuko Negita?  Are you familiar with her as well?

A.   Who?  Who?  I don't know who she is.  I never met her.

Q.   You have seen her name in association with Ramen-Ya and Y&S, have you not?

A.   But I never met her.

Q.   Have you seen her name --

A.   I know her name, but I have never seen her.  I saw only Mr. Negita.

Q.   Are you familiar with Ms. Miho Maki?

A.   Yeah.  I know Miho Maki.

Q.   How do you know her?

A.   Because she came to my office several times to ask some payroll problem, and she came to me to say hello.  But basically I talk with -- we just communicate through e-mail.

Q.   You and Ms. Maki communicate through e-mail?

A.   I'm not doing.  My -- the employees are communicating.  It is payroll -- always payroll.  Payroll is very easy, simple. Every week they send us payroll record, then I prepare the net amount and tax amount and we pay tax and we send them the

payroll breakdown.  That's it.  It's a simple job.  Simple job.
Very simple job.

Q.  Okay.  So let me just see if I understand.  Each week
Ms. Maki or somebody on behalf of Ramen-Ya and Y&S sends you
the breakdown of the amount that each person at Ramen-Ya worked
or the amount of wages that they had earned for that week, is
that correct?

A.  Based on -- based on -- send us the time, time record.
Then I just -- I'm not read.  Just my employees they just see
the tax table and they calculate tax amount and net amount and
they send it back.  That's it.  It's very simple job.

Q.  Your calculations are based entirely on information that
comes to you from someone at Ramen-Ya for Ramen-Ya's employees
and from Y&S for Y&S employees.  Is that correct?

A.  They send us a record.  Then we just calculate on the basis
of tax table, the computer, the computer-generated tax table,
and we just put in, into payroll the program and print it out
and send it, send it to them.  All the ADP services do the same
kind of thing.  We do the same kind of thing.

Q.  So the net amount that you calculate, that is the amount
that, per your calculations, should appear in each employee's
check, is that correct?

A.  Yeah, right.

Q.  And the gross amount would be before taxes are taken out --

A.  Right.

M752Kea1                    Jung - Direct

Q.   -- is that correct?

A.   Right.

Q.   And is it your testimony that you don't actually know who at Ramen-Ya or Y&S sends you the information from which you calculate the payroll?  Is that correct?

A.   No, correct.

Q.   You are a CPA, right?

A.   Right.

Q.   And you became -- when did you first become a CPA?

A.   I think about 30 years ago.

Q.   Does 1987 sound correct?

A.   '87 or '86.  '86, I think.

Q.   So for over 30 years you have been a CPA?

A.   Yeah, more than 30 years.

Q.   And you are also a tax preparer in New York?

A.   Right.

Q.   And what is required to become a CPA?

A.   Pardon me?

Q.   What did you have to do to become a CPA?

A.   I came to America as a -- how can I say?  I came here to study, and I went to school, graduate school, and then I -- after graduation I took CPA exam and I passed and then I am working as CPA.

Q.   And in addition to having -- so to become --

         MS. IZOWER-FADDÉ:  Actually, your Honor, is it okay

M752Kea1                        Jung - Direct

for background if I ask leading questions, because of the language limitations especially?

THE COURT:  Yes, that's fine.

MS. IZOWER-FADDÉ:  Thank you.

BY MS. IZOWER-FADDÉ:

Q.  To become a CPA, isn't it correct that there are certain educational requirements?  Yes or no.

A.  Yeah, yes.

Q.  And there are certain testing requirements that you need to pass a certain test?

A.  Right.

Q.  And there is also ethical requirements, you get interviewed and you are supposed to maintain a certain code of conduct, certain ethics in connection with being a CPA?

A.  In America you have to go to -- I finish the college in Korea, and then in America to become CPA, I have to go to graduate school, so I went to graduate school.  And then after graduate school I have qualification to take CPA exam, and I did.

Q.  And part of what you had to learn are the ethical requirements that govern being a CPA, is that correct?

A.  There is code of ethical requirement, and every year we just have a kind of CPA course to take, some credit for the ethical requirement.

Q.  And you have to certify every year that you have taken your

M752Kea1                    Jung - Direct

continuing education requirements.  Isn't that correct?

A.  Every year, yeah, I'm doing.  That's correct.

Q.  And you understand that there are consequences to preparing or filing a tax return that has inaccurate information in it where you were in a position to know the information is inaccurate?

A.  I know, I know.

Q.  And you wouldn't do that.

A.  I just prepared on the basis of bank statement.  Bank statement is very objective evidence, so I do not make any problems.  I always be careful.  I'm just very good at numbers, always when I was in school, I was -- my mathematics is always the number one in the school.

Q.  So in addition to bank statements, there is certain information you need to get from your clients in order to complete the tax returns?

A.  Every month they send us bank statement.  We put it in QuickBooks, the program, and we just -- there are so many things.  I think the credit card company issue K-1 statement. And I just compare everything, bank statement, the K-1 statement.  I just review everything.  I do not get into trouble.  So I always try to make it perfect.

Q.  So in -- but in addition to those documents, there is some information which you testified to just before about employee work hours, for example, that you need to rely on the clients

to provide to you directly, isn't that correct?

A.   I always on the basis of the document that I reported to Internal Revenue Service.  That's the most believable document.  So I don't know what they do, but mostly -- I don't know.  I just on the basis of the payroll record and bank statement and K-1 statement from the credit card company.

Q.   You are careful in your job.

A.   Yeah, I'm very careful.

Q.   And you wouldn't intentionally -- you wouldn't intentionally file anything that was inaccurate in the way it represented the income or deductible expenses of your client, would you?  You would not.

A.   On the basis of bank statement, it's very clear-cut.

Q.   Right.  And you would never intentionally file something that inaccurately reflected either the income or deductible expenses of any of your clients, would you?

A.   I don't understand exactly what you mean, what the . . .

Q.   Let me try to rephrase.

            THE COURT:  Let me ask a question.

            When you prepare tax returns, do you attempt for them to be accurate?

            THE WITNESS:  Yeah, that's right.

            THE COURT:  To your knowledge, have you ever prepared a tax return that is inaccurate, knowing that it was inaccurate at the time?

THE WITNESS:  I try to make accurate.  I get K-1 statement from credit card company and bank statement and my payroll record.  I just compare everything and then I prepare on the basis of what I have.

THE COURT:  Have you ever knowingly prepared a statement that you believed was false?

THE WITNESS:  I don't think so.  I always try to make it perfect.  So without doing that, I in trouble.  I don't want to be in trouble.  So now I'm more than 70 years old.  I do not make any trouble.  I like to make it clear.  That's why my business getting -- expanding.

THE COURT:  Go ahead.

BY MS. IZOWER-FADDÉ:

Q.  Mr. Jung, I just want to say that we understand that it is very stressful to be a witness and it is particularly stressful when English is not your first language.  You are here to provide us with facts.

THE COURT:  Why don't you just ask the next question?  We don't need a speech.  Go ahead, counsel.

MS. IZOWER-FADDÉ:  Okay.

We now have these marked for identification.  May I have my colleague bring them up?

THE COURT:  Yes.

MS. IZOWER-FADDÉ:  Mr. Haber?

THE COURT:  I have got copies of the exhibits on the

M752Kea1                          Jung - Direct

bench.  During a break you will mark my copies with the exhibit numbers that you have given to the documents that you have put in front of the witness.

What have you put in front of the witness?  Which exhibits?

MS. IZOWER-FADDÉ:  These are documents --

THE COURT:  What numbers?

MS. IZOWER-FADDÉ:  They --

MR. PAWAR:  PX 20A, B, C, D.

MR. HABER:  May I?

THE COURT:  Only one person speaking at a time.  I am speaking to the plaintiff now.  You can confer with your colleague.  Would you just indicate for the record what you have put in front of the witness and then, Mr. Pawar, I will hear from you.

MS. IZOWER-FADDÉ:  Okay.  So we have put in front of the witness the documents that he brought in this morning, and we have marked them Plaintiffs' Exhibit or PX 20A through E and those are tax returns for Ramen-Ya from 2014 to 2018 respectively.

We have marked as PX 21A through E Y&S tax returns from 2014 -- or what appear to be Y&S tax returns from 2014 through 2018.

And we have marked as PX 22A through D documents that bear the title "Employee Detail for Ramen-Ya, Inc." for the

years ending December 31, 2015, 2016, and the first -- and 2017, sorry, and 2018.  So those are A through D, A being 2015 and D being 2018.

And finally we have marked as PX 23A through E documents that each bear the title "Employee Detail for Y&S International Corporation" and they cover the -- A is for the period 2014 and then 2015, 2016, 2017, and 2018 are the remaining letters through E.

THE COURT:  And all of those exhibits have been placed in front of the witness, am I correct?

MS. IZOWER-FADDÉ:  Yes, your Honor.

THE COURT:  And Mr. Pawar, did you have something you wanted to raise with me?

MR. PAWAR:  Yes, your Honor.

So I want to say something to expedite the hearing, but I just want to note that 2018, which is PX 20E and then PX 21E are tax returns from 2018.  It's the first time I am seeing them.  That's one thing I just want to note for the record.

And then PX 22A through D and then PX 23A through E is the first time I am seeing these documents ever, so I just want to note that for the record.

Now, just to expedite the things, your Honor, as long as counsel can establish that this is Mr. Jung's signature on the bottom of the first page, I have no problem with the

M752Kea1                        Jung - Direct

admissibility of all of these tax returns, if that will make things go any quicker.

THE COURT:  Thank you, Mr. Pawar.

Counsel, you may proceed.

MS. IZOWER-FADDÉ:  I also haven't seen much of this before today.  So --

THE COURT:  Unless either of you have something to raise with respect to the fact that you haven't seen a document that was subpoenaed to the Court today, I don't particularly need the commentary.

Go ahead, counsel.

MS. IZOWER-FADDÉ:  Okay.

BY MS. IZOWER-FADDÉ:

Q.  Mr. Jung, are the exhibits that have been placed in front of you documents that you brought to Court with you this morning pursuant to subpoena?

A.  Yes.

Q.  And the exhibits that are marked PX 20A through E, are those the federal income tax returns for Ramen-Ya, Inc., for their fiscal years -- for their 2014 through 2018 fiscal years?

A.  Yes.

Q.  And the Ramen-Ya, Inc.'s, fiscal year runs from October 1 to September 30.  Is that correct?

A.  Yeah, correct.

Q.  Are these true and correct copies of the tax returns that

you filed on behalf of Ramen-Ya for each year -- the federal

income tax returns that you filed for Ramen-Ya for each year

2014 through 2018?

A.   Yes.

Q.   You will note that next to your signature there is a date

that shows July 4, 2022 on the first page.  Is that just a

function of the date you printed it out from your system?

A.   I printed out yesterday.

Q.   And your system automatically updates the date --

A.   Right.

Q.   -- in your signature block.

A.   Right.

Q.   The line above it, where it says "signature of officer,"

these documents don't have a signature here, but is it fair to

say that you would not have filed these tax returns if you

didn't have proper authorization from Ramen-Ya to file them?

A.   When I prepare tax return, I send it to them and they think

it's okay, then I file first of all the -- we have to pay tax,

and they say it's okay to pay tax, then I file it.  I never

file without any -- their consent.

Q.   So you received Ramen-Ya's express consent to file each of

these federal income tax returns for 2014 through 2018,

correct?

A.   Correct.

Q.   And let's -- so I -- let's move to the next grouping, which

M752Kea1                     Jung - Direct

is for --

THE COURT:  Are you offering 20A through E?

MS. IZOWER-FADDÉ:  I was going to do it all at once at the end, but I can, yes.

I would like to offer PX 20A through E into evidence.

THE COURT:  Any objection?

MR. PAWAR:  No objection.

THE COURT:  Received.

(Plaintiffs' Exhibits 20A through E received in evidence)

THE COURT:  You may put the Ramen-Ya tax returns to the side.  You can put those down.  Just find -- you can put them right by me, so you don't have too much paper in front of you.

BY MS. IZOWER-FADDÉ:

Q.  Turning to what's been marked as PX 21A through E, are these true and correct copies of the federal income tax returns for Y&S International Corporation for the years 2014 through 2018?

A.  Yes, right.

Q.  These are the documents that you prepared and filed on behalf of Y&S, correct?

A.  Right.

Q.  And you had express authorization from Y&S to file each of these tax returns, is that correct?

A.   Correct.

Q.   Thank you.

MS. IZOWER-FADDÉ:  I would move to have Plaintiffs' Exhibit 21A through E admitted into evidence.

THE COURT:  Any objection?

MR. PAWAR:  No objection.

THE COURT:  21A through E are received.

(Plaintiffs' Exhibits 21A through E received in evidence)

THE COURT:  You can put 21A through E, the ones that you just looked at, just put them right by me.  Thank you.

BY MS. IZOWER-FADDÉ:

Q.   Mr. Jung, I am going to ask you to turn now to the documents that have been marked PX 22A through D.  Can you tell me what these documents are?

A.   Which document you talking about?

Q.   PX 22.

THE COURT:  Counsel, you can approach, put your mask on, and just put the documents that you are referring to right in front of him.  Help him with it.

MS. IZOWER-FADDÉ:  Okay.  I will do that.

BY MS. IZOWER-FADDÉ:

Q.   So this is the one I am going to refer to.  This is PX 22, and then this is PX 23.

A.   Okay.

M752Kea1                     Jung - Direct

Q.   So Mr. Jung, you now have in front of you PX 22.  Do you
see that?

A.   Yeah, I see that.

Q.   Next time we will write it a little bigger.

     What is that document?

A.   Payroll, payroll document.  Every --

Q.   Is this a document that your firm creates?

A.   Every two weeks, every two weeks, they send this through my
e-mail, they send their gross amount, then I prepare on the
basis of the gross amount, and then I prepare the net amount.
I put it into my computer and print out the net amount and then
I prepare tax return -- I prepare tax amount then I pay tax
every two weeks.

Q.   Okay.  So when we are looking at, for example, PX 22A, we
will use that, these are all documents are the same type of
report, just for a different time period, isn't that correct?

A.   That's right.

Q.   So the information in the "gross" column, which is the
fourth column from the left, that is the information that you
get for each employee from Ramen-Ya?

A.   Right.

          (Continued on next page)

BY MS. IZOWER-FADDÉ:

Q. And then you make the calculations that are reflected in the remaining columns?

A. Right.

Q. And on the right-hand side, the net amount is the amount that you are letting them know should appear in the actual checks to the employees, is that correct?

A. That's right.

Q. OK. And that would be the same would be true for each of the other exhibits, sections of this exhibit, all the way through E?

A. Yeah, yes.

Q. And what you've printed out here shows the whole, you know, year by year each period, but these are information that you accumulated throughout the year?

A. Right, that's right.

Q. And this is just a compilation of what your internal records have for each of these employees which are the names on the left for each of these time periods, is that correct?

A. Correct.

        MS. IZOWER-FADDÉ: I would offer these PX 22A through D into evidence.

        THE COURT: Any objection?

        MR. PAWAR: No objection.

        THE COURT: 22A through D are received.

M75sKEA2                     Jung – Direct

(Plaintiff's Exhibits 22A through 22D received in evidence)

You can put those, again, right next to me. Thank you.

Go ahead, counsel.

BY MS. IZOWER-FADDÉ:

Q.   Mr. Jung, do you have in front of you now what's been marked for identification as PX 23A through E?

A.   Yes.

Q.   OK.   Are these the same type of report with the same information in the columns, just here it's for Y&S International rather than for RYI, rather than for Ramen-Ya?

A.   I just prepare separately.

Q.   But we can read the columns in the same way and you get this information -- let me just --

I'll just start it again, excuse me.

The information --

THE COURT:   These are for a different entity, correct?

THE WITNESS:   Correct.

THE COURT:   OK.   But one would read the columns the same way that you could on 22, which you just looked at, is that correct?

THE WITNESS:   Correct.   All the client the same.   The same tax program.   So I use the same tax program so it's so many client, everybody is the same.

Q.  So the name of the client and the name of the employee and the gross column, that information came to you from Y&S, is that correct?

A.  No.  No, I just prepare separately.  I don't know if they have any connection, but I prepare on the basis of -- on the basis of the information I was provided.

THE COURT:  And did Y&S provide you the information you in 23A through E?

THE WITNESS:  Right.

THE COURT:  Go ahead.

MS. IZOWER-FADDÉ:  Thank you, your Honor.

I would like to offer these into evidence, PX 23A through E.

THE COURT:  Any objection, Mr. Pawar?

MR. PAWAR:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibits 23A through 23E received in evidence)

MS. IZOWER-FADDÉ:  Thank you.

BY MS. IZOWER-FADDÉ:

Q.  Before you put these aside, do you see on the first page of Exhibit 23A the second employee listed, the name Yasuko Negita?

A.  Yeah, I see it.

Q.  And does this document reflect that Ms. Negita received -- that she received wages for each month, it looks like, except

for January twice a month throughout the year 2014?

A.   Right.

Q.   We should be able to compare the net column to the checks that are actually issued or the payments made to Ms. Negita, is that correct?

A.   Yeah, correct.

Q.   And at the end of a tax year, do you create the W-2s for Y&S?

A.   Right.

Q.   Do you also create the W-2s for Ramen-Ya?

A.   Right.

Q.   And do you get the amounts for the various sections of the W-2, would they match to the totals in this document?

A.   Computer generate automatically, so I think it's always the -- the machine, they just generate the W-2s.  It's correct. So I just report Internal Revenue Service and I report to Social Security Administration.  If they -- if there is any difference, then they just mail your information is not correct, so --

     But I've never seen such a case.  Always perfect.  I'm so good at mathematics, so no mistake at all, I think.

Q.   So let me ask you this.  You have some sort of a software program that you use in connection with the accounting services that you provide to your clients, is that right?

A.   Right.

Q.  And that software system you enter data into it and you can generate from that certain reports and certain forms, is that correct?

A.  Correct.

Q.  But the underlying data that it's being drawn from is all the same?

A.  Right.

Q.  And so the numbers here should match up to the numbers on the W-2s that get issues, is that correct?

A.  Correct.  It's not correct, I think I receive from the Internal Revenue Service or Social Security Administration.

Q.  And what we've been looking at is Exhibit PX 23, which is the employee detail for Y&S International.

     Would the same be true with regard to the connection -- I'm sorry -- with regard to the W-2s that you generate for Ramen-Ya that the same underlying information would be there as you have, Exhibit PX 22?

A.  I see.  Always same.  All the things are same.

Q.  Did I already move 23 in?  Yes.  OK.

     Who provides W-2 forms to the employees?

     Does that come from you or does that come from the corporate entities?

A.  I prepare it.  My employee just print out from the computer program, payroll program.  It's always perfect.

Q.  And what do you do with the printouts when you get them?

A.   I print out and I send it to -- I send it through e-mail to the same e-mail address.

Q.   For the e-mail address that you used for Ramen-Ya and Y&S?

A.   Right.

Q.   And then it's up to them to provide the W-2 forms to their employees, is that correct?

A.   Right.  I send to them and they just -- if they find some mistakes, something like address or the Social Security number, then they -- they send me back, please correct it, and I correct and then I send them.

Q.   And it's still up to them after they get the corrected version to be the ones to send it out to their employees?

A.   Right.  Then I report to Social Security Administration.

Q.   The e-mail address that you used to communicate with Ramen-Ya, was it the same as the e-mail address you used to communicate with Y&S?

A.   I don't know.  I don't know exactly, but just -- I just answer on the basis of the e-mail that I received.

Q.   You don't know whether it was the same e-mail address that you would receive for Ramen-Ya as from Y&S?

A.   I'm not doing that kind of work.  My employee, the employees are working on that, so I just take a look at if it's correct.

Q.   In addition to the federal tax returns, did you also prepare and file New York State and city tax returns for

Ramen-Ya?

A.   Right.  It's connected.  The program is connected, the New York State and New York City and federal is all connected.  So federal return is right, then all other things are the same.

Q.   So you prepared and filed the state income tax returns for Ramen-Ya for each year 2014 through 2018?

A.   It's all connected.  When I have tax program, the federal and state, city are all connected.  It's all one set.  So I just push one button and the report to all the 30 places.

THE COURT:  Mr. Jung, it might help if you just answer the question that you're asked.

The question was just:  Did you prepare the state tax returns for Ramen-Ya?

THE WITNESS:  That's right.

BY MS. IZOWER-FADDÉ:

Q.   And the city ones for Ramen-Ya for those years as well?

A.   That's right.

Q.   And the same for Y&S, you also prepared the state and city income tax returns for those entities, for --

A.   Yes, that's right.

Q.   For Y&S for 2018?

A.   That's right.  I used the computer program that connected everything.

Q.   And you also prepared the NYS 45 employee?

A.   I do.  I do, yes.

Q.   For both Y&S and Ramen-Ya?

A.   Yeah, I do.

Q.   For each year 2014 through 2018?

A.   Right, right.

Q.   OK.  But you didn't bring those today, so I'm going to show you.

My apologies.  I have to go back to Exhibit 22 and 23. The employer's quarterly federal tax returns and NYS 45s that are at the end of each section of Exhibit 22.  So 22A, the first several pages are the employee detail report, is that correct?

A.   Correct.

Q.   And then after that, the next several pages are the employer's quarterly federal tax returns on form 941?

A.   Right, that's right.

Q.   Those are for each of the quarters that correspond to the detail report on the prior pages?

A.   Yeah, NYS 45.

Q.   Yes.

A.   Connected.

Q.   And then after that, you have attached the NYS 45s?

A.   Right.

Q.   And these also correspond to the employee detail for Ramen-Ya, that's at the front of Exhibit 22A?

A.   That's right.

Q.   And is this the case with each of the other -- with each of the other exhibits in 22A, B, C, D, and -- 22A through D?

A.   All the same.

Q.   And these are true and correct copies of the tax documents that you prepared and filed on behalf of Ramen-Ya?

A.   Right.

Q.   For the employee tax documents that you prepared and filed for Ramen-Ya?

         (Pause)

         THE COURT:  Is that correct?

         THE WITNESS:  Correct.

Q.   I would like to just draw your attention to 22C.  It looks like for 22C, we don't have the same thing.  We have only half a year instead of full year for 2017.

         (Counsel confer)

         The form of the NYS 45 is a bit different.  It's the web form?

A.   2017, my program lost some documents.  Six months are missing.  But still, NYS 45 is still there.  So I see all connected.  Maybe some information, some data was lost six months lost, six months data was lost, but...

         My computer just have some problem.  I don't know.

Q.   Just to clarify, are you saying that the employee detail for Ramen-Ya for 2017 is missing the second six months of the year, but that the tax forms that are attached, the employee

tax forms for federal and state, are true and accurate as to what was filed for the full year?

A. That's right.

Q. Thank you for that clarification.

Before when we moved it into evidence, I hadn't -- I did not meet --

THE COURT: 22A through D are in evidence, and if I haven't received 23A through E, those are also in evidence.

MS. IZOWER-FADDÉ: OK.

Q. The same thing, you have the same types of attachments on 23 and as you did for 22?

A. That's right.

Q. And those are the true and correct copies of the tax employee tax filings for Y&S International for the years 2014 through 2018?

A. That's right.

Q. OK. Can we turn back to PX 20. These are the tax returns for Ramen-Ya.

Do you have that in front of you?

Mr. Jung, if you look at the first page of -- let's use PX 20A, the federal income tax return numbers, the line items that have to be reflected in the different parts of this form, is that right?

A. Right.

Q. And there is very specific information that's required to

be included in each of these numbered line items, is that right?

A.  Right.

Q.  And so, for example, if you look at line item number 12, it says compensation of officers.  Do you see that?

A.  Right.

Q.  And the information that you're obligated to provide in that line item and that Ramen-Ya is obligated to provide in that line item must be compensation to officers, is that correct?

A.  Correct.

Q.  And if it's not compensation, it would be wrong to include it in there, isn't that correct?

A.  Compensation of officers.  Compensation of officers.  I think I was told the person who was, I put it there.

Q.  Line 18, that line is for interest, do you see that?

A.  18?

Q.  Yes.

A.  It's blank.

Q.  There is no amount in the right-hand side, but that is --
if there were interest that was deductible that the corporation could take as a deduction, it had to be included in line 18?

A.  Right, that's right.  But I don't see any interest from bank statement.  Maybe I put it into bank charge.

Q.  I'm not saying there was interest, I'm just saying that had

M75sKEA2                          Jung - Direct

there been, that's where you would have put it, correct?

A.  Right.

Q.  OK.  So just lines 12 through 29, those are all deductions that a corporation can take to reduce the amount of income it's reporting for tax purposes, the amount of taxable income that it has?

A.  Right.

Q.  Right.  So is repayment of a loan tax deductible?

A.  Tell me again.  I don't understand what you're talking about.

Q.  When a company repays a loan, the repayment of the principal amount of a loan, that's not something that they can take as a deduction, isn't that correct?

A.  Correct.

Q.  By comparison, compensation and employee wages and salaries can be taken as a deduction, correct?

A.  Correct.

Q.  I'm sorry.  Compensation of officers and of employees can be taken as a deduction, correct?

A.  Correct.

Q.  But in order for that to be a proper deduction, isn't it the case that it has to be compensation for services actually provided to the entity?

A.  I prepared on the basis of the payroll record.

          THE COURT:  Can you try to answer the question that

counsel asked?

Why don't you ask the question again.

A.  I don't understand the meaning.

Q.  To include compensation of officers and salary and wages as a deduction, the officers and the employees have to have actually provided services to the entity commensurate with the deduction?

MR. PAWAR:  Objection.

THE COURT:  Basis?

MR. PAWAR:  Judge, the witness is not a legal expert to say whether the compensation to the officers were in relation, direct relation to the activities of the corporation or for the benefit of the employees or the employer.

THE COURT:  Overruled.

I'll take it for his understanding.

Q.  Let me rephrase that question.  As a CPA, you have to be familiar with what information is allowable in each line item of the tax return, isn't that correct?

A.  I didn't think about that.  I just prepared on the basis of payroll program.

Q.  Well --

A.  I don't know.  I don't understand what you're talking about, but I have so many clients, so I didn't -- I'm just working through e-mail, so I don't know about that matter.

So I just prepared on the basis of the payroll records

that I prepared.

Q.  You relied on Ramen-Ya and Y&S International to provide you information about the actual payroll expenses that they had, isn't that correct?

A.  That's right.

Q.  And about the actual compensation that they were providing to officers, is that correct?

A.  Correct.

Q.  And you assumed that those salaries and compensation were for services that were actually rendered and you had no reason to believe otherwise, isn't that correct?

A.  Correct.

Q.  The form W-3 that attaches W-2s that get sent to the copy that gets sent to the government, who signs the form W-3s?

A.  W-3, we just file through Internet, so signing is not needed.  We just send it to them and they think it's OK, then just through the computer program.

Q.  So is that, again, a situation where you're relying on Ramen-Ya or Y&S International, depending on whose W-3 form it is, to confirm the accuracy to you so that you can go ahead and file it?

A.  Right, that's right.

Q.  Thank you.

If you look at the first page, back to PX 20 on the first page in section C, it gives a date of incorporation.  To

your understanding, Ramen-Ya, Inc., was in incorporated on October 9, 2014, is that correct?

A.   Right, correct.

Q.   Will you turn now to the balance sheet which is schedule L, page five.  Schedule L is entitled balance sheet per books.
     Do you see that?

A.   Right.

Q.   Do you see line 19, loans from shareholders?

A.   Right.

Q.   So based on this information provided on this balance sheet, is it fair to say that as of the year ending September 30, 2015, the total amount of loans from shareholders for Ramen-Ya was $33,805?

A.   Right.

Q.   That's correct?

A.   Correct.

Q.   Do you also see the line that says capital stock at line 22?

A.   Right.

Q.   And across from common stock, you see that as of September 30, 2015, the common stock listed as $50,000.
     Do you see that?

A.   Right.

Q.   That's an investment, is that correct?

A.   Correct.

Q.   That's not a loan, right?

A.   Investment.

Q.   Right.  Because if it were a loan, it couldn't be on this line, could it?

A.   I don't understand what you're talking about.

Q.   If the corporation received a loan, that loan would not be reflected in line 22, isn't that correct?

A.   In the beginning, they put $50,000.  And then later, they don't need -- they don't have money.  So sometimes the corporate officers, they put the money in.  Therefore, I think that one, I put it loan from shareholders.

        THE COURT:  Sir, Mr. Jung, line 22 is not for loans, correct?

        THE WITNESS:  Correct, it's not loan, it's investment in the beginning.

Q.   And the loans from shareholders you put in on line 18?

        MR. HABER:  19.

Q.   I'm sorry.  Line 19, correct?

A.   Correct.

Q.   And that's going to be true with regard to each of these tax returns, both for Ramen-Ya and Y&S, if something is a loan from a shareholder, you're going to put it in on line 19, right, of this schedule L?

A.   I said before, it's investment in the beginning.  And then later, they put the money in, and then I think I put it into a

loan from shareholder.

THE COURT:  Mr. Jung, each time you prepared these returns, you prepare them in the same way, correct?

THE WITNESS:  Right, that's right.

THE COURT:  So when you are filling out line 22, those are always going to be investments, correct?

THE WITNESS:  Right.

THE COURT:  And line 19 is always going to be loans, correct?

THE WITNESS:  That's right.

BY MS. IZOWER-FADDÉ:

Q.  If there were a loan from a nonshareholder, that would appear as other liabilities, line 21, is that correct?

A.  Correct, something like bank loan, something like that.

Q.  Right.  And that would be on line 21?

A.  Right.

Q.  Thank you.

If you could turn now to schedule G which is entitled information on certain persons owning the corporation's voting stock.

Can you look at part two of schedule G, certain individuals in states owning the corporation's voting stock.

Are you on that page, sir?

A.  What page are you saying?

Q.  Schedule G.

M75sKEA2                         Jung - Direct

A.   Yeah, right.

Q.   And that lists Yasuko Negita as owning 100 percent of the voting stock of Ramen-Ya, is that correct?

A.   Correct.

Q.   And when you filed this, you understood that to be true and correct as to who the owner of Ramen-Ya was?

A.   I don't know.  I was just informed that this person is the 100 percent owner.  I was told that way, so I put it there.  I don't know.  I never met her.  I don't know who she is.

Q.   But you relied on the information that was provided to you by your client, is that correct?

A.   Yeah, I think so.

Q.   And you had no reason to believe it was not true?

A.   Right, that's right.

Q.   And let's turn to the next page, which this should be form 1125E entitled compensation of officers.

     You see, under name of officer, it says Yasuko Gegita, where the N is a G.  Do you see that?

A.   Right.

Q.   Is that just a typo?

A.   Yeah.

Q.   It should be an N, right?

A.   Right.

Q.   It should be Negita?

A.   Negita.

Q.   Right.   And do you see under section C where it says percent of time devoted to business, 100 percent?

A.   Right.

Q.   And percent of stock owned, 100 percent?

A.   Right.

Q.   And the amount of compensation where it says 21,400, that coordinates exactly to the compensation of officers on page one, line 12?

A.   Right.

Q.   So, and this document is being reported to the government that Ms. Yasuko Negita owns 100 percent of Ramen-Ya, and that she is an officer of the entity and because of the complete match between the amount of compensation on 1125E and the amount of compensation in line 12 on page one, at least she is the only officer receiving any compensation from Ramen-Ya for the year 2014?

A.   Right.

         THE COURT:  It's now 12 noon.  Why don't we take a 15-minute break.  We'll reconvene at 12:15.

         Sir, you can step down.

         Counsel, how much more time do you have on direct examination?

         MS. IZOWER-FADDÉ:  I have a bit.  I'm not planning to go through each of these documents separately, if that is what you're asking.  There is some additional tax documents that had

been produced during discovery that I want to ask him about.

THE COURT:  Maybe it would work during the break to see if you can shorten it a little bit.  We'll go from 12:15 until one o'clock, and then I've got an appointment one to two, and we'll reconvene at two.

I'll see you all back here at 12:15.

MS. IZOWER-FADDÉ:  Thank you, your Honor.

(Recess)

THE COURT:  Counsel, you may proceed.

MS. IZOWER-FADDÉ:  Thank you, your Honor.

BY MS. IZOWER-FADDÉ:

Q.  Mr. Jung, you have a binder next to you.

THE COURT:  No, that big binder to your left.

Q.  If you turn to PX 1A and just go past the federal income tax return and take a quick look, there's state and city tax returns there.

Do you see that?

A.  What did you say?

Q.  You flipped past the federal and you see that at the back of that exhibit, there are state and city tax returns for Ramen-Ya?

A.  Yeah, right.

Q.  I just want to confirm that these are true and correct copies of state and city income tax returns for Ramen-Ya for 2014 that you prepared and filed?

M75sKEA2                          Jung – Direct

A.   Right.

Q.   OK.  If you could just take a quick look.  The same thing with Exhibits 1B, C, etc., just confirm that the city and state ones are true and accurate copies of tax returns that you prepared and filed for Ramen-Ya?

THE COURT:  As painful as it may be, let's do it actually by exhibit.  Why don't you do 1B and 1C, unless -- let me ask Mr. Pawar.

Is there any dispute that the state and city returns that are parts of Exhibits 1B and 1C are true and correct copies of what was filed by Mr. Jung on behalf of Ramen-Ya?

MR. PAWAR:  No dispute, Judge.

THE COURT:  OK.

MS. IZOWER-FADDÉ:  If he's willing to stipulate as to Y&S also, which are the, I believe, PX 6 exhibits, that might also save a bunch of time.

THE COURT:  Mr. Pawar.

MR. PAWAR:  If Mr. Chun has no objection because --

THE COURT:  So why don't you, with respect to Exhibit 6 Y&S, why don't you ask a couple of questions and see whether Mr. Pawar is willing.

MR. PAWAR:  Only because Mr. Keawsri's name is listed as president, not my client in Y&S.

THE COURT:  You don't have to explain it.  We'll let the lawyer ask the question.

MS. IZOWER-FADDÉ:  Sure.

Mr. Jung, please turn to Exhibit 6A in your binder there.

I'm sorry.  6B.

THE COURT:  Are you at 6B, Mr. Jung?

If you look at the tabs, are you at what says tab 6B, as in boy?

Counsel, you may approach.

MS. IZOWER-FADDÉ:  Thank you, your Honor.

BY MS. IZOWER-FADDÉ:

Q.  Are those the 2017 income tax returns for Y&S International?

A.  Right.

Q.  And if you flip past the federal one, can you confirm whether the state and city income tax returns for Y&S International are true and correct copies of the 2017 tax returns that you prepared and filed?

A.  It's true.

Q.  I'm sorry.  I didn't hear you.

A.  It's true.

THE COURT:  Well, actually, why don't you get to the 2017 state tax return.  It's behind the federal tax return.

THE WITNESS:  It's true.  I told you they are connected.  Connected, so ...

THE COURT:  So what's listed as the state tax return,

M75sKEA2                          Jung - Direct

is that the state tax return that you filed for Y&S for 2017?

THE WITNESS:  That's right.

THE COURT:  And then if you go further back after the state tax return, there should be a New York City tax return.

THE WITNESS:  It's true.  It's all connected.  So I told you, it's connected.  It's kind of a set, therefore, it's all correct.

THE COURT:  And that New York City tax return is the tax return you filed for Y&S with New York City, is that correct?

THE WITNESS:  That's correct.

MS. IZOWER-FADDÉ:  Your Honor, I would like to move Exhibits 1 and 6 into evidence.

THE COURT:  Any objection?

MR. PAWAR:  No objection, Judge.

THE COURT:  Exhibits 1A through --

MS. IZOWER-FADDÉ:  D.

THE COURT:  -- D and 6 --

MS. IZOWER-FADDÉ:  A and B.

THE COURT:  -- A and B are received.

MS. IZOWER-FADDÉ:  Thank you, your Honor.

(Plaintiff's Exhibits 1A through 1D and 6A and 6B received in evidence)

MS. IZOWER-FADDÉ:  If I could have you turn to Exhibit 2A.

THE COURT:  Counsel, you may approach and point him to 2A.

MS. IZOWER-FADDÉ:  Thank you.

Your Honor, because he's closer to this, I'll start with 7A, if that's OK.

THE COURT:  Just make it clear for the record.

MS. IZOWER-FADDÉ:  Actually, the witness has in front of him Exhibit 7A, which are those --

Q.  Is that true and correct copies of the NYS 45 filings for Y&S International for 2014?

A.  That's right, true.

Q.  Now, there is also a 7D, PX 7D, which should be like three tabs later.

A.  It's true.

Q.  You're saying 7D is a true and correct copy of the full set of NYS 45 payroll tax returns for calendar year 2017 for Y&S International, is that correct?

A.  Correct.

Q.  OK.  And 2017 was the year that you had lost some information for, is that correct?

A.  Correct.

MS. IZOWER-FADDÉ:  OK.  So if I may approach to help him turn to Exhibit 2 now?

THE COURT:  Yes, you may approach.

MS. IZOWER-FADDÉ:  Thank you, your Honor.

M75sKEA2                      Jung - Direct

The witness has in front of him what has been marked
as Exhibit PX 2D.

BY MS. IZOWER-FADDÉ:

Q.  Mr. Jung, do you recognize these as Ramen-Ya's NYS 45 forms
for tax year 2017, each of the quarterly forms for that year?

A.  Right.

(Continued on next page)

M752Kea3                    Jung - Direct

Q.  And are these true and correct copies of the NYS-45 forms for 2017 for Ramen-Ya that you prepared and filed?

A.  Right.

MS. IZOWER-FADDÉ:  Okay.  Your Honor, can we see whether we can get a stipulation as to all of the --

THE COURT:  Are you offering 2A through E?

MS. IZOWER-FADDÉ:  2A through E and 7A through E.

THE COURT:  Any objection?

MR. PAWAR:  No objection to 2A through D.  I just --

MS. IZOWER-FADDÉ:  E.

THE COURT:  2A through E.  Any objection --

MR. PAWAR:  No.

THE COURT:  -- to 2A through E?

So 2A through E are received.

(Plaintiffs' Exhibits 2A through E received in evidence)

MR. PAWAR:  One second Judge.  I saw 7A through D or E.

MS. IZOWER-FADDÉ:  E.

MR. PAWAR:  That's fine, Judge.

THE COURT:  7A through --

MS. IZOWER-FADDÉ:  -- E.

THE COURT:  7A through E are received.

(Plaintiffs' Exhibits 7A through E received in evidence)

BY MS. IZOWER-FADDÉ:

Q.  While you are looking at PX 2, do you see that in the signature line where it is set up for signer's name, the printed signer name there is Yasuko Negita and the title is president?

A.  That's right.

THE COURT:  So do you see it says "Yasuko Negita, President" on 2A?

THE WITNESS:  That is right.

Q.  And you included that information there because that is who Ramen-Ya told you was the president, is that correct?

A.  That's right, correct.

MS. IZOWER-FADDÉ:  Your Honor, I think that I forgot to move to admit PX 6A and B into evidence.

THE COURT:  Any objections?

MR. PAWAR:  No objection.

THE COURT:  PX 6A and B are received.

(Plaintiffs' Exhibit PX 6A and B received in evidence)

BY MS. IZOWER-FADDÉ:

Q.  Mr. Jung, do you know any of the plaintiffs in this case?

MS. IZOWER-FADDÉ:  And if you need I can either read out the names of the plaintiffs or perhaps I can show him a document that contains the caption, the full caption.

THE COURT:  However you want to do it, but if you are going to show him a document, you need to mark it.

M752Kea3                        Jung - Direct

MS. IZOWER-FADDÉ:  All right.  Let me just go through the names, then.

Q.  Mr. Jung, are you familiar with someone by the name of Ornrat Keawsri?

THE COURT:  Why don't you give the court reporter a document with the caption so the court reporter can get the spellings down, if you have got it.  You can approach to hand the court reporter a document.

MS. ROSTAMI:  We have already provided the court reporter with a copy of the glossary of all of the names.

MS. IZOWER-FADDÉ:  Here.  And I do realize I do have a document that has most of the names written, so he can look at the names.  That's already been entered.

If we can look at PX 23A, that's one of the --

THE COURT:  Sir (handing).

BY MS. IZOWER-FADDÉ:

Q.  So actually looking at this document, you have already testified that columns -- the first four columns are information that was provided to you by in this case Y&S International.  What about the fifth column where it says "tips"?  Is that also information that was provided to you by Y&S International?

A.  Right.

Q.  And for the employee detail reports that are for Ramen-Ya that we looked at earlier that are Exhibit PX 22, would the tip

M752Kea3                    Jung - Direct

information in those documents also have been provided to you by Ramen-Ya?

A.   Right.

THE COURT:  So you are being asked about the column that says "tips."  You understand that?

THE WITNESS:  Yes.

THE COURT:  And the question is, is that tip information from the entity for whom the employee detail is reported?

THE WITNESS:  That's right.

THE COURT:  Okay.

MS. IZOWER-FADDÉ:  Unfortunately this is not matching up directly.  It lists too many employees, so I am just going to read the names your Honor, I apologize.

BY MS. IZOWER-FADDÉ:

Q.   So, Mr. Jung, are you familiar with Ornrat Keawsri?

A.   I don't understand.

THE COURT:  Do you know somebody named Ornrat Keawsri?

THE WITNESS:  I don't know.

Q.   And do you know somebody named Sachina Nagae?

A.   No.

Q.   Do you know somebody named Takayuki Sekiya?

A.   I don't know.

Q.   How about Siwapon Topon.

A.   I don't.

M752Kea3                        Jung - Direct

Q.  Do you know somebody named Pimparat Ketchatrot?

A.  I don't know.

Q.  Thirantham Raksuk?

A.  I don't know.

Q.  Parichat Kongtuk?

A.  I don't know.

Q.  Tanon Leechot?

A.  I don't know.

Q.  Thanatharn Kulaptip?

A.  I don't know.

Q.  Wanwisa Nakwirot?

A.  I don't know.

Q.  Natcha Natatpisit?

A.  I don't know.

Q.  Parada Mongkolkajit?

A.  I don't know.

Q.  And you don't have any -- you don't know myself or my colleagues sitting here with me, Ms. Rostami and Mr. Haber, aside from our attempts to communicate with you about the subpoena, isn't that correct?

A.  I don't know who they are.

          THE COURT:  You don't know this woman who is asking you questions, right?  The lawyer who is asking you questions, do you know her?

          THE WITNESS:  No, I don't know her.  I don't know who

M752Kea3                        Jung - Direct

she is.

Q. We have never had a conversation about the matters at issue in this case, right?

A. Right.

Q. And you haven't had a conversation about the matters in this case with Mr. Neal Haber, have you?

A. I don't know.

Q. Or with Ms. Florence Rostami?

A. I don't know.

Q. You never spoke with them about this case?

A. I don't know, maybe I talked to on the phone. I don't know.

Q. About the subpoena, though, only, right?

A. Somebody called me, then I was just rude.

Q. You said to her, The lawyer told me not to talk to you, or the lawyer said, I don't have to talk to you, something to that effect?

A. I don't want get involved with this matter, so it's not -- it's not my business. I just prepared on the basis of the kind of evidence, bank statement and objective statement, so I don't want get involved in this kind of business. It's not my business.

Q. In addition to preparing tax returns for Ramen-Ya, Inc., and Y&S International, have you provided -- have you prepared and filed tax returns for Mr. Masahiko Negita?

M752Kea3                     Jung - Direct

A.   Yeah, I think so.  I did.

Q.   You do his personal tax --

A.   But I didn't --

(Court reporter confers)

THE COURT:  You have to speak carefully.  This woman is taking down everything you say, so try to speak carefully and slowly for her benefit.

A.   I don't know who they are.  Just I talk about -- I just answer the e-mail and on the basis of e-mail and the bank statement, or K-1 statement and payroll record, I prepared on the basis of the record that I received through Internet, through e-mail.

Q.   You prepared -- you prepare Mr. Masahiko Negita's tax returns -- let me -- in the year --

A.   I prepare --

Q.   For the year 2014 to 2018, did you prepare Mr. Masahiko Negita's personal tax returns?

THE COURT:  And, Mr. Jung, before you answer that question, I think we have got an objection.

MR. PAWAR:  Objection.  Relevance.

THE COURT:  What is the relevance?

MS. IZOWER-FADDÉ:  That the amount that they are reporting on their jointly filed personal tax returns is consistent with the amount shown as paid to them as income.

THE COURT:  That is relevant.  Is there any dispute as

M752Kea3                        Jung - Direct

to that?

          MR. PAWAR:  Frankly, I haven't seen their personal tax returns.

          THE COURT:  I will permit the question.

          MS. IZOWER-FADDÉ:  Thank you.

BY MS. IZOWER-FADDÉ:

Q.  Did you prepare Mr. and Mrs. Negita's personal tax returns for the years 2014 through 2018?

A.  Yeah, I did.  On the basis of the form I prepared it.  It's very easy.  Simple.

Q.  But you did prepare them?

A.  Right.

Q.  And part of the information that you used to prepare them was that the W-2 form that -- or forms that you issued to Mrs. Negita for her work at Y&S and Ramen-Ya, is that correct?

A.  On the basis of W-2 I prepare the tax return.

Q.  And that included the W-2s from Y&S and Ramen-Ya that you testified about earlier today.

A.  Right.

Q.  Do you also do Mr. Kora's personal tax returns?

A.  Who?

Q.  Mr. Kenji Kora?

A.  Yeah, right, I did.

Q.  And you did his personal tax returns consistent with the W-2s that were issued to him?

A.   Right.

Q.   For his work at Y&S, right?

A.   Right.

Q.   Okay.  And you did that for each of the years 2014 to 2018?

A.   Yeah, I prepared.

Q.   Aside from the tax returns, the W-2s, and the payroll, did you provide any other accounting services for Ramen-Ya or Y&S?

A.   Mostly, mostly payroll service and tax return service.

Q.   Did you provide services for any other entity in which Mr. or Mrs. Negita was involved?

A.   He is not involved in any other business.  Mr. Kora is involved in other business, but Negita -- Mr. Negita is not involved in any other business.

Q.   What about Mr. --

          THE COURT:  Mr. Pawar.

          MR. PAWAR:  Judge, I have an objection to the extent she is asking him questions other than the personal tax returns which may be consistent with the W-2 and the Ramen-Ya and Y&S, but I don't see the relevance of asking him questions about any other business that Mr. or Mrs. Negita or Ms. Maki may have or may be engaging in.  I don't see any relevance to that.

          THE COURT:  How many more questions do you have on this line?

          MS. IZOWER-FADDÉ:  Just a few, your Honor, and I can connect it up or I can respond directly about the relevance.

THE COURT:  I will permit a couple more questions.
It's a bench trial.

MS. IZOWER-FADDÉ:  Thank you.

BY MS. IZOWER-FADDÉ:

Q.  Have you assisted Mr. and Mrs. Negita in incorporating any entities?

A.  Pardon me?  Tell me again.

Q.  Have you assisted Mr. or Mrs. Negita in incorporating any entities?

A.  Yes.

Q.  What entities?

A.  No, no, that's it, the Ramen-Ya only Y&S is different entity.

Q.  Is Ramen-Ya still operating?

A.  What?  What did you say?

Q.  Is Ramen-Ya still operating?

A.  I don't know.  I think, but I'm not preparing payroll for them right now.

Q.  When did you stop?

A.  I think maybe one month ago.

Q.  So Ramen-Ya has had payroll at least through a month ago?

A.  Right.

Q.  And has it been operating out of the same location, the west 3rd Street restaurant location?

A.  I have no idea.  I have never been there.  I'm not

interested in that subject.  I don't know.

Q.  Are you familiar with an entity named Ku-Raku New York, Inc.?

A.  Yeah, I remember.

Q.  What is that entity?

A.  I think it's long time ago they just made corporation but no business at all.

Q.  So you have never prepared any tax returns or payroll or provided any accounting services related to Ku-Raku?

A.  I remember I filed zero, zero tax return, no business, so just they want to keep the corporation, so I filed zero, zero tax return.

THE COURT:  So you mean you did not file any tax returns.

THE WITNESS:  Zero, zero, filed zero.

Q.  Are you familiar with an entity operating under the trade name Ramen Ku-Raku NYC?

A.  I told you, I told you, I filed zero return.

Q.  And who do you file that on behalf?  Who is your contact for that entity?

A.  I think Miho Maki.  She asked me to file zero return, so I filed zero return.

Q.  And do you know who on those returns you reflect as the president of that entity?

A.  I don't remember right now.  I have to take a look at my

file when I go back to my office.

Q.  Do you know who the owner of that entity is?

A.  I think -- I think Miho Maki, Miho Maki.

Q.  But you don't recall.  You don't recall that specifically?

A.  When I go back to my office, but it's zero return.  So I'm not -- zero return.  It doesn't help me.  No money.

Q.  Were you -- you were the incorporator for that entity, though, weren't you?

A.  It looks that, yeah, yeah, I did, I think.  But no activity.

Q.  Have you provided any suggestions or assistance in connection with Ramen-Ya, Y&S or Ku-Raku obtaining a liquor license?

A.  No.  It's not my job.  Liquor license not my job.

Q.  Do you have somebody that you refer clients to?

A.  No, no, no.  I don't do that kind of thing, that kind of work.  I'm just busy with my accounting work.

Q.  Do you recommend or refer clients to any workers compensation insurers?

A.  Workers compensation, I have the -- one good agent, so I always recommend to that agent.

Q.  Who is that agent?

A.  I think it's -- her name is Sunny Kim.  So I always recommend that my client for the workers compensation to that client, but I think just introduce them and that's it.  They

M752Kea3                          Jung - Direct

communicate with each other.  I'm not -- just introducing, that's it.

Q.  And then you will -- let me -- withdrawn.

Have you ever met with Mr. Pawar, who is counsel for the --

A.  No, I have never met him.

Q.  Have you ever spoken with him on the phone?

A.  I don't remember.  I have never met him.  I don't know who he is.

Q.  Have you ever met Mr. Chun, who is --

A.  No.

Q.  -- at the --

A.  No, he never talk to me he never called me and I don't know who he is.  I know only Mr. Negita and Ms. Miho Maki.  That's two people I know.

Q.  Did you discuss your testimony here today with Mr. Negita or Ms. Maki?

A.  Mr. Negita and Miho Maki.

Q.  You talked with them about your testimony today?

A.  Yeah, I talked with them sometimes.

THE COURT:  No.  The question is did you talk to them about what you would tell me, what you would tell the Court.

THE WITNESS:  No, no, just I was -- I don't get involved in this business, so I refuse to come here.  But you just threaten me to come here, so that's why I came here.

M752Kea3                       Jung - Direct

That's it.  Somebody keep sending me a kind of the --

THE COURT:  Mr. Jung --

THE WITNESS:  I don't like it.

THE COURT:  Mr. Jung, out of fairness to the parties, I am the one who threatened you to be here, and we appreciate your attendance here today.

I'm not sure how many more questions counsel has.

THE WITNESS:  You have all the evidence here already, then why you ask me to bring the document?  I really don't understand.  I think the same document you have already.  I don't like it.

MS. IZOWER-FADDÉ:  I think -- I'm not sure whether I will finish before lunch, but I don't have that much more.

THE COURT:  Keep going.  You have got about 12 more minutes before we take the lunch break.

MS. IZOWER-FADDÉ:  Okay.

BY MS. IZOWER-FADDÉ:

Q.  So let's turn to PX 3.  I am just going to ask you to page through PX 3A through B and I'm just going to ask you whether those are profit and loss statements for Ramen-Ya that you provided, that you created at the request of Ramen-Ya.

A.  It's computer printout.

Q.  From your computer or somewhere else?

A.  From my computer, computer printout.  It is draft.

Q.  It is a draft and you would provide those to Ramen-Ya to

M752Kea3                      Jung - Direct

review?

A.   Right.

Q.   And the underlying information reflected in there on sales, on each of the categories, is that information that came to you from Ramen-Ya?

A.   I think I segregate it, I separate it, so -- I ask is the right one now?

Q.   But you prepared these documents?

A.   Yeah, every month I prepare -- they send us bank statement. I prepare on the basis of bank statement every month.

Q.   And if you turn now to PX 4A through D, are those RYI balance sheets -- sorry, Ramen-Ya balance sheets for fiscal years 2014 through 2017?

          THE COURT:  Are you just trying to authenticate these? Any objection to PX 4A through D.

          MR. PAWAR:  No.

          THE COURT:  PX 4A through D are received.

          MS. IZOWER-FADDÉ:  Thank you.

          (Plaintiffs' Exhibits 4A through D received in evidence)

          MS. IZOWER-FADDÉ:  I also wanted to confirm these were things that he created rather than on the Ramen-Ya side.

          THE COURT:  Sir, with respect to each of these balance sheets, did you create them from your program?

          THE WITNESS:  Right.

M752Kea3                    Jung - Direct

THE COURT:  And was that from information you got from the bank statements?

THE WITNESS:  Yeah, right.

MS. IZOWER-FADDÉ:  So I also want to make sure that we have PX 3A and B admitted into evidence.  Those are the profit and loss statements for Ramen-Ya.

THE COURT:  Any objection?

MR. PAWAR:  No objection.

THE COURT:  PX 3A and B are received.

(Plaintiffs' Exhibits 3A through B received in evidence)

MS. IZOWER-FADDÉ:  And the same thing with regard to Y&S -- sorry, PX 15, which is Y&S profit and loss statements, and I believe you don't have an objection to that before but I just want to confirm --

THE COURT:  Any objection to the receipt of PX 15?

MR. PAWAR:  No objection.

THE COURT:  PX 15 received in evidence)

(Plaintiffs' Exhibit 15 received in evidence)

BY MS. IZOWER-FADDÉ:

Q.  Can we take a look at PX 4 for a minute?

THE COURT:  You want him to look at 4A?

MS. IZOWER-FADDÉ:  Please.

Q.  If there were a loan to the company, to Ramen-Ya, would it be reflected on Ramen-Ya's balance sheet somewhere?

A.  I don't remember.  I don't.  Just it's a long time ago.
They just starting the business at that time.

Q.  So you are not sure whether or not it would be reflected in
the balance sheets of the company?

MR. PAWAR:  Objection, your Honor.

A.  I don't remember.

MR. PAWAR:  I think he said -- well, "I don't
remember."

THE COURT:  He just said he doesn't remember.

Q.  So go to PX 4C, please.

(Pause)

MS. IZOWER-FADDÉ:  He is in a totally wrong part of
the book.

THE COURT:  We are going to take a break.  It is just
about 1:00.  We are going to take a break until 2:00.

Mr. Jung, I am going to ask you to be back at 2:00.

During the break, counsel is going to work on seeing
whether there are ways to shorten the testimony, including I am
going to direct the parties to meet and confer referring the
authentication of documents.  If you can agree on the
authentication of documents, it may permit Mr. Jung to get back
to work more quickly.

MS. IZOWER-FADDÉ:  Thank you.

THE COURT:  Anything else from plaintiff before we
break for lunch?

M752Kea3                          Jung - Direct

MS. IZOWER-FADDÉ:  No.

THE COURT:  Mr. Pawar, any sense of how long your cross-examination of Mr. Jung will be.

MR. PAWAR:  Judge, the way it looks right now, I do not think it will be more than 15 to 20 minutes.

THE COURT:  Okay.  All right.  I will see you all -- and Mr. Pawar, anything else before we break for lunch?

MR. PAWAR:  Judge, the issue with the translator, it's been resolved, so. . .

THE COURT:  Very good.  Thank you.

Mr. Jung, I am going to ask you to step down and to be back here a couple of minutes before 2:00.  Thank you, sir.

(Luncheon recess)

M752Kea3                        Jung - Direct

A F T E R N O O N   S E S S I O N

2:05 p.m.

THE COURT:  Anything before we call Mr. Jung back to the stand from plaintiff?

MS. IZOWER-FADDÉ:  No, your Honor.

THE COURT:  From defendant?

MR. PAWAR:  No, your Honor.

THE COURT:  Okay.  Mr. Jung, do you want to step back up to the stand?

Counsel, do you want to inquire?

MS. IZOWER-FADDÉ:  Yes, your Honor.

BY MS. IZOWER-FADDÉ:

Q.  Mr. Jung, during the break, you went to lunch with the defendants in this case, isn't that correct?

A.  Yeah.

Q.  And they bought you lunch?

A.  They sit down there.  I was alone.  I ate alone.

Q.  Are you sure you weren't at the same table as them?

A.  Pardon me?

Q.  Are you sure you did not sit with them?  Did you sit with them?

A.  I didn't talk with them.  I just ate alone.

MR. PAWAR:  Judge, my client bought him lunch.  That's it.

THE COURT:  Okay.  You got your point.

M752Kea3                     Jung - Direct

Did you sit at the same table as they did.

THE WITNESS:  No, the different table.

THE COURT:  If you want to put your lawyer on as a witness, that's fine.  I don't think it's going to make a difference to me one way or the other --

MS. IZOWER-FADDÉ:  That's fine.

THE COURT:  -- if that's helpful.

BY MS. IZOWER-FADDÉ:

Q.  Did you talk with anyone during the break about your testimony today?

A.  No, we talk -- I talked about my Social Security and he is thinking he is going to retire soon, so we talk about the Social Security, not this matter.

Q.  Okay.  And -- so that's fine.  Let's move on, then.

You don't know what work Ms. Yasuko Negita did that she was paid for by either Ramen-Ya or Y&S, do you?

A.  The Mrs. Negita?

Q.  Yes.

A.  I think Negita -- Mr. Negita is working, but I think -- because of Social Security, I think her Social Security is not enough, that is why he put -- he is waiting into her age, I think.

(Court reporter confers)

A.  Her Social Security very small, so I think this is just my guess, what I am thinking.

M752Kea3                        Jung - Direct

THE COURT:  Okay.  Go ahead.

Q.  So let me rephrase this.  I am asking you on the basis of your personal knowledge——things that you saw with your eyes, heard with your ears, said with your mouth——whether you have actual knowledge of what work Mrs. Yasuko Negita did for Ramen-Ya.  Do you?

A.  I do -- I have no idea.  I think Mr. Negita worked, but she got paid.  That's my knowledge.

Q.  What's the basis of that knowledge?

THE COURT:  The portion of his testimony where he said I have no idea?  You have got -- go to your next question.

MS. IZOWER-FADDÉ:  Okay.  Thank you, your Honor.

Q.  And you do not know what work Mrs. Negita did for Y&S either, do you?

A.  I have no idea.  But I know that Mr. Negita worked something, some work, but Mrs. Negita, I have no idea.  I have never seen her.

Q.  And have you ever gone to the restaurants?

A.  I went only one time, only went there one time for -- not for the business.  I went to the -- the nextdoor music.  I just went there, I ate dinner, that's it.

Q.  So you actually don't know from your own personal knowledge what anyone did for Ramen-Ya or for Y&S, isn't that the case?

A.  Any knowledge what?  I think the Maki-san, Miho Maki, was always there.

M752Kea3                         Jung - Direct

Q.  How do you know that?

A.  I went there and sometimes she came to my office and we talked.

Q.  Have you ever seen any loan documents reflecting loans from Mrs. Negita to Ramen-Ya?

A.  To do business they need money.  I think -- I don't know who invested the money, but . . .

Q.  I am asking about loan documents.  Have you ever seen any loan documents?

A.  No, no.  I didn't see anything.

Q.  And I asked it with regard to Mrs. Negita.  You haven't seen any loan documents showing any loans made by Mr. Negita to either Ramen-Ya or Y&S, have you?

A.  No.  I have no idea.  He's invest more money.  $50,000 is not big money.  To do business you need to have at least that kind of money.

THE COURT:  Sir, you are being asked whether you saw a loan agreement to Ramen-Ya.

THE WITNESS:  I have no idea.  I have no authority to get involved in that kind of business.  I get just paid $200 for payroll.  Why do I get involved in that kind of business? I have no idea.  Just I got paid very small money for payroll service.

Q.  Do you recall providing a signed document in this case titled a declaration?

M752Kea3                    Jung - Direct

A.  No, I didn't say anything.  I just prepared on the basis of the payroll record through my -- the e-mail.  That's what I did.

Q.  Were you ever asked to sign a document to be submitted to the Court in this case?

A.  I have no idea.  I have no idea.  From the beginning I said I don't want to get involved in your business.  I told. Somebody call me that ask me.  I told them:  You have the same record, Internal Revenue Service has the same record, then why you asking me the same record?  You could go yourself to find the document from there.  I told them.  The same document.

          THE COURT:  Sir, this will go more quickly if you just answer the questions that --

          THE WITNESS:  Okay.

          THE COURT:  -- you are being asked.

          Counsel, next question.

          THE WITNESS:  I have no idea.

Q.  Would you turn to Exhibit 12, Plaintiff's Exhibit 12, and may I --

          THE COURT:  Why don't you approach and show him Exhibit 12.

          MS. IZOWER-FADDÉ:  The witness is looking at what has been marked as PX 12 and is already admitted in evidence in this case.

          THE COURT:  I think there was an agreement that it be

admitted, but it is now received.

MS. IZOWER-FADDÉ:  Oh, I'm sorry, your Honor.

(Plaintiff's Exhibit 12 received in evidence)

BY MS. IZOWER-FADDÉ:

Q.  Mr. Jung, could you look at the bottom of that page.  Is that your signature?

A.  Yeah, right, it's my signature.

Q.  Do you recall signing this document?

THE COURT:  Do you remember signing this?

THE WITNESS:  I remember.

THE COURT:  Sir, just to confirm, you did sign this document in June of 2019?

THE WITNESS:  Yeah, right.

BY MS. IZOWER-FADDÉ:

Q.  And who asked you to sign this document?

A.  I don't know who ask, but my -- the employee just prepared this one, then I read this one.  It says I prepared --

THE COURT:  Next question.

Q.  Who drafted this document?

A.  My employee.

Q.  Your employee.  What's the name of your employee?

A.  Ms. Yuka Odaka.

Q.  Can you spell that police?

A.  Y-U-K-A her name, and the last name is O-D-A-K-A, Odaka.

Q.  Did somebody request you to provide this declaration?

M752Kea3                        Jung - Direct

A.   Decoration?  I don't know what you talking about.

Q.   This document, did somebody request that you provide this document?

A.   The document says it's on the basis of actual tax record. What's wrong with it?  I think it is very right.

THE COURT:  You are just being asked, sir, was it your idea to put together this declaration or . . .

Who asked you to do this?

THE WITNESS:  I don't know.  I don't know.  But I think it's very accurate on the basis of tax return.  I think it's right, so I signed it.

Q.   All right.  So I'm not asking you whether you agree with the content of it.  I want to understand who reached out to you to get you to sign this.

THE COURT:  What's the relevance of this?

MS. IZOWER-FADDÉ:  I am working to that.  I don't have much more.

A.   These are kind of regular -- I sign this kind of thing many times.  I think there is a kind of pattern.  They are like this.

Q.   So from your perspective, Exhibit 12 was just -- you were just acknowledging that you prepared these tax returns and that the tax returns that were produced are accurate?

A.   Yeah, right.

Q.   So that's a typical type of document that you might be

asked as an accountant to sign on behalf --

A.   Yes, that's right, that's right.

Q.   Okay.  Are there other typical types of documents that you are asked to sign to provide to a court?

A.   I don't remember.  I don't remember.  Just when I read it I think it is right and I sign it.

Q.   If you will turn to Exhibit 18 now.

THE COURT:  PX 18?

MS. IZOWER-FADDÉ:  Yes, PX 18.  Sorry.

A.   Yeah, I see it.

Q.   On the second page of that document, is that your signature?

A.   No, I don't see my signature here.  No signature.

Q.   Did I say PX 17?

THE COURT:  You said PX 18.  I sort of ignored your comment because I don't have a PX 18 in my exhibit book, but maybe the witness has it.

MS. IZOWER-FADDÉ:  I'm sorry.  When we arrived this morning I thought we handed up, not to you, but -- okay, so it is stamped as PX 19.

(Counsel confer)

THE COURT:  I've got PX 18 now.  Do you want to approach and show the witness PX 18?

MS. IZOWER-FADDÉ:  Yes.  And it occurs to me, your Honor, that our vendor may have transposed PX 18 and PX 19 so

we may have to clarify that, but let me approach and see.  I am looking for another declaration of Mr. Jung, one from December of 2020, so I will -- I'm coming up now.

THE COURT:  What I have is PX 18 and PX 19.  I've got two copies of them.  Also what has been marked as PX 17.  No, I'm sorry, bear other exhibit numbers.

MS. IZOWER-FADDÉ:  This is 18, yes, and you are right it has the wrong exhibit number on it, but it is the declaration.  It is behind his tab 18.  Here.  This is where.

THE COURT:  Counsel, whatever you said was not exactly clear for the record.

MS. IZOWER-FADDÉ:  Right.  I will fix it now.

Your Honor, at the pretrial conference we had said that we would make Mr. Jung's second deposition -- sorry, second declaration PX 18, but it looks like our vendor put PX 19 at the bottom of that one and that we were going to make -- the 2017 management agreement was supposed to be PX 19, but the vendor put PX 18 on the bottom of it.  So is it okay if we -- it may just be --

THE COURT:  I think you should use the exhibit numbers that are on the document itself.

MS. IZOWER-FADDÉ:  Thank you, your Honor.

THE COURT:  Mr. Pawar, you have got copies of PX 19 and PX 18.

MR. PAWAR:  I do.  Judge, I just need some

clarification when the question is being asked if she is

referring to -- which -- what is PX 18?  I have both

declarations.  I just don't know.

THE COURT:  That's a good point.  For the record, when

you are referring to PX 18, why don't you refer to it as the

declaration that is dated December 10, 2020, and when you are

referring to PX 18, you can refer to it as a management

agreement with a date of March 1, 2017 at the top.  Go ahead.

MS. IZOWER-FADDÉ:  I am asking the witness about

PX 19, which is a declaration under his name dated December 10,

2020.

Q.  Mr. Jung, is that your signature on the second page of this

document?

A.  Yeah it's my signature.

Q.  Okay.  I will ask you to turn to the first page and to look

at the paragraph numbered 7.  Oh, actually let me -- hold on

one second.

Mr. Negita -- I'm sorry.  Mr. Jung, how did you come

to provide this declaration that we are looking at now, PX 19?

Let me rephrase the question.

Who asked for you to provide this document?

A.  I don't remember.

Q.  Do you know who drafted it?

A.  I don't remember.  I don't remember.  I think -- I have so

many client.  How can I remember what this kind of thing?  I'm

M752Kea3                        Jung - Direct

71 years old.  I'm getting old.

Q.  Did you draft it?

A.  Yeah, I signed it.  I think it is right.

Q.  You signed it, but did you write it?

A.  I signed it.  Somebody prepared, so I signed it.

Q.  Okay.  So let's turn to paragraph 7.  It says,
"Mrs. Negita's compensation was repayment of a loan that she
had given to the corporations."

A.  Yeah, I think that's right.

Q.  How do you know that?

A.  Mr. Negita has no money.  Then she did business.  He opened
the business, so he can get his money.  He --

Q.  How do you know that what the compensation that Mrs. Negita
was paid and that the business took as a tax deduction was
instead the repayment of a loan that she had given to the
corporations?

A.  I have no idea about that, but I think, I think the, the
paying wage and accumulate Social Security benefit is not bad,
so I think it's good idea, even though you just get your money
back, but I think for your Social Security I think you got to
put the money as wage.  It's a good idea.  That's what I am
thinking.

          THE COURT:  Can I see counsel at the sidebar?

          (Continued on next page)

M75sKEA4

(At the sidebar)

THE COURT:  I don't recall receiving PX 19 in evidence.  Is it in evidence?

MS. IZOWER-FADDÉ:  We're not planning to actually move it into evidence.  We are trying to --

MS. ROSTAMI:  Your Honor, if I may.  I have e-mailed it to Mr. Fishman, both this one and --

MR. PAWAR:  That's not the question.

THE COURT:  My question is whether it is in evidence.

MS. ROSTAMI:  It is not.

MS. IZOWER-FADDÉ:  It is not in evidence.

THE COURT:  Tell me what exactly the reason is for this line of inquiry.

MS. IZOWER-FADDÉ:  Because the defendants have taken the position in this case that the money that received was a loan, and that actually is one of the points that is in Mr. Pawar's proposed findings of fact.  We are trying to see the basis -- this is something they put in on summary judgment to make that argument, and we are trying to identify the basis of this.

It's our sense that Mr. Jung has no personal knowledge of this being a loan at all and just followed what he was told to put in that declaration.

THE COURT:  So you are impeaching something to which he's not testified?

M75sKEA4

MS. IZOWER-FADDÉ:  Well -- OK.

THE COURT:  I mean, is that what you're attempting to do?

MS. IZOWER-FADDÉ:  I think that in this case, unfortunately, we do not have our own witnesses, right.  We're relying on the other side.  And we have only the knowledge of the arguments that we expect them to make.

We're only calling this witness now and we can sort of wait and see, but my sense is later on, there are witnesses that are going to say this, and then they may try to point to this having been sent to court.

Personally, I don't think it should be admissible at all because he wasn't subject to cross-examine at this point.  He has established no personal knowledge on these points that he raises here.  He also says affirmatively Ms. Yasuko had no financial responsibility with regard to the entities.

THE COURT:  Mr. Pawar, are you planning to offer this declaration into evidence?

MR. PAWAR:  No, Judge, and I object to the witness reading from it.  That has been no establishment that he knows anything.  And if they want to offer it as an exhibit to refresh his recollection, that's another thing.  I think the whole line of questioning with respect to this exhibit, which is not in evidence, should be stricken from the record.

THE COURT:  I'm not going to strike it from the record

M75sKEA4

because there wasn't an objection at the time, but the point about reading from a document that's not in evidence is well taken.

Let me ask, are you planning in your examination to inquire into whether Ms. Negita's compensation was a repayment of a loan she had given to the corporations, in your examination of this witness?

MR. PAWAR:  Based on earlier testimony that counsel has elicited from this witness, but not from this document.

MS. IZOWER-FADDÉ:  You mean his utter lack of knowledge?

THE COURT:  I'll permit you to inquire with respect to this declaration, but not to read from it, not to treat it as if it's a document in evidence.  If you think there is something you're getting from it, go ahead.

MS. IZOWER-FADDÉ:  Your Honor, I'm happy to wait until I get to follow up after, if I feel I need to, after Mr. Pawar asks his questions because we'll see how far that goes.

THE COURT:  It's up to you.  OK.

(In open court)

MS. IZOWER-FADDÉ:  I don't have any more questions at this time for this witness.

THE COURT:  Mr. Pawar, you may inquire.

MR. PAWAR:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. PAWAR:

Q.  Good afternoon.

THE COURT:  Put the exhibits to the side.  Close out the binder if you want.  Mr. Pawar will direct you to whatever exhibits he thinks he needs to.  You can hand it to me, sir.

Go ahead, Mr. Pawar.

MR. PAWAR:  Thank you, your Honor.

Q.  Mr. Jung, prior to today, you and I have never met, correct?

A.  What did you say?

Q.  Prior to today, you and I have never met, yes?

A.  I don't know who you are.

Q.  Thank you.

All the information that you received that you put inside the tax returns, you received them from Miho Maki, is that correct?

MS. IZOWER-FADDÉ:  Objection.

THE COURT:  Overruled.

A.  I received through Internet.  I don't know who prepared this one.  Through Internet.  Then I just answered through Internet.

Q.  And by Internet, you mean through e-mail, correct?

A.  Right, e-mail.

Q.  And that e-mail was from Ms. Miho Maki, correct?

A.  I don't know who sent it.  I received e-mail and my

M75sKEA4                    Jung - Cross

employees prepared the document, and then we send it back.

Q.  Mr. Jung, besides your signature --

          MR. PAWAR:  And, judge, if we can get either --

          Let me ask the question first.

Q.  Mr. Jung, besides your signature, are there any other signatures on the tax documents that you are looking at today in your testimony?

A.  The same, same signature.  Always same signature.

Q.  Besides your signature, are there any other signatures?

A.  No, nobody.  Nobody.  I'm the only CPA in my office.

Q.  OK.

A.  So nobody can sign it.

          THE COURT:  The question is you saw, when you looked at some of these forms, that it had a signature line for the taxpayer.  It indicated a president and then there was a blank next to where a wet signature would appear.

          Do you remember that, seeing that?

          THE WITNESS:  If I e-file, we don't need officer signature.  When e-file, they don't need officer signature.

Q.  OK.

A.  Officer just ask me to do it and I can do it.  So I just always request, can I file it.  And they think it's OK, then I file it.  And the big thing is the tax payment.  Can I pay that payment, when can I pay that payment.  That's the key point.

Q.  OK.  So you said you have never spoken with Ms. Yasuko

M75sKEA4                    Jung - Cross

Negita, correct?

A.   What did you say?  Tell me again.

Q.   You have never spoken with Ms. Yasuko Negita, correct?

A.   Sometimes I talked, but I can't say never talked, but...

Q.   OK.  Did Ms. Negita ever give you permission --

A.   Ms. Negita?

Q.   Yes.

A.   I -- I didn't see her.  I -- I never met her.

Q.   OK.  You were discussing that you filed the tax returns after someone gives you permission, right?

         Do you remember saying that?

A.   I just send the e-mail.

Q.   Yes.  I understand.

A.   Is it OK.

Q.   Yes.

A.   Can I pay this tax.  Then they say OK, then I just file it.

Q.   OK.  Was Ms. Negita of the persons to tell you OK?

A.   I don't know who said OK.  But I just through e-mail, somebody say OK, then I file it.

Q.   Is it possible that it was either Ms. Maki or Mr. Negita who told you it's OK?

A.   I don't know who -- who they are, just -- I just receive e-mail confirmation, and then I file it.

Q.   OK.  Earlier you said that you assumed the compensation that were given to the officers was for the work done for

M75sKEA4                         Jung - Cross

Ramen-Ya, correct?

A.   Yeah, right.

Q.   But you don't know for a fact, correct?

A.   Right.

Q.   You also stated that the investment and the loan that is noted in the tax returns were made by the officers of the company, correct?

         MS. IZOWER-FADDÉ:  Objection.

         THE COURT:  Sustained.

Q.   The only officer that is listed in the tax documents is Mr. Kora and Ms. Yasuko Negita, correct?

A.   Y&S, Mr. Kora.  Ramen-Ya, Ms. Negita.

Q.   OK.  Isn't it true Ms. Yasuko Negita never cashed any checks that were written to her?

A.   I don't remember anything.

Q.   Isn't it true that Miho Maki is the person that gave you expressed consent to file the tax returns?

A.   I don't know who -- who said OK, but I just send e-mail. And then can I -- I don't know I'm talking with Miho Maki or Mr. Negita.  I don't know who I'm talking.

Q.   Do you know for a fact it wasn't Ms. Negita?

A.   I don't know.  I don't know.  I assume Mr. Negita or Ms. Maki.

         MS. IZOWER-FADDÉ:  Objection.

         THE COURT:  It's received for what it's worth.

M75sKEA4                      Jung - Cross

Overruled, I suppose, but it's a bench trial.  I can disregard speculation.

Go ahead.

MR. PAWAR:  Last question, Judge.

BY MR. PAWAR:

Q.  Isn't it true that Ms. Yasuko Negita's name is on the corporate documents because Mr. Negita has bad credit and some tax problems?

MS. IZOWER-FADDÉ:  Objection.

THE COURT:  Overruled.

A.  Yeah, I -- I just he told me that way.  He told me he has some bad credit, so he can't -- he doesn't want to use his name for the business.  So I think he want to use his wife's name.

THE COURT:  So that --

A.  I understand that one.

THE COURT:  That testimony is stricken.  That's hearsay.  The objection is sustained.

Q.  Mr. Jung, do you have any personal knowledge why Ms. Negita's name is on the corporate documents instead of Mr. Negita?

A.  Mr. Negita -- is not supposed to do business.  I think he has bad credit.

Q.  That's from your personal knowledge?

A.  He told me that he has bad -- he has serious tax problem.  He just told me that, that he has some problem.

M75sKEA4                        Jung - Cross

Q.  Mr. Jung, you cannot tell us what Mr. Negita told you, OK?

A.  OK.

Q.  That's not allowed under the rules.

So from your personal knowledge, do you have any personal knowledge whether reviewed from tax returns or any other documents or being the CPA for their personal finances, do you have any personal knowledge why Mr. Negita's name is not on the corporate documents?

A.  Because he has bad credit and he has some -- the tax liability.

Q.  And you know that from personal information, correct?

A.  Yeah, I know.  I think I file tax return, he's the tax return was deducted.  How can you say it?

It was what was paid to New York State.  He has some problem.  I know that he has some problem with New York State.  New York State tax department.

Q.  And that's why Ms. Negita's name is on the corporate documents?

A.  Right, right.  When he -- his name is there, then the New York State take his money.

Q.  Judge.

A.  His money away.

Q.  Judge.

A.  So he used -- I think he used his wife's name.

MR. PAWAR:  Judge, I have nothing further.

THE COURT:  All right.  Further examination?

MS. IZOWER-FADDÉ:  Brief.

REDIRECT EXAMINATION

BY MS. IZOWER-FADDÉ:

Q.  Mr. Negita, you were the incorporator -- Mr. Jung, I'm sorry, you were the incorporator of Ramen-Ya, correct?

A.  Yeah.

Q.  And is it your testimony that at the time that you incorporated Ramen-Ya you assisted Mr. Negita in obscuring his role in Ramen-Ya in order to avoid his creditors, is that your testimony?

A.  Right.

MS. IZOWER-FADDÉ:  I have no further questions.

THE COURT:  Anything further?

MR. PAWAR:  No, your Honor.

THE COURT:  Mr. Jung, you are excused.  Thank you very much for your testimony.  You may step down and you're free to leave the court.

(Witness excused)

THE WITNESS:  OK.  Thank you.

THE COURT:  Call your next witness.

MS. IZOWER-FADDÉ:  May I have two minutes to just organize my papers, and then I'll call Ms. Negita -- I'm sorry. Ms. Maki will be my next witness.

THE COURT:  Why don't we have Ms. Maki actually take

the stand.  Do you mind?

MS. IZOWER-FADDÉ:  I'm fine with that.

THE COURT:  Is Ms. Maki here?

Ms. Maki, you may step up.

MR. PAWAR:  Judge, we'll need a translator also to go up there.

THE COURT:  OK.  We will swear the translator first.

Ms. Maki, you may be seated for a moment.  You can take your mask off.

MR. PAWAR:  Judge, Ms. Maki.

THE COURT:  Ms. Maki.

MR. PAWAR:  I don't think she's a Mrs.,  your Honor.

THE COURT:  Thank you.

(Interpreter sworn)

THE COURT:  Now, Ms. Maki, you may stand up and my deputy will administer the oath to you.

MIHO MAKI,

    called as a witness by the Plaintiffs,

    having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Please state your full name for the record and spell out your first and last name.

THE WITNESS:  Miho Maki.

THE DEPUTY CLERK:  Please spell it out for the court, please.

THE WITNESS:  M-i-h-o M-a-k-i.

M75sKEA4                          Maki - Direct

THE DEPUTY CLERK:  Thank you.

THE COURT:  Counsel, do you want the witness to have this binder of exhibits?

MS. IZOWER-FADDÉ:  I will be asking her about some of them, your Honor, but I think it's OK if you leave it up there for the moment.  I'll try my best to use the loose ones instead, since there is a lot of overlap.

THE COURT:  You can take back the corporate tax returns during the break when you have a moment.

You may inquire.

MS. IZOWER-FADDÉ:  OK.

DIRECT EXAMINATION

BY MS. IZOWER-FADDÉ:

Q.  Good afternoon, Ms. Maki.

A.  Good afternoon.

Q.  You've been in this courtroom so I'm not going to repeat an introduction of myself.

What's your full name?

A.  My name is Miho Maki.

THE COURT:  Mr. Pawar.

MR. PAWAR:  Yes, Judge.  I would just prefer if the translator can speak a little louder into the microphone so my clients can hear it.

Q.  Are you known by any other names?

A.  No.

M75sKEA4                       Maki - Direct

Q.  Was there a time that you were known as Miho Maki Hasegawa?

A.  Yes.

Q.  Is your e-mail address *Miho Maki@gmail.com*?

A.  Yes, that is correct.

Q.  Do you have any other e-mail addresses?

A.  Yes, I have several.

Q.  Are there any -- were any of the other e-mail addresses ever used for business purposes?

A.  I used to use Ramen-Ya.NY --

          THE INTERPRETER:  Correction.

A.  *Ramen-YaNY@gmail.com*.  I used to use it.

Q.  And you used that on behalf of the company Ramen-Ya?

A.  That's correct.

Q.  Did you also use it on behalf of Y&S International?

A.  I use it for several different companies.

Q.  What other companies?

A.  I don't remember, but I think I used them with our wholesalers.

Q.  What wholesalers?

A.  I don't remember, but they were businesses that we used to have interactions with.  But I'm not sure if I actually used the e-mail address with them or not.

Q.  Were these wholesalers businesses that Mr. or Mrs. Negita had an ownership or officership position in?

A.  No.

M75sKEA4                        Maki - Direct

Q.   So aside from RYI and Y&S, are there other businesses that you've been employed by or that you have been an officer of that you used either the e-mail addresses that you have described for us?

A.   No.

Q.   Are you familiar with an entity named Ku-Raku New York, Inc.?

A.   Yes, I am.

Q.   And that's an entity that operates under the trade name Ramen Ku-Raku NYC?

A.   Um, I think -- I think it is.

Q.   And is the e-mail address *Miho.Maki@gmail.com* an e-mail address associated with that business?

A.   No.

Q.   Is that an e-mail address that you used for your own personal use?

A.   It is my personal e-mail address.

Q.   Have you given anyone permission to use that for Ku-Raku New York, Inc., or Ramen Ku-Raku NYC?

          MR. PAWAR:  Judge, I'm going to object to this line of questioning.  This new company has nothing to do with whether Ms. Miho Maki is an officer of Ramen-Ya or Y&S.  It's going into an area that --

          THE COURT:  It's overruled.  I'll permit, although limited.

M75sKEA4                        Maki - Direct

THE INTERPRETER:  The interpreter needs the question read again.

BY MS. IZOWER-FADDÉ:

Q.  Is that an e-mail address that you used for -- sorry. Strike that.

Have you given anyone permission to use that e-mail address for Ku-Raku New York, Inc., or Ramen Ku-Raku NYC?

A.  No, I did not.

THE COURT:  What is the spelling of Ku-Raku?

MS. IZOWER-FADDÉ:  K-u, dash, R-a-k-u.

Q.  Ms. Maki, when did Ramen-Ya stop doing business?

THE INTERPRETER:  I'm sorry.  The interpreter got distracted.

THE COURT:  The court reporter can read back the question.

(Record read)

A.  They stopped doing business a month ago.

Q.  From 2018 up until the time that it stopped doing business, was it still located at Third Street?

A.  The company wasn't able to continue business because of COVID, and that's why the shop was closed.

Q.  One month ago?

A.  I'm sorry.  I'm sorry.  I was confused and I said -- I gave you wrong information.

Yes, it closed a month ago.

M75sKEA4                          Maki - Direct

Q.  Up until it closed, was it always operated out of the Third Street location?

A.  The Third Street location closed a year ago.

Q.  And what was its operations -- where did it operate out of after the Third Street location closed?

A.  We did not do any business.

Q.  Did you continue to pay employees?

A.  That's -- that restaurant closed and we opened another location on Fourth Street.

Q.  In addition to Y&S, there's a second restaurant on Fourth Street that you're referring to?

A.  No.  We borrowed the same address on Fourth Street.  I'm sorry.

Q.  Y&S and Ramen-Ya were operating out of the same restaurant space, a ramen shop at the same time, is that correct?

A.  Yes, that's how we operated.  We only did deliveries, but we were operating.

Q.  And during that time, Ramen-Ya was using the same kitchen to do deliveries of ramen to customers and Y&S was using the kitchen to do in-house customer service, is that correct?

A.  I don't know the details.

Q.  Do you have a position -- sorry.

        Have you ever been an officer of Ramen-Ya?

A.  Yes, I have been.

Q.  During what period?

M75sKEA4                          Maki - Direct

A.   I can't remember clearly, but I think I started two years
ago.

Q.   And then were you an officer of Ramen-Ya until it ended --
I'm sorry -- closed?

A.   Correct.

Q.   Did you ever have an ownership interest in Ramen-Ya?

A.   I'm not sure if I understand your question.

Q.   Did you ever own any part of Ramen-Ya?

A.   I don't know.

Q.   Was there a change in your salary or wages at the time that
you became an officer of Ramen-Ya?

A.   I don't think it ever changed.

Q.   Did you continue to receive wages from Y&S once you became
an officer of Ramen-Ya?

A.   I don't remember.

Q.   Do you know whether Ku-Raku is in operation?

A.   Whether or not they are still in business?

     Yes, Ku-Raku is operating.

Q.   Where do you work?

A.   Asking where I work?

Q.   Currently.

A.   Are you talking about right now?

Q.   Yes.

A.   I help out at Ku-Raku from time to time.

Q.   Do you have a specific role at Ku-Raku?

M75sKEA4                        Maki - Direct

A.   No, I don't have any specific role.

Q.   Are you an officer of Ku-Raku?

A.   No, I'm not.

Q.   Does Ku-Raku have any officers?

A.   I don't know.

Q.   Who operates Ku-Raku?

A.   What do you mean by operating, like chefs?

Q.   Who is in charge -- who supervises Ku-Raku?

A.   I don't know the details about the operation.

Q.   Who owns Ku-Raku?

A.   I understand that the president is Ms. Yasuko Negita.

Q.   Isn't it the case that Ms. Negita is also the 100 percent owner of Ku-Raku?

A.   I don't know.

Q.   You understand that the judge has already determined that the plaintiffs in this case worked at RYI and Y&S, don't you?

A.   People who are suing us, right?

Q.   Yes.

A.   Yes, I am aware.

Q.   And you're also aware that the judge has already determined that you were an employer of plaintiffs during the period from 2014 to 2018?

          THE INTERPRETER:  I'm sorry, I lost the end of the question.

Q.   You were an employer of plaintiffs during 2014 through

M75sKEA4                        Maki - Direct

2018?

A.   Yes, I worked there.

          MR. PAWAR:   Judge.

          THE COURT:   Yes.

          MR. PAWAR:   I apologize, your Honor.   The last question clarified the time period of 2014 to 2018.   The previous question did not clarify the time period of 2014 to 2018.

          Also, the Ku-Raku restaurant, I don't think there was a timeframe established as to when it opened and when it began the operations.

          THE COURT:   You can inquire on cross-examination.

          Go ahead.

BY MS. IZOWER-FADDÉ:

Q.   And you also understand that the judge has already determined that Mr. Negita and Mr. Kora and Y&S and Ramen-Ya were all employers of the plaintiffs during the period 2014 to 2018, right?

A.   Yes.

Q.   And you understand that the purpose of this trial is to determine whether Ms. Negita will be treated as an employer of the plaintiffs alongside you and the other defendants?

A.   Yes.

Q.   Ms. Maki, you gave a deposition in this case, didn't you?

A.   Previously, right?

M75sKEA4                          Maki - Direct

Q.   Yes.

     You were deposed at Ms. Rostami's offices?

A.   Yes, I went there.

Q.   And the deposition took place over two separate days?

A.   Yes.

Q.   And there was a translator present at the deposition that translated the questions from English to Japanese and the answers from Japanese to English, right?

A.   Yes.

Q.   And at the start of the deposition, you were sworn in just as you were today?

A.   Yes.

Q.   And you swore to truthfully respond to the questions?

A.   Yes.

Q.   And you understood that you were obligated to testify truthfully and you did testify truthfully, right?

A.   Yes.

Q.   Are you aware that portions of your deposition testimony have been admitted as evidence in this trial?

A.   I wasn't aware of that.

Q.   Do you understand that means that the evidence in this trial will include not only what you say on the stand, but certain portions of your deposition testimony as well?

A.   Yes.  OK, now I understand that's what's happening.

Q.   Do you recall when you were deposed?

THE INTERPRETER:  I'm sorry, when?

MS. IZOWER-FADDÉ:  I'll rephrase that.

Q.  Do you recall that you were deposed in October of 2019?

A.  I don't remember that.

Q.  Do you recall that you were, at the time you were deposed, Ms. Yasuko Negita was not yet a defendant in this case?

A.  No, I don't know.

Q.  Do you recall that Ms. Yasuko Negita was not originally a defendant in this case and that she got added in later?

A.  Without knowing the details, yes, I have heard something to that effect.

Q.  During the course of your work at Ramen-Ya, did your responsibilities remain -- I'm sorry -- your work at Ramen-Ya and Y&S International, did your responsibilities remain relatively the same throughout your time there?

A.  Yes.

Q.  And your -- strike that.

Aside from working at Ku-Raku occasionally as you testified, do you work anywhere else right now?

A.  No, I don't.

Q.  Prior to your work at Ramen-Ya did you work at another restaurant that the Negitas also were involved with?

A.  Before Ramen-Ya?

Q.  Yes.

A.  Yes.

M75sKEA4                         Maki - Direct

Q.   What was the name of that restaurant?

A.   It was Negiya.

Q.   And before working at Negiya, did you work at another restaurant that Mr. and Mrs. Negita were involved in?

A.   No.  No, I didn't.

Q.   Did you ever work in a restaurant named Ronin, R-o-n-i-n?

A.   Ronin and Negiya are the same business.  They just changed name.

Q.   When did you first start working for the Negitas?

A.   I don't remember.  I know that it was a long time ago.

Q.   Was it more than ten years ago?

A.   About ten years ago, I think.

Q.   Did you know the Negitas before you started working with them -- for them?

          THE INTERPRETER:   Sorry.

A.   No, I didn't.

Q.   Did you first meet them when you were working at Ronin or when they hired you to work at Ronin?

A.   I met Mr. Negita.

Q.   At Ronin?

A.   Correct.

Q.   Do you know that Ms. Negita -- well, that Mr. Negita testified at his deposition that the operational control of Ronin was given over to his wife, Mrs. Negita?

A.   No.  No, I didn't know.

M75sKEA4                          Maki - Direct

Q.   Who supervised your work at Ronin?

          THE INTERPRETER:   If the interpreter can have a

minute?

          (Pause)

          MR. PAWAR:   Judge, I'm just going to object to this

line of questioning.

          THE COURT:   I'll permit a little bit more.   It does

have some relevance.

A.   I don't remember who.

Q.   Is it fair to say that for at least the last ten years, you

have been financially reliant on the positions that the Negitas

have given to you in their restaurants?

          THE INTERPRETER:   I'm sorry.   The interpreter blanks

out.

          THE COURT:   Do you want to read it back to the

interpreter?

          (Record read)

A.   Well, you could say I've been relying on it, but that's the

only place I've been working at.

Q.   And the Negitas always had the power to hire you for each

of the positions they have given you and they also had the

power to fire you, isn't that true?

A.   I don't know.   I'm not sure who had the power in regards to

your question.

Q.   During the course of your time working at Ramen-Ya, let's

M75sKEA4                         Maki - Direct

just concentrate on 2014 to 2018, from time to time -- let

me ...

            Did you need to provide information to Ramen-Ya's

workers' compensation insurance provider?

            THE INTERPRETER:  Could I have the question again?

I'm sorry.

            (Record read)

A.   Whether or not I was the one who was making the payments?

Q.   Did you have any connection with filling out forms or

responding to audit requests by Ramen-Ya's workers'

compensation insurance provider?

A.   Yes, I was responsible for that.

Q.   And as part of that, did you have to identify who the

president of Ramen-Ya was?

A.   Did you ask whether or not I knew who the president was?

Q.   No, I asked whether you had to provide to the workers'

compensation -- let me just strike that.

            Between 2014 an 2018, when you filled out forms in

connection with Ramen-Ya's workers' compensation insurance, did

you have to provide the name of Ramen-Ya's president?

A.   No.  I don't remember, but I don't think I did.

Q.   What was the name of Ramen-Ya's workers' compensation

insurer?

A.   I don't remember.

Q.   Was it Rochdale Insurance Company?

M75sKEA4                         Maki - Direct

A.   No, that's not a name that I've heard of.

Q.   Let me spell it for you.  R-o-c-h-d-a-l-e?

A.   I left everything up to the insurance company, so I don't remember.

Q.   Did you have an insurance broker that you were using?

A.   Yes, I left the broker to take care of it.

Q.   Did you provide information to the broker about who Ramen-Ya's president was?

A.   Yes, I did.

Q.   And you provided Ms. Yasuko Negita's name as president, isn't that correct?

A.   Yes, I did.

Q.   And you did that for each year for 2014 through 2018, correct?

A.   Well, it was a continuing process, so I never had to give that same information about the president's name again later.

Q.   But you never changed or corrected that information for those years, isn't that correct?

A.   I don't remember clearly.  I don't think I did it, but I don't remember.

Q.   Ms. Yasuko Negita was the president of Ramen-Ya for the entire period from 2014 to 2018, wasn't she?

A.   I don't know how long she remained a president, but at the beginning, she was.

Q.   Did you ever come to know during that time period that she

M75sKEA4                        Maki - Direct

no longer was?

A.   Yes, it changed to me.

Q.   Do you recall -- I'm sorry.

     But it didn't change to you until June of 2019, isn't that correct?

A.   I don't remember.  I don't remember when I took over.

Q.   Is there something that we could show you that would refresh your recollection?

A.   I don't personally remember when that change happened.

Q.   Were there any documents that were created to reflect the change of you becoming president of Ramen-Ya?

A.   I don't know if there is any.

Q.   Were there any resolutions of the corporation removing Ms. Negita as president and replacing her with you?

A.   Yes.

Q.   There was a written resolution or just an oral one?

A.   The name of the president was written by the CPA.

Q.   Where?

A.   It was put down on paper at Mr. Tai or Mr. Jung's office.

Q.   Did you ever become an owner of Ramen-Ya?

A.   I'm merely a president.

Q.   You never got any ownership interest in Ramen-Ya, is that correct?

A.   That's correct.

Q.   So Ms. Negita remained the sole owner of Ramen-Ya

throughout its -- from 2014 until it closed, isn't that correct?

A.  Would you mind explaining to me what the differences are between a president and an owner?

Q.  A president, when I'm referring using the word president, I am referring to the position of, you know, the role that somebody has in the company from an employment perspective. And when I'm referring to the owner, I'm talking about who actually owns the shares of the company.

A.  I'm a president.

Q.  And you never became an owner, correct?

A.  Correct.

Q.  And the owner was always 100 percent Ms. Yasuko Negita, correct?

A.  I don't know who the owners are.

Q.  But whomever the owner was, that person would have the right to remove you from your position, would have had the right to remove you from your position at any time, right?

A.  I'm not sure if I understand your question.

Q.  Well, ultimately, if somebody wanted to fire you, they could if they owned the company even though you were its president, isn't that correct?

A.  I don't know.

            (Continued on next page)

M752Kea5                          Maki - Direct

Q.  Is it your testimony as you sit here today that you don't know if there was anybody that could have fired you from your position at Ramen-Ya?

        MR. PAWAR:  Objection.  Asked and answered.

Q.  Is that your testimony?

        THE COURT:  Overruled.

        THE INTERPRETER:  The interpreter needs the latter half of the question.

        THE COURT:  The court reporter can give it to you.

        (Record read)

A.  My understanding is that the person who would be able to fire me is Mr. Masahiko Negita.

Q.  Has that always been your understanding?

A.  Yes, because Mr. Negita was the one who came to the restaurant and actually worked.

Q.  I will come back to that.  Just give me a second.

        Do you recall another workers' compensation company named AmTrust North America?

A.  Yes.

Q.  And you provided them with information about Ramen-Ya?

A.  Yes, I was the one who did.

Q.  And when you told them that Mrs. Yasuko Negita was the president of Ramen-Ya, you were truthful in the information that you gave, isn't that true?

A.  Yes, I gave them that information because I had to provide

them with that specific information upon application.

Q.   And it was true that Mrs. Yasuko Negita was the president,
correct?

A.   Yes, that was the name of the company's president.

Q.   Did you provide Mr. Jung with the information about the
employees' work that he then used to create the payroll?

A.   Are you asking me if I was the one who did?

Q.   Did you provide that information to Mr. Jung?

A.   Yes.

Q.   And you understood that Mr. Jung used the information that
he received from you to calculate the taxes that needed to be
paid both by the company and from each employee's wages,
correct?

A.   I don't know who the specific person was who was in charge
of that specific calculations, but I was the one who brought
the information to the office of Mr. Kil Jung by e-mail.

Q.   And you knew that the information you were providing to him
was in connection with Ramen-Ya's tax obligations, correct?

A.   Yes.

Q.   And do you file personal tax returns?

         MR. PAWAR:  Objection.

         THE COURT:  Overruled.

A.   Yes.

Q.   Do you prepare them yourself?

A.   I asked Mr. Jung -- I asked Mr. Jung's office.

Q.   J-U-N-G?  Same as the person who testified this morning?

A.   Yes.  I asked a personnel at his office.

Q.   And you understand that you are obligated when you approve those tax returns to be reporting true and accurate information to the government, isn't that correct?

A.   Yes.

Q.   And so when you approved the filing of your personal tax returns, you are certifying, you are telling the government this is the true information about my taxable income, isn't that correct?

A.   I don't know.

Q.   You understand, though, that you have to be truthful in the filings that you make with government entities, don't you?

A.   Yes, and that's what I send them.

            THE COURT:  Ms. Izower, I am supposing you have a bit more.  What is your sense of how much more you have got with this witness?

            MS. IZOWER-FADDÉ:  I have some documents that I need to address with her, but what time is it?

            THE COURT:  Let's -- why don't we take a -- it is 3:37 now.  Why don't we take a five-minute break and then we will go -- ten-minute break, and then we will go until 4:15 today. Okay?

            MS. IZOWER-FADDÉ:  But is it okay if I just -- I had like two questions to close this line.

M752Kea5                           Maki - Direct

THE COURT:  Yup.

MS. IZOWER-FADDÉ:  Thank you.

BY MS. IZOWER-FADDÉ:

Q.  And you understood just as you have a personal obligation to accurately report information that's going to be filed with the government, that both Ramen-Ya and Y&S also had an obligation to accurately report information to the government entities when it filed its taxes.

A.  Yes, I am aware of that.

Q.  And so the information that you provided to Mr. Jung's office that -- about the employees and their wages was accurate to the best of your knowledge, wasn't it?

A.  Yes, I was the one in charge of that.

THE COURT:  Give me just one moment.

Let's take a ten-minute break now.  It is just about 3:40.  We will reconvene at 3:50 and go until 4:15 today.

MS. IZOWER-FADDÉ:  Thank you, your Honor.

(Recess)

THE COURT:  Ms. Maki, let me remind you that you are still under oath.

Counsel, you may inquire.

MS. IZOWER-FADDÉ:  Thank you, your Honor.

BY MS. IZOWER-FADDÉ:

Q.  Ms. Maki, during your time at Ramen-Ya, did you ever assist in filling out liquor license applications or renewals?

M752Kea5                    Maki – Direct

A.  Yes, I did.

Q.  Did you ever do that for Y&S?

A.  Mr. Kenji Kora was in charge of that for Y&S.

Q.  On the liquor license application, were you required to provide information as to who the president of Ramen-Ya was?

A.  Yes.

Q.  And for Ramen-Ya, you provided the information that Mrs. Yasuko Negita was the president, isn't that correct?

A.  Right.

Q.  And the liquor license applications also required you to provide information on the name of the workers' compensation carrier?

THE COURT:  Yes, Mr. Pawar.

MR. PAWAR:  Judge, I want to bring this up now so that we can avoid this for tomorrow.

THE COURT:  Is there an objection or no?

MR. PAWAR:  Yes, objection to the form of the question.

Your Honor had permitted plaintiffs to treat the defendants as hostile witnesses and your Honor also permitted them to ask open-ended questions.  I have been watching the cross/direct of Ms. Maki and a lot of the questions are leading, and leading in the sense that as if she is being hostile, and I think there should be some attempt made to ask the question instead of just asking her a leading question or

just asking open-ended question.

THE COURT:  Didn't I already rule that she could be treated as a hostile witness?

MS. IZOWER-FADDÉ:  Yes, your Honor.

THE COURT:  So -- and I think at that point there was no objection to it.  So I think this ship has sailed.

MR. PAWAR:  Judge, my understanding was, and if that ship does have sailed, perhaps I can anchor again, but the problem is, Judge, when your Honor made the ruling you said they would be permitted to ask open-ended questions, not leading questions.  So --

THE COURT:  If you are a hostile witness, you can ask closed-ended questions.  That's the point of being a hostile witness.

MR. PAWAR:  Except they haven't even asked her a question that she has refused to answer.

THE COURT:  All right.  The objection is overruled. She is a defendant in this case and she qualifies as a hostile witness.

Go ahead.

MS. IZOWER-FADDÉ:  So is it possible to have the last question read back?

THE COURT:  Yes.  If the court reporter can read the question back.

(Record read)

M752Kea5                          Maki - Direct

A.   Yes.

Q.   And the liquor license application also required you to indicate whether the principal of the company would be the manager of the company, isn't that correct?

A.   I don't understand the question.

Q.   Do you understand -- is your confusion over the word "principal"?  Is that what the confusion is?

A.   I don't understand the question itself.

         MS. IZOWER-FADDÉ:  Your Honor, may I just go select another document to help with this?

         THE COURT:  Sure.

         MS. IZOWER-FADDÉ:  Thank you.

         (Pause)

         MS. IZOWER-FADDÉ:  Your Honor, based on prior experience now with the binder being so hard to move around, is it okay if it's the same thing, but that we give her just a single copy of PX 8?

         THE COURT:  That's fine if you want to approach with the exhibit.

         MS. IZOWER-FADDÉ:  Is it okay if I just write PX 8 on the bottom so that it is clear?

         THE COURT:  Show it to your adversary, Mr. Pawar.

         MR. PAWAR:  Is it the liquor license application?

         MS. IZOWER-FADDÉ:  Yes.

         MR. PAWAR:  I have it on my computer, Judge.

M752Kea5                        Maki - Direct

THE COURT:  Okay.  You may approach.

MS. IZOWER-FADDÉ:  Thank you, your Honor.

Your Honor, I believe that we had already moved to have 1 through 17 admitted into evidence, and this is no. 8.

THE COURT:  Any objection to PX 8?

MR. PAWAR:  No, your Honor.

THE COURT:  PX 8 is received.

(Plaintiff's Exhibit 8 received in evidence)

BY MS. IZOWER-FADDÉ:

Q.  Ms. Maki, you have in front of you what has been marked as PX 8, which just means Plaintiff's Exhibit 8.

A.  Okay.

Q.  If you look at page -- I just had it -- 15, it should be 15 on the top.

THE COURT:  Do you want to approach?

MS. IZOWER-FADDÉ:  I just realized there are page numbers on the top in other places, and my colleague just directed me to the page, so excuse me, your Honor.  May I?

THE COURT:  Yes.

(Counsel confer)

MS. IZOWER-FADDÉ:  Your Honor, we are going to use the top page numbers so that everybody will see it, the ones that were stamped by the electronic filing system.

Q.  So I am asking the witness to turn to page 17 of 24 based on the top of the document.  Let me know when you have that

M752Kea5                        Maki - Direct

page open.

A.   Yes, it is open.

Q.   And you recognize this as a liquor license application for Ramen-Ya?

A.   Yes.

Q.   And if you turn to the next page, page 18 of 24?

A.   Okay.

Q.   In section 9, do you see where it says "name of principal" and it says "Yasuko Negita"?

A.   Yes.

Q.   And under that it says "title, president."  Do you see that?

A.   Yes.

Q.   And next to that "number of shares, 200 shares," do you see that?

A.   Yes.

Q.   And in section 9 you see that it is telling you to list the names and addresses of principals, stockholders, officers, directors, LLC members, managers, or LLP partners?  Do you see that?

A.   Where is it?  Right here?

Q.   Next to number 9, there is a line right underneath.

A.   Okay.

Q.   So you see that, yes?

A.   Yes.

Q.  So if I use the name "principal" -- the word "principal" in questions related to this form, I am talking about the people that are identified in this section 9.  Will you understand that if I use the term "principal"?

A.  Yes.

Q.  And in this liquor license application that was filed for Ramen-Ya to get a liquor license application, it -- this was -- only Mrs. Negita was identified as a principal.

A.  Yes.

Q.  And she is also the only one reflected as a stockholder, isn't that correct?

A.  Where are we looking at?

Q.  Section 9.

A.  Right here?

Q.  Are you look being at section 9?

A.  Yes.

Q.  We see that they list 200 shares for Mrs. Negita?

A.  Yes.

Q.  And there are no other shareholders listed in that section, isn't that correct?

A.  Correct, there is none.

Q.  And when Ramen-Ya submitted this application to obtain a liquor license, it was providing true and accurate information to the licensing authority, wasn't it?

A.  I don't know.  I can't say.

M752Kea5                          Maki - Direct

Q.  You testified already that you had a role in providing --

in filling out the liquor license applications, didn't you?

A.  Yes.

Q.  So when you filled out the liquor license application,

isn't it the case that you provided true information to -- in

this application that would be submitted to a government

entity?

A.  I was told that I should use the name of Mrs. Yasuko Negita

instead of Mr. Masahiko Negita because that wouldn't -- that

wouldn't help -- that will not get the license issued.

        THE COURT:  I'm going to strike that answer.  Go

ahead.  It's hearsay.

Q.  Well --

        THE COURT:  Let me ask a question.  Ms. Maki, when you

submitted this application, did you believe that it was

truthful?

        THE WITNESS:  I don't remember this specific

application.

        THE COURT:  Well, do you remember filling out

applications knowing that they were false?

        THE WITNESS:  I asked our agent at the company, I

asked him to do it for us.

Q.  And is your agent Mr. Shin Yin Shu?  Sorry, Yin Shu.

A.  Correct.

Q.  Did you provide the information to Mr. Shu that he needed

M752Kea5                         Maki - Direct

to complete this application?

A.    I don't remember.

Q.    But Mr. Shu was Ramen-Ya's agent for the purpose of obtaining licensing -- a liquor license from -- for Ramen-Ya?

A.    Yes, I believe that's the case.

Q.    So Mr. Shu represented on behalf of Ramen-Ya the information that's contained in this application, is that correct?

            THE INTERPRETER:    I'm sorry?

Q.    So Mr. Shu provided the information in this application in his role as Ramen-Ya's agent, isn't that correct?

A.    Okay.    It says here this is from 2014.    That means that I am not aware of this.    I wasn't involved in filling out this form.    I believe Mr. Masahiko Negita was in charge of filling this out.

Q.    Did Y&S use Mr. Shu for its liquor license applications as well?

A.    Oh, I don't know.    Mr. Kenji Kora was in charge of that.

Q.    If you will turn to page 21 of 24, please, do you see the top of the page, question 6?

A.    Yes.

Q.    "Will the business employ a manager?"    And do you see that the answer given by Ramen-Ya's authorized representative is "no"?    Do you see that?

A.    Yes, I see that.

Q.  And do you see, then, at 6(a), it says, "If 'no,' will the principal manage?"

A.  Yes, I see that is what's written here, but I'm not -- I wasn't involved in filling out this form.

Q.  But the answer that's given on that form is "yes," isn't it?

A.  Yes, I see that.

Q.  So this form that Ramen-Ya submitted to obtain a liquor license made a direct representation to the licensing agency that Mrs. Yasuko Negita was its sole principal, shareholder, and president, and that she would be managing Ramen-Ya?

         MR. PAWAR:  Objection.

         THE COURT:  Overruled.

Q.  Isn't that correct?

A.  Yes, it appears that that is what this form says, but I have never seen her actually in action at work.

Q.  So it's your testimony -- is it your testimony -- is it your testimony that Ramen-Ya misrepresented the role of Mrs. Negita to the liquor license authority in order to obtain a license?

         MR. PAWAR:  Objection.

         THE COURT:  Sustained.

BY MS. IZOWER-FADDÉ:

Q.  And I also -- Mrs. Negita will -- at the time -- you testified earlier today that when you gave your deposition in

M752Kea5                        Maki - Direct

this matter you testified truthfully, correct?

A.   Yes.

MS. IZOWER-FADDÉ:  Your Honor, can I ask you to take judicial notice of certain dates that documents were filed in this case?

THE COURT:  Yes, I will take judicial notice.  Is there any objection to judicial notice of what's on the docket in my case?

MR. PAWAR:  No, absolutely not, Judge.  I just don't know which document they are asking.

THE COURT:  They will let me know later on.  We are not going to at this time spend -- is there a particular date you have in mind right now?

MS. IZOWER-FADDÉ:  Do I have like five minutes left or are we --

THE COURT:  I will give you five more minutes.

MS. IZOWER-FADDÉ:  Yeah, I was going to ask if you would take judicial notice of when the motion for leave to file the second amended complaint was filed and then granted.

THE COURT:  And what are those dates?

MS. IZOWER-FADDÉ:  The motion for leave to amend was granted on August 5, 2020 and the -- I'm sorry, Mr. Haber, do you have the other date?

(Counsel confer)

MS. IZOWER-FADDÉ:  And the third amended complaint was

filed adding Yasuko on August 12, 2020.

THE COURT:  And you want me to take notice of the --
judicial notice of those two dates?

MS. IZOWER-FADDÉ:  And that the third amended
complaint is the first time that Mrs. Yasuko Negita appeared as
a defendant in this case.

THE COURT:  I think I can take judicial notice.  Any
objection?

MR. PAWAR:  No, your Honor.

THE COURT:  I will take judicial notice of those three
facts.

BY MS. IZOWER-FADDÉ:

Q.  Mrs. Maki, can you -- do you recall testifying at your
deposition that you would discuss -- or, sorry, that you could
not just hire employees for Ramen-Ya without discussing with
Mrs. Yasuko or that you didn't feel could you do that?

MR. PAWAR:  Objection.

THE COURT:  Do you have the particular testimony that
you want to ask her about?

MS. IZOWER-FADDÉ:  I do, but maybe then we will --
because there is going to be a few things like that.  Let me
just back up and say that obviously we are going to need some
more time in the morning with this witness, but --

THE COURT:  I'm not imposing time constraints.

MS. IZOWER-FADDÉ:  I wasn't -- I wanted to --

M752Kea5                    Maki - Direct

Ms. Maki, I wanted to draw your attention to the fact that you gave your deposition closer in time to the under-- you know, to the relevant time period.

THE COURT:  When did she give her deposition?

BY MS. IZOWER-FADDÉ:

Q.  You gave your deposition in October of 2019 and --

THE COURT:  Do you remember that, Ms. Maki, that your deposition was in approximately October of 2019?

THE WITNESS:  It sounds about right even though I don't remember the exact date.

Q.  And that was before Mrs. Negita was a defendant in this case.  Do you recall that?

A.  I don't know when that happened.

Q.  Okay.  So the judge has taken judicial notice that Mrs. Negita did not become a defendant in this case until the filing of the third amended complaint, which was filed on August 12, 2020.  So with that understanding, you understand that at the time you gave your deposition, Mrs. Negita was not yet a defendant in this case.

A.  Understood.

Q.  Okay.  So at the time of your deposition, do you recall being asked -- I need one page more than this.  Oh, here it is. Okay.  And is this -- this is the designated part starting on page 126.

Do you recall being asked:  "Do you hire employees?"

and do you recall giving the answer "basically with regard to hiring, it's not my only -- it's not only my opinion that matters."

Do you recall giving that testimony?

A.   I don't remember.

Q.   Okay.  I am going to continue reading from page 127 of your deposition transcript.

"Q   Who else's opinion matters?

"A   So when we come to hiring people, employees, I will consult with Negita-san and also Kora-san by asking how about this person or that person.

"Q   Does Negita-san meet the people that you are thinking of hiring before you hire them?

"A   No, hardly.  It hardly happens.

"Q   But you -- you talk to them and they help in the decision about who to hire, is that correct?

"A   So I consult with Ms. Yasuko Negita and Mr. Kora as to make a suggestion by saying how about this person to hire?

"Q   And do you discuss who to hire with Masahiko Negita?

"A   Hardly.  No."

THE INTERPRETER:  The interpreter needs --

THE COURT:  So you can pass up and why don't you mark where you started to read from the transcript until the end? And then the question for the witness is:  Do you remember giving that testimony.  Can you provide it to the court

reporter?  I mean to the interpreter.

MS. IZOWER-FADDÉ:  Yes, your Honor.  I am just marking the start and end point.

(Translation)

A.  I don't remember this.

THE COURT:  Is now a convenient time to break for the day?

MS. IZOWER-FADDÉ:  Yes, your Honor.  Thank you.

THE COURT:  Okay.  Ms. Maki, you may step down.

Okay.  Anything from plaintiffs' side to raise with the Court before we break for the day?

(Continued on next page)

M75sKEA6

MS. ROSTAMI:  Yes, your Honor.  I'm in charge of doing the closing statement.  I would like to know how much time do I have and whether I can use a PowerPoint presentation.

THE COURT:  You can use a PowerPoint presentation. How much time do you think you'll need?

MS. ROSTAMI:  Well, I don't want to bore the court with all the facts that I know the court has, you know, has knowledge of.

How about if you allow me 15 minutes?

Too long?

THE COURT:  No, 15 minutes is fine.  I would have given you more time.

MR. HABER:  Take more.

MS. ROSTAMI:  Could I please have 20 minutes then?

THE COURT:  20 minutes is fine.

Mr. Pawar, how much time do you think you're going to need?

MR. PAWAR:  Not more than 10, 15 minutes, Judge.

THE COURT:  You can each have 20 minutes.

Anything else from plaintiffs' side?

MS. ROSTAMI:  Do we get a reply?

THE COURT:  You can have 15 minutes for your opening summation and five minutes for reply.

Mr. Pawar, you can have 20 minutes.

Mr. Pawar, anything from you before we break for the

M75sKEA6

day?

MR. PAWAR:  Yes, Judge.  I don't have the exact docket entry, but I'll have it by tomorrow morning.  I would like your Honor to take judicial notice of certain things.  For example, there was an order granting the motion to amend the third amended complaint, an issue she was trying to establish a timeline.  The request to add Ms. Negita as a defendant was made as early as 2019.  So I just want to --

I'm looking at the docket right now.

THE COURT:  I'm going to take judicial notice of whatever the parties want me to from the docket, unless there is some objection.

Anything else, Mr. Pawar?

MR. PAWAR:  No, your Honor.  Thank you.

THE COURT:  Look, we'll reconvene at 9:30 tomorrow.

I do have one request for the parties.  One of the benefits of this courtroom is that we have an ELMO system. What that permits you to do is to display from the podium a document that you want the witness to look at.  It would eliminate the need to go back and forth.

I'm not going to require any party to use the ELMO, but what I am going to ask both sides to do is to stay around until after we break today to be instructed on how to use the ELMO, unless you already know how to do so.  Maybe you can even get a little bit of practice.  Because I do think it will move

M75sKEA6

things along more quickly.

Anything else from plaintiffs' side?

MS. IZOWER-FADDÉ:  No, your Honor.

THE COURT:  Anything else from defendants' side?

MR. PAWAR:  No, your Honor.

THE COURT:  Mr. Pawar, that applies to you also to stay with the ELMO.

I see Mr. Chun standing.

MR. CHUN:  Yes.  So what time should my client be here on Thursday, nine or 9:30?

THE COURT:  Why don't we start at nine o'clock on Thursday.

MR. CHUN:  I would ask to be excused tomorrow and I will appear with my client on Thursday.

THE COURT:  You're excused.

MR. CHUN:  Thank you.

THE COURT:  OK.  We'll see all of you 9:30 tomorrow morning.  Why don't you get here at 9:15 just to make sure we can start on time.

Have a good afternoon, everybody.  Once again, please stay around and see how the ELMO works.

(Adjourned to Wednesday, July 6, 2022, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 KIL S. JUNG

Direct By Ms. Izower-Faddé . . . . . . . . . . .11

Cross By Mr. Pawar . . . . . . . . . . . . . . .85

Redirect By Ms. Izower-Faddé . . . . . . . . .91


 MIHO MAKI

Direct By Ms. Izower-Faddé . . . . . . . . . . .93


                    PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 20A through E . . . . . . . . . . . . . . . . .25

 21A through E . . . . . . . . . . . . . . . . .26

 22A through 22D  . . . . . . . . . . . . . . .29

 23A through 23E  . . . . . . . . . . . . . . .30

 1A through 1D and 6A and 6B  . . . . . . . . .50

 2A through E  . . . . . . . . . . . . . . . . .53

 7A through E  . . . . . . . . . . . . . . . . .53

 PX 6A and B  . . . . . . . . . . . . . . . . .54

 4A through D  . . . . . . . . . . . . . . . . .67

 3A through B  . . . . . . . . . . . . . . . . .68

 15     . . . . . . . . . . . . . . . . . . . .68

 12     . . . . . . . . . . . . . . . . . . . .76

 8      . . . . . . . . . . . . . . . . . . . 116