UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/13/2023
```

-------------------------------------------------------------------X
                                      :

ORNRAT KEAWSRI, et al.,                :

                   Plaintiffs,      :

                                   :            17-cv-02406 (LJL)

      -v-                   :

                                   :         OPINION AND ORDER

RAMEN-YA INC. et al,             :

                                 :

                   Defendants.     :

                                 :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

     Plaintiffs Ornrat Keawsri, Sachina Nagae, Takayuki Sekiya, Siwapon Topon, Pimparat

Ketchatrot, Thiratham Raksuk, Parichat Kongtuk, Tanon Leechot, Thanatharn Kulaptip,

Wanwisa Nakwirot, Natcha Natatpisit, and Parada Mongkolkaji (collectively "Plaintiffs" or

"Judgment Creditors"), joined by the trustee for the Chapter 7 bankruptcy estates ("Trustee") of

Ramen-Ya, Inc. ("RYI") and Miho Maki ("Maki"),[1] move for an order, pursuant to Federal Rule

---

[1] On June 23, 2023, RYI (23-mg-10979) and Maki (23-mg-10978) each filed voluntary petitions
for relief under Chapter 7 of the Bankruptcy Code. Dkt. No. 665; Dkt. No. 667; Dkt. No. 687 ¶¶
1–2. Upon commencement of RYI's bankruptcy proceedings, Judgment Creditors' motion to
turn Kuraku over directly to Judgment Creditors was no longer properly made. *See St. Paul Fire
and Marine Ins. Co. v. PepsiCo., Inc.*, 884 F.2d 688, 701–02 (2d Cir. 1989) ("[I]f the claims are
property of the debtor, they must be abandoned by the trustee before they can be asserted by
individual creditors." (citation omitted)). In response to Maki and RYI's bankruptcy petitions,
however, Judgment Creditors filed a motion to withdraw the reference to the Bankruptcy Court
of Judgment Creditors' claims against Maki and RYI and for the appointment of a receiver to
administer the assets of Maki and RYI. Dkt. No. 675. On July 12, 2023, Trustee indicated its
support for that motion, as well as all other motions by Judgment Creditors, subject to the
modification that Ku-raku New York, Inc. or its restaurant asset Ramen Kuraku be turned over to
Trustee for the benefit of RYI's estate or Maki's estate, rather than directly to Judgment
Creditors. Dkt. No. 687. At a status conference on July 20, 2023, the Court withdrew the order
of reference from the Southern District of New York Bankruptcy Court with respect to Judgment
Creditors' motion to enforce the judgment against RYI and Maki, which was memorialized in an
order on July 26, 2023. Dkt. No. 709. On July 26, 2023, counsel for Judgment Creditors

of Civil Procedure 69 and New York's Civil Practice Law and Rules ("CPLR") § 5225(a), declaring that Ku-Raku New York, Inc. ("Kuraku") is an alter ego or mere continuation of judgment debtor RYI and ordering it to turn over its asset, a restaurant called Ramen Kuraku ("Restaurant Kuraku"), or if it is not an alter ego or mere continuation of RYI, ordering Maki to turn over her ownership of Kuraku.  Dkt. Nos. 632, 735.

Judgment Creditors and Trustee also move for an order, pursuant to Federal Rule of Civil Procedure 69 and CPLR § 5225(b) and New York Debtor and Creditor Law § 274: (1) determining that the transfer of $68,000 from Maki to her adult daughter Haruna Maki ("Haruna") was fraudulent and ordering that Haruna turn over $68,000; (2) determining that the transfer of $55,000 from judgment debtor Y&S International Corp. d/b/a Ramen-Ya ("Y&S") to Haruna was fraudulent and ordering that Haruna turn over $55,000; (3) determining that the transfers of $150,000 from RYI and $149,000 from Y&S to Kil S. Jung ("Jung") were fraudulent and ordering that Jung turn over these sums; and (4) ordering RYI and Maki to pay the remaining balance of the judgment dated August 10, 2022 ("Judgment"), Dkt. No. 514, forthwith.  Dkt. No. 632.  In addition, Judgment Creditors and Trustee move for the appointment of a receiver to administer the assets of Maki and RYI, including—if it is an alter ego or mere continuation—those that are in the name of Kuraku.  Dkt. No. 675.

This Opinion and Order addresses the motion to have Kuraku declared an alter ego.  The remainder of the relief requested will be addressed in a subsequent order.  For the following reasons, the motion to declare Kuraku an alter ego of RYI is granted.

---

notified the Court that it had also been retained by Trustee.  Dkt. No. 707.  On August 25, 2023, counsel for Judgment Creditors and Trustee indicated that Trustee had joined Judgment Creditors' motions.  Dkt. No. 735.

**BACKGROUND**

Familiarity with the prior proceedings in this matter is assumed.  Judgment Creditors are former employees of two Japanese noodle restaurants located in the West Village in New York City, RYI and Y&S.  During the course of their employment, Judgment Creditors—who were servers at the restaurants—were subject to numerous violations of federal and state labor laws.  Defendants Masahiko Negita ("Mr. Negita"), Maki, RYI, Y&S, Toshihito Kobayashi, and Yasuko Negita ("Ms. Negita") (together "Defendants") deprived Judgment Creditors of tips that they earned by deducting 20% of the tip pool for the expenses of the restaurants before distributing the tips.  Defendants also failed to pay Judgment Creditors overtime pay and spread-of-hours pay, and failed to maintain complete and accurate wage statements and to provide Judgment Creditors pay-rate notices.

On April 3, 2017, Judgment Creditors commenced this action against Mr. Negita, Maki, RYI, Y&S, Toshihito Kobayashi, and Shigeaki Nakanishi to obtain redress for the violations of their rights.  Dkt. No. 1.  Plaintiffs asserted causes of action for unpaid wages and unpaid overtime under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*, as well as for unpaid wages, unpaid overtime, and unlawfully withheld tips under the New York Labor Law ("NYLL") and the New York Hospitality Wage Order ("Wage Order"), 12 N.Y.C.R.R. § 146.  *Id.* ¶¶ 90–125.  Plaintiffs also asserted claims for unpaid "spread of hours" payments under the NYLL and the Wage Order and for failure to provide complete and accurate pay statements as required by the NYLL § 195(3), the Wage Order, and the New York Wage Theft Prevention Act.  *Id.* ¶¶ 126–143.

Shigeaki Nakanishi was dismissed from the case, Dkt. No. 23, and a first amended complaint was filed on September 21, 2017, Dkt. No. 34.  On January 2, 2018, the Court entered an order granting Plaintiffs' motion for conditional certification of a collective action and

denying a motion to dismiss.  Dkt. No. 130.  On September 27, 2018, Plaintiffs filed a second

amended complaint.  Dkt. No. 182.  The Court accepted that complaint for filing on October 3,

2018.  Dkt. No. 185.

The case has been characterized by one particular feature.  For the most part, Defendants

have not responded to the allegations either on the law or on the facts.  Defendants have

responded with efforts to delay and obstruct Plaintiffs' right to recovery and with efforts to make

their assets remote from attachment by Plaintiffs.  Those efforts are summarized in numerous

opinions of the Court and declarations of counsel over the course of the litigation.  *See* Dkt. No.

137 ¶¶ 10-40; Dkt. No. 244 (Order of Magistrate Judge Wang) at 1; Dkt. No. 274 (Declaration of

Florence Rostami in Support of Motion for Attachment of Property of Defendants Negita and

Kobayashi) ¶ 64; Dkt. No. 309 (Order to Show Cause of Magistrate Judge Wang) at 1; Dkt. No.

334 (Order to Show Cause of Magistrate Judge Wang) at 1–2; Dkt. No. 367 (Memorandum

Opinion & Order of Magistrate Judge Wang) at 2–3.  On August 1, 2019, Plaintiffs filed a

motion to attach: (1) defendant Mr. Negita's ownership interest in the real property located at

309 Knickerbocker Road, Tenafly, New Jersey 07670, Block No. 410, Lot No. 10, located in the

Municipality of Tenafly, and (2) defendant Toshihito Kobayashi's ownership interest in Y&S.

Dkt. No. 273.  That motion was supported by evidence that the Defendants appeared to lack

substantial assets within the State of New York from which a judgment against them could be

easily satisfied.  Dkt. No. 274 ¶ 70.  It also was established by evidence that Defendants were

dissipating the assets of RYI and Y&S by causing them to distribute substantial sums of money,

disguised as salary, to Mr. Negita's wife, Yasuko Negita ("Ms. Negita"), who at the time had no

discernible role in the management or operation of either restaurant.  *Id.* ¶¶ 71–77.  In total, from

2014 through 2018, Ms. Negita received more than $500,000 from both restaurants

notwithstanding there being no evidence that she engaged in any work for either.  *Id.* ¶ 75.  On

October 30, 2019, Plaintiffs were forced to file a motion for leave to file a third amended

complaint adding Ms. Negita as a Defendant.  Dkt. No. 327.  That motion too was supported by

evidence that large sums of money were being paid from RYI and Y&S to Ms. Negita.  Dkt.

No. 328 ¶ 20.

Magistrate Judge Wang, to whom the matter had been referred for general pretrial

purposes, Dkt. No. 197, permitted Plaintiffs to file their third amended complaint but denied the

motion for an order of attachment, concluding that for the very reason Plaintiffs were permitted

to amend the complaint—factual allegations that Ms. Negita was an employer—Plaintiffs could

not show that the payments to her were fraudulent.  Dkt. No. 367 at 9, 11.  And, because

Ms. Negita could have assets to satisfy a judgment, Plaintiffs had not shown that Defendants

would be unable to pay a judgment.  *Id.* at 14–15.[2]

On August 12, 2020, after being given leave to do so, Plaintiffs filed their third amended

complaint adding Ms. Negita and Kenji Kora to the case as defendants.  Dkt. No. 371.  Plaintiffs

alleged that Ms. Negita was, during the time period encompassed by the third amended

complaint, the owner of RYI and was responsible for the management and operation of both RYI

and Y&S alongside Maki.  *Id.* ¶ 2.  Plaintiffs claimed that Ms. Negita, alongside Maki and

Mr. Negita, also had the authority to create and enforce personnel decisions at RYI and Y&S,

including hiring and terminating employees, setting wages, and maintaining records.  *Id.* ¶ 36.

Plaintiffs alleged that in this capacity, Ms. Negita regularly visited the restaurant owned by RYI

and held meetings with Maki where they discussed employment matters and took control of the

---

[2] Judge Wang concluded: "Plaintiffs' argument that Defendants have been transferring assets to
Ms. Negita to frustrate a judgment is moot now that she will be a party to the suit."  Dkt. No. 367
at 15.

funds present in the cash registers.  *Id.* ¶ 66.  The third amended complaint is the operative complaint.

On August 10, 2021, the Court issued an Opinion and Order granting summary judgment to Plaintiffs on their claims against RYI, Maki, Mr. Negita, Y&S, and Kora.  Dkt. No. 419. Specifically, the Court held that these defendants were "employers" under the FLSA and the NYLL and therefore jointly and severally liable for all actual damages, liquidated damages, statutory penalties, and attorneys' fees and costs.  *Id.*[3]

On July 11, 2022, after a bench trial, the Court found that Ms. Negita was also an "employer" of Plaintiffs under the FLSA and the NYLL, making her jointly and severally liable to Plaintiffs with RYI, Maki, Mr. Negita, Y&S, and Kora.  Dkt. No. 497.  In the course of its opinion, the Court observed that the Defendants had funneled money to Ms. Negita and had a motive to lie and an obvious interest in helping her avoid judgment:

> The witnesses had a motive to lie.  The evidence establishes that Mr. Negita is heavily in debt to the IRS and that RYI has had to close, is still paying off its bills, and was unable to sell any of its fixed assets.  Maki has no apparent assets to satisfy a judgment.  The witnesses all have an interest in protecting [Ms.] Negita's assets from judgment so that those assets can be enjoyed by Mr. and [Ms.] Negita and in the new restaurant business they have filed an application for—and with which Maki is helping—rather than being used to pay plaintiffs for the FLSA liability the court has found.

*Id.* at 473.  On August 8, 2022, the Court issued an Opinion and Order awarding Judgment Creditors $687,825.81 in damages and penalties, and awarding Plaintiffs' counsel $1,110,807.82 in attorneys' fees and costs, as well as any post judgment interest.  Dkt. No. 512.  It held Defendants jointly and severally liable for all amounts due and owing to Judgment Creditors.  *Id.*

---

[3] The Court denied Plaintiffs' motion for summary judgment as to Kobayashi.  Dkt. No. 419 at 27.  Plaintiffs elected not to proceed to trial against Kobayashi.  Dkt. No. 441 at 4.  Accordingly, the claims against him were dismissed.  Dkt. No. 512 at 2.

On August 10, 2022, a judgment for this amount was entered by the Clerk of Court.  Dkt. No. 514.

What then followed was a course of conduct that involved obstructing Judgment Creditors' ability to recover on the judgment.  On September 30, 2022, the Court imposed sanctions on RYI, Maki, Mr. Negita, Ms. Negita, Y&S and Kora for violating the Court's rulings through their refusal to produce documents and information sought by Judgment Creditors.  Dkt. No. 560.  After RYI, Maki, Mr. Negita, and Ms. Negita ("RYI Judgment Debtors") continued to refuse to produce the documents needed to locate their assets, the Court held a hearing on November 23, 2022 during which it conducted an *in camera* review of the documents that RYI Judgment Debtors sought to exclude from disclosure.  Minute Entry (Nov. 23, 2022).  The Court issued an Opinion and Order on December 12, 2022 granting in part Judgment Creditors' motion to compel RYI Judgment Debtors to produce certain post-judgment discovery documents.  Dkt. No. 605.  The Court will not repeat all of the conduct that led to those orders.  For those with the fortitude to review them, that conduct is recited in the Court's prior opinions and in the declarations of counsel for Judgment Creditors.

On March 23, 2023, counsel for Mr. Negita and Ms. Negita filed a joint Voluntary Petition for Bankruptcy under Chapter 11 on behalf of Mr. Negita and Ms. Negita in the Bankruptcy Court for the District of New Jersey.  Dkt. No. 631-1.  On April 13, 2023, Judgment Creditors filed the instant motion to enforce the judgment entered on August 10, 2022.  Dkt. No. 632.  Judgment Creditors' counsel filed a declaration and a memorandum of law in support of the motion that same day.  Dkt. Nos. 633, 634.  The Court held a hearing on the motion to enforce on May 18, 2023, which was continued on August 18, 2023.  Minute Entry (Aug. 18, 2023).

In between the first and the second hearings, on June 23, 2023, Maki and RYI each filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code.  Dkt. No. 665; Dkt. No. 667; Dkt. No. 687 ¶¶ 1–2.  In response, Judgment Creditors filed a motion to withdraw the reference to the Bankruptcy Court of Judgment Creditors' claims against Maki and RYI and for the appointment of a receiver to administer the assets of Maki and RYI.  Dkt. No. 675.  Judgment Creditors represented that the Trustee for the estates of Maki and RYI, who is statutorily vested with the responsibility to represent the interests of the creditors and to protect the bankruptcy estate, provided his consent to withdrawal of the reference and to the pursuit of this alter ego motion to the extent that they concern the assets of Maki and RYI, in exchange for Judgment Creditors' agreement that any recovered assets would be submitted to the Trustee for the benefit of all creditors of Maki and RYI.  Dkt. No. 676 ¶ 19.

On July 20, 2023, the Court held a conference at which it withdrew the order of reference from the Southern District of New York Bankruptcy Court with respect to Judgment Creditors' motion to enforce the judgment against RYI and Maki.  Minute Entry (July 20, 2023).  The withdrawal was memorialized in an Order entered on July 26, 2023.  Dkt. No. 709.  On July 26, 2023, counsel for Judgment Creditors notified the Court that it had been retained to represent the Trustee, Dkt. No. 707, and on August 25, 2023 counsel for Judgment Creditors and Trustee indicated that Trustee had joined Judgment Creditors' motions.  Dkt. No. 735.

Maki testified on her own behalf and on behalf of RYI at a Section 341 Meeting of Creditors associated with her and RYI's bankruptcy petitions held on July 12, 2023.  Dkt. No. 728-1.  On August 18, 2023, however, Maki invoked the Fifth Amendment at an evidentiary hearing before this Court.  Maki refused to answer questions concerning, among other topics, (1) the use of Haruna Maki's bank accounts to pay bills related to RYI and Kuraku, to transfer

funds directly to Kuraku, to transfer funds to Jung, and to transfer funds to Ms. Negita; (2) the
source of the funds, and the purpose of her transfers of funds, from her own bank account to
Haruna Maki's bank accounts; (3) the purported loans from RYI to Kuraku; (4) the
representation on the liquor license application that the investment used to establish Kuraku was
$24,600 in cash from RYI; (5) the total amount of funds from RYI invested in Kuraku; and
(6) the transfers of funds from RYI and Y&S to Jung.  Transcript of Evidentiary Hearing on
Plaintiffs' Motion to Enforce on August 18, 2023 ("Aug. 18 Tr.") at 49–72.

Jung did testify at the August 18, 2023 hearing.  Jung testified that he did not know
Haruna Maki, and that he had not provided any services to Haruna Maki, but that Maki had made
payments from Haruna Maki's account to his account, and had asked him to hold onto the
money.  Aug. 18 Tr. 78–79.  Jung was also asked about a check in the amount of $150,000 paid
to him from Y&S in December 2021, Dkt. No. 633-26 at ECF p. 2, and a check in the amount of
$149,900 paid to him from RYI in May 2022, Dkt. No. 633-27 at ECF p. 2.  Jung testified that he
was told to hold onto the money for a time.  Aug. 18 Tr. 76.

Judgment Creditors still have not received the entirety of the judgment.

## DISCUSSION

Judgment Creditors, joined by Trustee, move for an order, pursuant to Federal Rule of
Civil Procedure 69 and CPLR § 5225(a) declaring that Kuraku is an alter ego of RYI.  Dkt. Nos.
632, 735.  Judgment Creditors and Trustee also seek an order that Kuraku must turn over its
asset—namely, the restaurant Ramen Kuraku—or if it is not an alter ego of RYI, ordering Maki
to turn over her ownership of Kuraku.  *Id.*

Federal Rule of Civil Procedure 69 provides that state law generally supplies the
procedures for enforcement of a judgment.  The Rule states that "[t]he procedure on execution,
in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of

execution shall be in accordance with the practice and procedure of the state in which the district court is held . . . ." Fed. R. Civ. P. 69(a)(1).  Because this action is before the Southern District of New York, the Court applies New York's Civil Practice Law and Rules.

RYI Judgment Debtors argue that the Court should refer these issues to the United States Bankruptcy Courts overseeing the bankruptcy proceedings in this case.  Dkt. No. 640 at 1–2. That argument has become moot now that the Court has withdrawn the reference, Dkt. No. 709, and the Trustee has joined this motion, Dkt. No. 735.

RYI Judgment Debtors also argue that this Court cannot rule on the motion to declare Kuraku an alter ego of RYI when there is an automatic stay in place regarding Mr. Negita and Ms. Negita, and Ms. Negita is an owner of Kuraku.  *Id.* at 2; Dkt. No 698 at 4.  That argument is without merit.  Because the Court has entered judgment, "it has ancillary jurisdiction over subsequent proceedings necessary to 'vindicate its authority, and effectuate its decrees.'" *Dulce v. Dulce*, 233 F.3d 143, 146 (2d Cir. 2000) (quoting *Peacock v. Thomas*, 516 U.S. 349, 354 (1996)). "This includes proceedings to enforce the judgment."  *Id.*; *see Jones v. Milk River Café, LLC*, 2022 WL 3300027, at *3 (E.D.N.Y. Aug. 11, 2022); *VFS Fin., Inc. v. Elias-Savion-Fox LLC*, 73 F. Supp. 3d 329, 335 (S.D.N.Y. 2014).  "The court in which the litigation is claimed to be stayed is pending has jurisdiction to determine not only its own jurisdiction but also the more precise question whether the proceeding pending before it is subject to the automatic stay."  *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 347 (2d Cir. 1985). Automatic stays of bankruptcy "pursuant to [Section] 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants."  *Tchrs. Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986).

The motion before the Court is a motion to declare Kuraku an alter ego of RYI, which would result in the inclusion of Kuraku in the RYI bankruptcy estate for the satisfaction of the claims of creditors of RYI.  It is of no import that Ms. Negita is an owner of Kuraku; the automatic stay of actions against Mr. Negita and Ms. Negita do not extend to their co-Defendant RYI, which is jointly and severally liable for the judgment that Judgment Creditors seek to enforce.  The Court is therefore free to rule on a motion regarding other RYI Judgment Debtors, and whether Kuraku is an alter ego of RYI and thereby stands in shoes of RYI, while the automatic stay of actions against Mr. Negita and Ms. Negita is in place.  *See Mardice v. Ebony Media Operations, LLC*, 2021 WL 146358, at *3 (S.D.N.Y. Jan. 15, 2021).[4]

On the merits, Judgment Creditors argue that Kuraku is an alter ego or mere continuation of judgment debtor RYI.  Dkt. No. 632.  As a general matter, the law honors the corporate form.  Entrepreneurs who establish one business which fails may establish a new business without taking on the liabilities of the earlier business.  *See Wallace v. Crab House*, 2023 WL 2477819, at *4–6 (S.D.N.Y. Mar. 13, 2023).  That general proposition, however, has limits.  Where the entrepreneurs do not treat the two business as distinct neither does the law.  "The phrases 'piercing the corporate veil' and 'alter ego liability' generally are used interchangeably for the purposes of New York law."  *In re Parmalat Securities Ligitation*, 375 F. Supp. 2d 278, 291 n.74 (S.D.N.Y. 2005).  "[T]he three-factor rule [of veil piercing] and the *alter ego* theory . . . are

---

[4] On August 24, 2023, Mr. Negita submitted a certification in opposition to Judgment Creditors' motion for an order finding that Kuraku is an alter ego of RYI, making several claims about, among other things, payments from RYI and Y&S to Jung, deposits into Haruna Maki's TD Bank account, and checks written on Haruna Maki's account.  Dkt. No. 731.  The certification was submitted after both sides agreed that the evidence was closed and, conveniently, at a time when Judgment Creditors would not have had the right therefore to cross-examine Mr. Negita.  The Court gives it no weight.  In any event, it would not make a difference to the Court's conclusions.

indistinguishable, do not lead to different results, and should be treated as interchangeable."
*Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir.
1991). Still, "alter-ego liability is not an independent cause of action." *Ferro Fabricators,
Inc. v. 1807-1811 Park Ave. Dev. Corp.*, 11 N.Y.S.3d 548, 550 (1st Dep't 2015). Rather, alter
ego liability operates as "an assertion of facts and circumstances which will persuade the court to
impose the corporate obligation on its owners." *Morris v. New York State Dep't of Taxation &
Fin.*, 623 N.E.2d 1157, 1160 (N.Y. 1993). Even so, "veil-piercing actions may be initiated as
supplementary special proceedings under [CPLR] § 5225(b), rather than as plenary actions."
*Trust v. Kummerfeld*, 153 F. App'x 761, 762–63 (2d Cir. 2005) (citing *Morris*, 623 N.E.2d at
1160). "[F]ederal courts . . . have deemed the CPLR special proceeding requirement satisfied
when a plaintiff proceeds by complaint or motion against the third party holding a judgment
debtor's assets." *Tiffany (NJ) LLC v. Dong*, 2013 WL 4046380, at *10 (S.D.N.Y. Aug. 9, 2013)
(report and recommendation) (citing *Northern Mariana Islands v. Millard*, 845 F. Supp. 2d 579,
581 (S.D.N.Y. Feb. 27, 2012).

"Under New York law, the corporate veil may be pierced and an individual or another
corporation may be held liable for the corporation's obligations upon a finding that '(1) the
owner exercised such control that the corporation has become a mere instrumentality of the
owner, who is the real actor; (2) the owner used this control to commit a fraud or "other wrong";
and (3) the fraud or wrong results in an unjust loss or injury to the plaintiff.'" *Sesa, Inc. v.
Terrafina*, 2020 WL 6382919, at *3 (S.D.N.Y. Oct. 30, 2020) (quoting *In re Vebeliunas*,
332 F.3d 85, 91–92 (2d Cir. 2003)); *see also Freeman v. Complex Computing Co., Inc.*, 119 F.3d
1044, 1053 (2d Cir. 1997); *Wm. Passalacqua Builders*, 933 F.2d at 138. Additionally,
"[a]lthough the alter ego doctrine is primarily applied in situations involving successor

companies, where the successor is merely a disguised continuance of the old employer, it also applies to situations where the companies are parallel companies." *Moore v. Navillus Tile, Inc.*, 276 F. Supp. 3d 110, 145 (S.D.N.Y. 2017), *vacated pursuant to settlement agreement*, 2018 WL 7048697 (S.D.N.Y. Oct. 26, 2018); *see also Salgo v. New York Concrete Corporation*, 447 F. Supp. 3d 136, 144 (S.D.N.Y. 2020).

Courts consider the following factors to determine whether the element of control is satisfied: (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address, and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms' length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity; and (10) intermingling of property between the entities. *See, e.g.*, *Freeman*, 119 F.3d at 1053; *accord N.Y. State Elec. And Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014). The analysis is heavily fact-intensive. *See, e.g.*, *Smoothline Ltd. V. N. Am. Foreign Trading Corp.*, 2002 WL 31885795, at *9–10 (S.D.N.Y. Dec. 27, 2002). Additionally, the "factors are not exhaustive, nor is proof of any one factor or a combination of factors necessarily determinative. Rather, a finding that a [defendant] is an alter ego of another entity is warranted when doing so will achieve an equitable result." *Miramax Film Corp. v. Abraham*, 2003 WL 22832384, at *8 (S.D.N.Y. Nov. 25, 2003) (citing *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989)). However, "[w]hile complete domination of the corporation is the key to piercing the corporate veil, . . . such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required." *Freeman*, 119 F.3d at 1053 (quoting *Morris*, 623 N.E.2d at 1161).

The evidence makes clear that Kuraku was established with RYI's funds as part of a scheme by Mr. Negita, Ms. Negita, and Maki to evade their liabilities and those of RYI to Judgment Creditors and to frustrate any ability of RYI's former employees to hold RYI responsible and to collect were the Court or a jury to find them liable.  The evidence also makes clear that Kuraku is a mere continuation of RYI.  Kuraku held its first meeting of its board of directors on October 20, 2018, after the Court denied Judgment Creditors' motion to dismiss and granted the motion for conditional certification, making clear both that the case would go forward and that it would go forward as a FLSA collective action.  Dkt. No. 130.  At the time, RYI Judgment Debtors—in their guise as Defendants—were ignoring the Court's orders to post notice of the collective action and were illegally coercing the employees to sign purported dispute resolution agreements that would, in effect, have prohibited them from participating in the collective action.  Dkt. No. 137; *see* Dkt. No. 176.  The record is unclear exactly when the RYI restaurant ceased operations, but at least by the time Restaurant Kuraku began operations in late 2021, the RYI restaurant had ceased to operate; in 2020, the RYI restaurant closed for indoor dining, and began operating a delivery business out of the Y&S restaurant.  Dkt. No. 700 at 20.  In August 2021, the Court awarded Judgment Creditors summary judgment on the claims against all Judgment Creditors except for Ms. Negita.  Dkt. No. 419.  In November or December of 2021, using tables, furniture, and china from the RYI restaurant, Restaurant Kuraku opened its doors for business.  Dkt. No. 700 at 22.  As outlined below, all of its managers then managed Kuraku.  The scheme to open Kuraku was devised and undertaken to avoid satisfaction of this judgment.  Aside from a different location for its restaurant asset, Kuraku is just RYI by another name.

First, there is extensive evidence that RYI and Kuraku intermingled funds.  The capital to establish Kuraku's operations was paid directly from RYI's bank account, and from the proceeds of a loan RYI had received pursuant to the Paycheck Protection Program ("PPP").[5]  Dkt. No. 633 ¶ 54; Dkt. No. 633-18.  In particular, RYI's ledger reflects that RYI gave Kuraku at least $30,895 from February 2019 through June 2020, after the decision on the motion to dismiss and to certify a collective action and as RYI was ceasing business.  Dkt. No. 633-18.  A bank statement for RYI's account also contains an image of a check dated June 23, 2020, after RYI closed, in the amount of $10,000 from RYI to Kuraku.  Dkt. No. 633-16 at ECF p.6.  The ledger entry and bank account information are supported by the fact that on December 7, 2020, Kuraku filed an application for a liquor license with the New York State Liquor Authority.  Dkt. No. 633-19.  The license application gave Maki's email address as that of the applicant, listed Mr. Negita as the President, and stated that Kuraku had $24,600 in cash which was funded by RYI.  *Id.*  The comingling of funds is further evinced by RYI's bankruptcy filing, in which it identified loans of $24,600 made by RYI to Kuraku in 2018 as one of its assets.  Dkt. No. 670-2.  Despite the claims to the contrary, there is no evidence that these funds were "investments" or "loans." There is no evidence that loan documents were drawn up from Kuraku to RYI or that stock certificates were granted to RYI.  They were a pure transfer.  There also is no evidence that Kuraku received capital from any other source.

Further, there is almost complete, if not complete, overlap between the management of Kuraku and the management of RYI.  RYI closed for all but a delivery business by August 2020 and ceased operations in May 2022, Dkt. No. 700 at 20; Dkt. No. 728-1 at ECF p. 11, while Y&S

---

[5] RYI borrowed over $500,000 from the United States Department of Treasury through the PPP. Dkt. No. 633 ¶ 48(d).

closed in May of 2021, Dkt. No. 700 at 20.  Maki was a president of the RYI restaurant, and manager of the RYI and Y&S restaurants, Dkt. No. 700 at 14–15, Ms. Negita was the president of RYI, Dkt. No. 399-12 at 34–35, 242–43; Dkt. No. 399-20; Dkt. No. 398 ¶¶ 7–9, and Ms. Negita was an actual or beneficial owner of RYI until, in the wake of this lawsuit, she transferred her shares to Maki in exchange for no consideration, Haber Decl. ¶ 30; Dkt. No. 399-11 ("Negita Dep.") at 16–18; Dkt. No. 399-12 at 41–42; Dkt. No. 399-20.  Mr. Negita managed both restaurants.  He established RYI, gave instructions regarding human resources issues, and delegated responsibility to Maki.  Dkt. No. 419 at 17.  Maki, Ms. Negita, and Mr. Negita ran RYI and were the only people who ran RYI.

All of the same characters ran Kuraku, which began operations late in 2021 or in 2022, Dkt. No. 700 at 18–19, after the RYI restaurant had closed.  Maki is a manager at Kuraku, just as she was at RYI, and she is paid $2,500 per week.  *Id.* at 15, 27.  According to the minutes of the first meeting of the board of directors of Kuraku, Ms. Negita and Maki were its directors, Maki was its Secretary, and Ms. Negita was President and Treasurer.  Dkt. No. 633 ¶ 56; Dkt. No. 633-20.[6]  There are two individuals authorized to sign checks for Kuraku—Maki and Ms. Negita.  Dkt. No. 700 at 16.  According to the corporate documents of Kuraku, Ms. Negita owns 90 shares of Kuraku and Maki owns ten shares.  Dkt. No. 633-20; Dkt. No. 700 at 16.

Kuraku inherited RYI's menu and the distinctive character of its website.  It is engaged in the same business as RYI and offers the same type of food—Japanese ramen noodles—as RYI; the websites of the two restaurants not only offer many of the same menu items but also contain some identical text.  *Compare* Dkt. No. 633-21 at ECF p. 2 (Website of Kuraku) ("A lone,

---

[6] Maki's association with Kuraku is further established by the nineteen checks from Kuraku made out to Maki between July 21, 2022 and March 9, 2023 which plainly appear to be for services rendered.  Dkt. No. 641 ¶¶ 31, 33; Dkt. No. 641-9.

master swordsman has appeared in New York.  He has been enlightened in the ways of living freely.  And then 'it' came.  Ramen, a battle where cheating is an ineffective strategy and this suited his nature well."), *with* Dkt. No. 633-22 at ECF p. 11 (Website of RYI Restaurant) ("A lone, master swordsman has appeared in New York.  He has been enlightened in the ways of living freely.  And then 'it' came.  Ramen, a battle where cheating is an ineffective strategy and this suited his nature well."); *see also* Dkt. No. 633 ¶ 57.

RYI also inherited RYI's physical assets.  When RYI closed, it could not or did not sell any of its fixed assets.  Dkt. No. 700 at 21.  It simply moved those fixed assets to Kuraku.  The furniture from RYI is being used by Kuraku.  Dkt. No. 633 ¶ 58; Dkt. No. 700 at 22.  The china used at RYI was transferred to Kuraku.  Dkt. No. 700 at 22.

The evidence also makes clear that RYI, Maki, Mr. Negita, and Ms. Negita used their control to commit a fraud or "other wrong," thereby satisfying the second step of the alter ego test, that the control "was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights."  *Electronic Switching Industries, Inc. v. Faradyne Electronics Corp.*, 833 F.2d 418, 424 (2d Cir. 1987).

First, the evidence establishes that the operations of Kuraku were funded by revenues of RYI laundered through accounts bearing the name of Maki's daughter but controlled by Maki and not by her daughter.  There can be no doubt that the Haruna Maki TD Bank account belonged to Maki and was owned and controlled by Maki.  Though the account was nominally opened in the name of Maki's daughter, it bore the home address of Maki.  Dkt. No. 641-1.  Maki testified during the May 18, 2023 hearing that her daughter, Haruna Maki, entered the United States in November 2013 at the age of roughly twenty-one or twenty-two and left in 2019, after her visa expired in the middle of 2019, returning only once for a visit in the summer

17

of 2019 before leaving again two-to-three months later.  Dkt. No. 700 at 31–32; *see also* Dkt.

No. 700 at 29, 31–32.  Maki testified that Haruna Maki opened the TD Bank student checking

account with her name and address on the account, and that Maki may have gone with her to do

so.  Dkt. No. 700 at 31 ("Q. Did you go with your daughter to TD Bank to open this account?  A.

I don't remember.  I might have gone, I might not have gone."); Dkt. No. 641-1.  An account at

Bank of America was also opened in Haruna Maki's name on October 23, 2014.  Dkt. No. 736-1.

There is reason to question Maki's testimony that her daughter remained in the United States

continuously until 2019.  Her testimony was vague and self-interested and not supported by any

documentary or corroborating evidence.  For example, she could not identify the names of the

schools her daughter attended or even when her daughter left the United States.  As a general

matter, the Court finds Maki not to be a credible witness.

 Even assuming, however, that Haruna Maki had some control or involvement with the

account up to the middle of 2019, after that date that account belonged to and was controlled by

Miho Maki and was used by her to launder funds from RYI to the other Defendants and to

Kuraku.  At the May 18, 2023 hearing, Maki admitted that she started the account with Haruna

Maki's permission but that eventually she was the one utilizing the account.  Dkt. No. 700 at 38.

The evidence admitted at the hearing established that, from at least mid-2019 forward, the

Haruna Maki account was funded by entities having no relationship to Haruna (but having a

relationship to Maki) and was used to pay entities having no relationship to Haruna (but having a

relationship to Maki and to the other Defendants).  For example, from March 2017 until January

2020, during the period of RYI's operations, $81,000 in cash was deposited into Haruna Maki's

TD Bank account.  Dkt. No. 641-2.  The evidence established, and the Court finds, that those

funds emanated from RYI and Y&S, and were paid to the Haruna Maki account to shield them

from creditors.  The funds plainly did not come from Haruna Maki.  She was not in the United

States for the bulk of the time period at issue and when she was in the United States she was a

student.  Nor did the vast majority of the funds come from Maki; during the time of the deposits,

there are no corresponding withdrawals from bank accounts owned by Maki herself that would

indicate Maki was sending her own personal funds to her daughter for her daughter's benefit.

Dkt. No. 641 ¶ 14; Dkt. No. 641-5 at 52.  The evidence does not establish she had any source of

funds other than RYI, Y&S, and Mr. and Ms. Negita.  The funds came from RYI and Y&S.  RYI

and Y&S operated on a cash only basis.  They would have had the money to deposit in the

account and the interest in doing so.  The large majority of the funds, with the exception of only

two deposits totaling $3,500, were deposited at branches in Englewood or Bergenfeld, New

Jersey, both of which are only a short distance from Mr. Negita and Ms. Negita's home in

Tenafly, New Jersey, but not close to Maki's residence on the Upper East Side of Manhattan.

Dkt. No. 641 ¶ 13; Dkt. No. 641-4; Dkt. No. 641-1.

That conclusion, and the conclusion that the Haruna Maki accounts—her TD Bank

account and another at Bank of America—both acted as nominee accounts to shield funds from

creditors is supported by other evidence.  Between February 2020 and September 2022, an

additional $73,000 was deposited into the Haruna Maki TD Bank account—$68,000 in checks

from Maki to Haruna Maki and $5,000 in a check from Y&S to Haruna Maki.  Dkt. No. 633-31;

Dkt. No. 641 ¶ 15.  On May 29, 2021, two additional checks totaling $50,000 were written from

Y&S's TD Bank account to Haruna Maki, which were both deposited in Haruna Maki's Bank of

America account.  Dkt. No. 633 ¶ 78; Dkt. No. 633-30; Dkt. No. 736-5.  In sum, $123,000 was

paid from Maki and Y&S to Haruna Maki's bank accounts, entirely after Haruna Maki had left

the United States.

Numerous payments were also made after Haruna Maki had left the United States by check from each of Haruna Maki's bank accounts to entities with which Haruna Maki had no relationship.  Dkt. No. 700 at 37.  The payments include, among others, two checks from Haruna Maki's TD Bank account each in the amount of $5,000 to Kuraku in March and April 2019, Dkt. No. 641-7 at ECF. pp. 8, 12, a check from Haruna Maki's TD Bank account to Kuraku in the amount of $10,000 in December 2020, Dkt. No. 641-8 at ECF p. 4, two checks from Haruna Maki's TD Bank account to Ms. Negita in the amount of $5,000 in November 2021, *id.* at ECF pp. 10, 11, one check from Haruna Maki's TD Bank account to Jung, the tax accountant for Kuraku, RYI, and Y&S, in the amount of $30,000 written on March 9, 2023, *id.* at ECF p. 12, and one check from Haruna Maki's Bank of America account to Jung in the amount of $30,000 written on March 9, 2023, Evidentiary Hearing on Plaintiffs' Motion to Enforce on August 18, 2023 Exhibit 33.  Additionally, eight payments were made by check, totaling $44,868.04, from Haruna Maki's TD Bank account to Sun Noodle in 2019, including several in the fall of 2019 after Maki had left the United States permanently.  Dkt. No. 641-7 at ECF pp. 7, 10, 11, 14–18. There would have been no reason for Haruna Maki to make any of these payments.  There is no evidence that Haruna Maki ever worked for RYI, Y&S, or Kuraku or was otherwise involved in their operations.  There is no evidence that Jung did any work for Haruna or even knew Haruna. Jung testified at the hearing.  He was credible.  He testified that he did not work with or even know Haruna Maki.  Aug. 18 Tr. 78.  It is plain that Defendants used the Haruna Maki account to funnel profits from RYI and Y&S into Kuraku, and to keep such profits away from the Judgment Creditors.

The evidence also demonstrated specifically that not only was the Haruna account used as a nominee account to funnel money from RYI to Kuraku but also that Kuraku was used

specifically to defraud Judgment Creditors.  The individual judgment debtors, Maki, Mr. Negita,

and Ms. Negita have used Kuraku to funnel assets of RYI that they would not have been able to

access directly for their own personal benefit.  Maki's bankruptcy petition reveals that she

"borrowed" $7,500 from Kuraku.  Dkt. No. 676 ¶ 35; Dkt. No. 670-1 at ECF p. 19.  RYI's

bankruptcy petition reveals that it received a loan of $24,600 from Kuraku, and that Kuraku paid

$7,500 to Douglas Pick, who represents RYI and Maki in the Southern District of New York

bankruptcy proceedings, for "prepetition services" related to the RYI petition.  Dkt. No. 676

¶ 36; Dkt. No. 670 at ECF pp. 13, 27.  Maki, Mr. Negita, and Ms. Negita also received

significant salaries from Kuraku.  Kuraku's Quarterly Combined Withholding, Wage Reporting,

and Unemployment Insurance Return show that Ms. Negita received from Kuraku $23,000

during the third quarter of 2022, $18,000 during the fourth quarter of 2022, and $21,000 during

the first quarter of 2023—an average of $6,900 per month.  Dkt. No. 676 ¶ 38; Dkt. No. 676-4.

During that same time period, Mr. Negita was paid $24,100 (a monthly average of $2,700).  Dkt.

No. 676 ¶ 38; Dkt. No. 676-4.  Maki was paid $52,000 (a monthly average of $5,800 during that

period).  *Id.*

  The evidence that the Haruna Maki bank account was used to keep funds out of the reach

of the Judgment Creditors is overwhelming even before the Court considers any adverse

inferences it is permitted to make with regards to Maki's invocation of the Fifth Amendment at

the August 18 hearing.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *LiButti v. United

States*, 107 F.3d 110, 121 (2d Cir. 1997).  At the hearing, Maki was asked, "[d]id Haruna Maki

make a loan in the amount of 1,903,039.91 to Kuraku in 2021?"  Aug. 18 Tr. 54.  Maki refused

to answer.  *Id.*  The Court therefore infers that were she to answer, she would have indicated that

Haruna Maki made no such loan.  The money was transferred from a Haruna Maki account to

Kuraku not as a loan but as a transfer from RYI or Mr. and Ms. Negita, with the Haruna Maki account being used simply to shield its origin.  Maki was also asked, "would you please look through [bank statements from Haruna Maki's TD Bank account] and identify any check, any payment, any transaction in those statements that was done by Haruna Maki?"  *Id.* at 59.  Maki again refused to answer.  *Id.*  It is plain and the Court infers that were Maki to answer, she would have testified that none of the payments listed on the TD Bank statement were made by Haruna Maki and that all of them were authorized by Maki herself.  Maki was further asked about the cash deposited into Haruna Maki's TD Bank account at a branch in Englewood, New Jersey— cash that could only have come from one of the cash-operated restaurants: "[d]o you know where that $4,000 in cash came from to be put into Haruna Maki's account?" and later, "[d]id this money come from the cash proceeds from Ramen-Ya and/or Y&S?"  *Id.* at 60–61.  Maki refused to answer.  *Id.*  The Court infers that were she to answer, she would have testified that the cash came from RYI and was paid into the TD Bank account, only to then be used for Kuraku and Mr. Negita and Ms. Negita as a means to keep the funds beyond the reach of Judgment Creditors.

Because RYI exercised such substantial control over Kuraku, used that control to commit a fraud or other wrong, and that fraud or wrong resulted in an unjust loss or injury to the Judgment Creditors, the Court deems Kuraku an alter ego of RYI.

## CONCLUSION

The motion to deem Kuraku an alter ego of RYI is GRANTED.

SO ORDERED.

Dated: September 13, 2023
       New York, New York                    _____
                                             LEWIS J. LIMAN
                                             United States District Judge